No. 1:15-CV-42

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

---

MILTON DWAYNE GOBERT,

*Petitioner,*

v.

WILLIAM STEPHENS,

Director, Texas Department of Criminal Justice,
Institutional Division,

*Respondent.*

---

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the 331st Judicial District of Travis County

---

## PETITION FOR WRIT OF HABEAS CORPUS

---

**SETH KRETZER**
SBN: 24043764

The Lyric Center
440 Louisiana Street; Suite 200

Houston, TX 77056
(713) 775-3050 (office)
(713) 224-2815 (fax)
*email: seth@kretzerfirm.com*

**CARLO D'ANGELO**
SBN: 24070101

100 East Ferguson; Suite 1210
Tyler, Texas 75702

(903) 595-6776 (office)
(903) 407-4119 (fax)
*e-mail: carlo@dangelolegal.com*

Court-Appointed Attorneys for Petitioner Milton Dwayne Gobert

---

## PETITION FOR WRIT OF HABEAS CORPUS

TO THE HONORABLE U.S. DISTRICT COURT:

NOW COMES, **MILTON DWAYNE GOBERT**, the Petitioner, and respectfully submits his Petition for Writ of Habeas Corpus, asking the Court to issue a writ ordering his release from the Institutional Division of the Texas Department of Criminal Justice.  This application follows his conviction and death sentence in the 403rd Judicial District of Travis County, cause number D-1-06-904006, styled *State v. Milton Dwayne Gobert*.

Gobert is illegally restrained of his liberty by the Director of the Texas Department of Criminal Justice – Institutional Division, by virtue of a sentence and judgment imposing the penalty of death in the aforementioned case.

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record for Petitioner, MILTON DWAYNE GOBERT, certifies that the following listed persons have an interest in the outcome of this case.  These representations are made in order that this court may evaluate possible disqualifications or recusal.

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| | | |
| Milton Dwayne Gobert | Polunsky Unit | Petitioner |
| Mr. Seth Kretzer | The Lyric Center<br>440 Louisiana Street<br>Suite 200<br>Houston, TX 77002<br>(713) 775-3050 (direct)<br>(713) 224-2815 (fax) | Appointed attorney for current federal habeas |
| Mr. Carlo D'Angelo | 100 East Ferguson<br>Suite 1210<br>Tyler, TX 75702 | Appointed attorney for current federal habeas |
| Leonard Martinez | 812 San Antonio, Ste. 101<br>Austin, TX 78701 | Trial Counsel |
| Kent Anschutz | 1012 Rio Grande<br>Austin, TX 78701 | Trial Counsel |
| Paul Anthony Quinzi | 707 West 10th Street<br>Austin, TX 78701 | Trial Counsel |
| Jon Evans | 806 West 11th Street<br>Austin, Texas 78701 | Trial Counsel |
| Karyl Anderson Krug | 812 San Antonio, Suite G-12<br>Austin, TX 78701 | Counsel for Direct Appeal |

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| John W. Stickels | P.O. Box 121431<br>770 North Fielder<br>Arlington, Texas 76012 | State Writ Lawyer |
| | | |
| *Respondent* | | |
| Gary Cobb, Allison Wetzel | Travis County District Attorney's Office<br>509 West 11th Street<br>Austin, TX 78701 | Assistant District Attorney |
| Corby Holcomb, Howard F. 'Buddy' Meyer, | Travis County District Attorney's Office<br>509 West 11th Street<br>Austin, TX 78701 | Assistant District Attorney |
| *Judges* | | |
| Honorable Bob Perkins | Judge Presiding, 331st Judicial District Court<br>Travis County Courthouse<br>1000 Guadalupe St,<br>Austin, TX 78701 | Trial Judge and State Habeas Judge |
| | | |

## DESIGNATION OF ABBREVIATIONS and EXPLANATION OF THE TRIAL RECORD

"RR" refers to reporter's record from the state trial court.  "CR" refers to

clerk's record from state trial court.

## STATEMENT OF JURISDICTION

This petition is submitted pursuant to 28 U.S.C. § 2254 et. seq., clause two of the United States Constitution, and various amendments, including (but not limited to) Amendments Five, Six, Eight, Nine, and Fourteen.

## Gobert's AEDPA Deadline Is Satisfied

Gobert's direct appeal to the Court of Criminal Appeals (CCA) was decided on November 23, 2011. *Gobert v. State*, No. AP-76,345, 2011 Tex. Crim. App. Unpub. LEXIS 891 (Tex. Crim. App. 2011); 2011 WL 5881601. The Supreme Court denied cert on October 1, 2012. *Gobert v. Texas*, 133 S. Ct. 103 (2012).

Gobert's state writ was filed on January 26, 2012. *Ex Parte Gobert*, 2012 WL 479689 (February 15, 2012) (granting a one-day extension due to inclement weather outside of writ counsel's control). The state district judge entered his Findings of Fact and Conclusion of Law on October 15, 2014. The CCA denied habeas relief on January 14, 2015. *Ex Parte Gobert*, No. WR-77,090-01 (Tex. Crim. App. 2015). The actual order from the CCA reads, "SO ORDERED THIS 14th DAY OF JANUARY 2014". But "2014" is clearly a typographical error, as this was handed down in "2015" as confirmed by the docket sheet:

DATE            EVENT TYPE

1/14/15          11.071 WRIT DISP

The state writ was pending until January 14, 2015, when the CCA ruled. Gobert's AEDPA deadline is therefore January 14, 2016. 28 U.S.C. 2244(d)(2); *see also Fields v. Johnson*, 159 F.3d 914, 916 (5th Cir. 1998).

In an order dated February 26, 2015, this Court set a briefing deadline for the initial writ of January 12, 2016.   Doc. No. 10.   This Court also permitted Gobert to amend his writ by March 11, 2016.

## EXHAUSTION

Gobert states that most of the federal constitutional claims alleged herein have been exhausted in proceedings before the Texas courts.[1] The first exception is a claim trained on Claim V, that state habeas counsel was ineffective in failing to thoroughly investigate and raise the issue of trial counsel's ineffective assistance of counsel in failing to investigate Deputy Lass prior to calling her to testify.

Second, an unexhausted *Martinez v. Ryan* claim exists with respect to Claim VI, the failure of state habeas counsel to raise the issue of trial counsel's ineffective assistance of counsel in failing to file a motion for new trial in Mr. Gobert's case.

## Summary of Arguments

I.    The trial court's finding that trial counsel was not deficient in failing to interview Jason Gibson, who would have provided evidence of the existence of a prior relationship between Gobert and Cotton, thereby allowing Gobert to rebut the claim that he killed Cotton during the course of attempting to commit the robbery"

---

[1] The burden is on Respondents to demonstrate that Gobert failed to exhaust a particular claim.  *See, e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Esslinger v. Davis*, 44 F.3d 1515, 1528 (11th Cir. 1995); *Herbst v. Scott*, 42 F.3d 902, 905 (5th Cir. 1995); *English v. United States*, 42 F.3d 473, 477 (9th Cir. 1994); *Brown v. Maass*, 11 F.3d 914, 914-15 (9th Cir. 1993); *Harmon v. Ryan*, 959 F.2d 1457, 1461 (9th Cir. 1992).

was the product of an unreasonable analysis of the facts of this cause and how those facts apply against the backdrop of *Strickland*.

II.     The trial court's ruling denying this claim on the basis that Gibson's affidavit did not constitute "newly discovered" or "newly available" evidence and that Gobert failed to demonstrate that this evidence would have had an impact on the outcome of the case is the result of an unreasonable application of the well-settled federal authorities set forth supra to the facts of this case.

III.    The trial court's ruling denying this claim on the basis that trial counsel's *Wiggins* investigation in this case was neither deficient nor prejudiced the outcome of this case is the result of an unreasonable application of *Strickland* and *Wiggins* to the facts in the prosecution of Gobert.

IV.     The trial court's ruling denying this claim on the basis that appellate counsel was ineffective in failing to argue on appeal that: 1) it was not error to admit the testimony of paramedic Brian Mason that Demetrius's injuries were consistent with someone trying to kill him; 2) it was not error to exclude the hearsay testimony of Detective de los Santos under *Crawford v. Washington*; and 3) it was not error to admit a video recording showing Demetrious's physical condition as he was being interviewed at the hospital, is the result of an reasonable application of *Strickland*  and *Wiggins* to the facts of this case.

V.      State habeas counsel was ineffective under *Martinez v. Ryan* for failing to fully investigate and develop claim five in the state habeas writ addressing whether trial counsel rendered ineffective assistance of counsel by failing to thoroughly investigate the testimony of Tasha Lass prior to calling her as a defense witness during the guilt/innocence phase of trial

V(a).   The trial court's FFCL that this claim was barred because Gobert's appellate counsel raised this claim on direct appeal and state habeas counsel failed to offer new evidence and that trial counsel was nevertheless not ineffective for failing to thoroughly investigate Lass is the result of a misapplication of the facts of this case to well-settled federal law under *Strickland*.

VI.     State habeas counsel was ineffective under *Martinez v. Ryan* for failing to raise the issue of whether trial counsel rendered ineffective assistance of counsel by failing to timely pursue the investigation and filing of a motion for new trial and thereafter moving to withdraw five days prior to the filing deadline for said motion.

VII.  Gobert's death sentence was arbitrarily and capriciously assigned based on the jury's answer to the unconstitutionally vague future dangerousness issue.

VIII.  Gobert's Fourteenth Amendment due process rights were violated under *Apprendi* because it put the burden of proving the mitigation special issue on Gobert rather than requiring the State to make the finding beyond a reasonable doubt.

IX.  Gobert's Fourteenth Amendment right to due process and Eight Amendment right to be free from arbitrary and capricious punishments were violated because the Texas death penalty statute lacks minimal standards for a jury to determine who should live and who should die.

X.  Gobert's Fourteenth Amendment due process rights and Eighth Amendment rights were violated under *Penry v. Johnson* because the mitigation special issue sends mixed signals.

XI.  Texas's 12-10 Rule as amended in 1991 violates the Eighth and Fourteenth Amendments as construed by *Mills v. Maryland* and *McKoy v. North Carolina*.

XXII.  The CCA's holding that Merillat's testimony concerning specific acts of violence by Gobert while incarcerated did not violate Gobert's 8th Amendment right to an individualized assessment of his future dangerousness was the product of an unreasonable analysis of the facts of this cause and how those facts apply against the backdrop of well settled Supreme Court precedent.

XIII.  The CCA's holding that Dr. Coon's testimony rendering an opinion as to the issue of future dangerousness based totally on hypothetical scenarios violates well settled federal precedent under *Daubert,* offends Gobert's 8th Amendment right to an individualized assessment of his future dangerousness and was the product of an unreasonable analysis of the facts of this case and how those facts apply against the backdrop of well settled Supreme Court precedent.

XIV.  The CCA's holding that Article 37.071 is: 1) not "too broad" to guarantee fair application of the death penalty; 2) not inadequate and unconstitutional because the future dangerousness issue is submitted to the jury for determination, but not set forth in the indictment; and 3) not unconstitutional even though it permits unreliable evidence to suffice as the basis for a death verdict is all the

product of an unreasonable analysis of the facts of this cause and how those facts apply against the backdrop of well settled Supreme Court precedent.

XV.   The CCA's holding that trial counsel's introductory questions expressing concern about Gobert's decision to testify and subject himself to cross-examination was not constitutionally deficient performance under *Strickland* is the product of an unreasonable application of the facts of this case to settled Supreme Court precedent.

XVI.   The CCA's holding that after excising the Gobert's confession, there was still sufficient probable cause in the search warrant affidavits to support the second search of his apartment and the search to obtain his DNA, is the product of an unreasonable application of the facts of this case to settled Supreme Court precedent.

## PROCEDURAL HISTORY

### A.    Procedural History in State Court

#### 1.    Indictment

On February 1, 2006, Gobert was charged in an Indictment of committing the murder of Mel Kernena Cotton by stabbing with a knife, a deadly weapon, on or about October 6, 2003.  Two different death-eligibility theories were presented: 1) that the murder happened in the course of attempting to commit and committing *kidnapping* and 2) that the murder happened in the course of attempting to commit and committing *robbery*:

6510

D.A.#3-03-1917/MNI#1062094                                    331st  **Re-Indictment**
No×½-CCPA VCC    The State of Texas v. MILTON DWAYNE GOBERT
Indictment    Capital Murder
Bond $ same
In The 299th Judicial District Court of Travis County, Texas

IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

THE GRAND JURY, for the County of Travis, State of Texas, duly selected, empaneled, sworn, charged, and organized as such at the January Term, A.D. 2006, of the 299th Judicial District Court for said County, upon its oath presents in and to said Court at said term, that MILTON DWAYNE GOBERT, on or about the 6th day of October A.D. 2003, and before the presentment of this indictment, in the County of Travis, and State of Texas, in the course of attempting to commit and committing kidnapping of Mel Kernena Cotton, did then and there intentionally commit murder by causing the death of an individual, namely, Mel Kernena Cotton, by stabbing Mel Kernena Cotton with a knife, a deadly weapon,

And the Grand Jury further presents that on or about the 6th day of October A.D. 2003, and before the presentment of this indictment, in the County of Travis, and State of Texas, MILTON DWAYNE GOBERT in the course of attempting to commit and committing robbery of Mel Kernena Cotton, did then and there intentionally commit murder by causing the death of an individual, namely, Mel Kernena Cotton, by stabbing Mel Kernena Cotton with a knife, a deadly weapon,

And the Grand Jury further presents that MILTON DWAYNE GOBERT, on or about the 6th day of October A.D. 2003, and before the presentment of this indictment, in the County of Travis, and State of Texas, in the course of attempting to commit and committing kidnapping of Demetrius Cotton-McCants, did then and there intentionally commit murder

SCANNED

Filed In The District Court
of Travis County, Texas
FEB ⹃ 1 2006
At _____
Amalia Rodriguez-Mendoza, Clerk

HZ
000002

## 2.    Extensive Litigation of Suppression Issue

Gobert was arrested for a parole violation and for the assault of a woman named Christine or Christina.  Following his arrest, Gobert was questioned by Austin detectives Burgh and Scanlon. Burgh began the interview by advising Gobert of his constitutional and statutory rights under *Miranda v. Arizona*, 384 U.S. at 479 (1966); TEX. CODE CRIM. PROC. ANN. art. 38.22, §§ 2, 3 (West 2005). Asked if he understood his rights, Gobert replied that he did and then said, "I don't want to give up any right, though, if I don't got no lawyer." Scanlon immediately asked, "You don't want to talk?" The question was repeated by Burgh, "You don't

want to talk to us?" Gobert answered, "I mean, I'll talk to y'all. I mean, I know, you know, what she had said about it, you know. I'll speak with y'all, but (inaudible), man. I mean, I'll speak with y'all, you know." Scanlon then said, "Okay, signing this—signing this is not giving up your right. Signing this is acknowledging that this was read to you." He then added, "Okay? Your choice to talk to us is different. This—all this is, is acknowledging that you were warned."

Burgh then began to question Gobert regarding his relationship with Christina. After a number of questions were asked and answered, Scanlon interrupted to ask, "I want to clear something up, though, because earlier you said you don't want to give up your right to a lawyer. I want you—I want you—I want to clear up the fact that you want to talk to us about this. Okay? You understand what I'm saying?" Gobert answered, "Yeah." Scanlon continued, "I want to clear it up. I mean, that's—that's what you want to do, right?" Gobert again answered, "Yeah." The interrogation continued for several hours and ultimately resulted in appellant confessing to the murder of Mel Kernena Cotton.

Gobert's motion to suppress trained on the statement, "I don't want to give up any right, though, if I don't got no lawyer." The trial court concluded that this was an unequivocal invocation of the right to counsel during questioning. The State appealed, and originally the CCA affirmed. *State v. Gobert*, 228 S.W.3d 221 (Tex. Crim. App.-April 19, 2007).

12

But the CCA withdrew this opinion on October 4, 2007.  2007 WL 4234657. In an opinion dated February 1, 2008, the CCA reversed itself and remanded, and held that the statement "I don't want to give up any right, though, if I don't got no lawyer" was not an unequivocal request for counsel.  *State v. Gobert*, 244 S.W.3d 861 (Tex. Crim. App. – 2008).

But in an opinion January 28, 2009, the CCA held that this statement was a clear and unequivocal invocation of the right to counsel, so the interrogation had to cease.  *State v. Gobert*, 275 S.W.3d 888 (Tex. Crim. App. – 2009).  The trial court's order was reinstated and the case remanded.

### 2.   Trial

Voir dire commenced on January 19, 2010 (RR 17/17).  The guilt/innocence phase began on February 22, 2010 (RR 26/11) and concluded on March 2, 2010 (RR 32/134) with Gobert's conviction.  The punishment phase began on March 3, 2010 (RR 33/4).  Thirty-four witnesses were called.  The last punishment phase witness was Gobert (38/41), but before he testified his lawyer said in the presence of the jury:

> Mr. Martinez: Mr. Gobert asked, against the advice of counsel, he had asked that we reopen so that he might have an opportunity to address the jury.
>
> The Court: So you wish to make a motion to reopen?
>
> Mr. Martinez: I am being told that I must make a motion to reopen.

13

The Court: All right. Who will be [sic] the Defense be calling?

Mr. Martinez: Mr. Gobert wants to take the stand.

(RR 38/40).  On March 10, 2010, Gobert was sentenced to death (RR 38/280).

### 3.    State Direct Appeal

Gobert appealed, raising seven points of error: 1) notorious prison investigator A.P. Merillat's expert testimony concerning prison conditions and opportunities for violence was not reliable or relevant to future-dangerousness issue in penalty phase; 2) admission of an investigator's testimony violated the Eighth Amendment's guarantee for individualized sentencing; 3) the admission of forensic psychiatrist's testimony concerning future dangerousness was error; 4) the trial court abused its discretion in declining a longer mid-trial continuance of sentencing proceeding so the defense could investigate its own witness, Tasha Lass, who effectively became an adverse witness for the state; 5) trial counsel's failure to investigate Tasha Lass before calling her amounted to ineffective assistance; 6) trial counsel's punishment-phase closing argument expressing disapproval about Gobert's decision to testify against counsel's advice was not the result of any plausible trial strategy under the first prong of *Strickland*; and 7)

search warrant affidavits did provide probable cause to search Gobert's apartment and car and to obtain his DNA.

The CCA rejected each argument in an opinion dated November 23, 2011. *Gobert v. State*, No. AP-76,345, 2011 Tex. Crim. App. Unpub. LEXIS 891 (Tex. Crim. App. 2011); 2011 WL 5881601. Thereafter, Gobert petitioned the Supreme Court for certiorari; relief was denied on October 1, 2012.  133 S.Ct. 103.

### 4.    State Habeas

The trial court appointed John Stickles to represent Gobert in his 11.071 habeas application.  Twelve allegations contesting the validity of Gobert's conviction and sentence were presented; without holding a live evidentiary hearing, the state trial court entered its FFCL denying relief on November 3, 2014. On January 14, 2015, the CCA affirmed.

### B.    Procedural History in Federal Court

On January 21, 2015, Gobert's state habeas counsel filed a motion with this Court requesting the appointment of federal habeas counsel (Doc. 1).  On January 26, 2015, this Court appointed the undersigned counsel (Doc. 4). On February 26, 2015, this Court entered a scheduling order and set the deadline for submission of Gobert's federal capital habeas writ for January 12, 2015, and any amendment to the writ to be due on or before March 22, 2016. (Doc. 10).

<u>**STATEMENT OF FACTS**</u>

The guilt/innocence and punishment facts are taken from the opinion of the Texas Court of Criminal Appeals opinion rendered in this case.

**A)   Guilt/Innocence Facts**

In the early hours of October 6, 2003, five-year-old Demetrius Cotton was awakened by the sound of his mother, Mel Cotton, screaming from her bedroom. He went into her room and saw a strange man there–"kind of tall, bald, and buff." He had a mustache and was wearing boots and boxers. He had gloves on his hands. Demetrius saw his mom sitting on the edge of the bed with duct tape on her mouth; the man was standing in front of her, stabbing her in the arms with a sharp knife. She was trying to get away from him. She stood up, but then lost her balance and fell. The man kept stabbing, so Demetrius "ran over and tried to pull him down by his leg." He said, "Stop," but the man pushed him off, turned on the bedside light and continued stabbing at his mom. The man told Demetrius, "sit down and shut up," so Demetrius sat down scared.

Then the man put duct tape on Demetrius's ankles and mouth. He told Demetrius to get out of the room, so the child hopped out into the hallway. The man locked the door when Demetrius tried to get back inside the bedroom. He heard his mom scream, "Leave me alone," but the man said, "Give me the money" and "Where is it at in your purse?" Demetrius hopped into his room and sat on a

pallet of blankets beside his bed. He heard the man take his mom's phone and "stomp on it" in the bathroom. The man also cut the telephone cord.

Demetrius fell asleep, but he woke up when he heard the man come into his room.  The man "choked" Demetrius with both hands. Demetrius tried to scream, but he couldn't. He blacked out. When he woke up later, he had a hole in his chest with blood coming out.  He went to his mom's room. She was laying on the floor on her side. Demetrius felt her neck. It was cold. "[S]he was gone." He touched her hand and talked to her for a while.  Then he went to the bathroom for a washcloth to stop his chest from bleeding. He looked to see if anyone else was there in the apartment. The man was gone. Demetrius ate a popsicle, then went back to his room, got his stuffed caterpillar, and waited for a long time for someone to come. He fell asleep again, but woke up early that Monday morning when he heard knocking on the door. He took his stool to the door to see out of the peephole, and when he saw his "Aunt Tweety," he opened the door.

Monica Salinas, who lived in the same Austin apartment complex as Mel Cotton and Demetrius, heard a hysterical woman crying, "My sister is dead, my sister is dead, please help me." She ran up the stairs, saw Demetrius with duct tape still around his neck and Mel Cotton's body in the master bedroom, so she called 911. She saw "blood everywhere and handprints of blood all over the room."

Paramedics rushed Demetrius to the hospital. He had four stab wounds in his chest.  They were so deep that a paramedic saw Demetrius's lung inflating and deflating. Demetrius said that he could hear the air coming out of the hole in his chest; it sounded like "a farting noise." Demetrius lost twenty to thirty percent of his blood volume and had a pneumothorax (collapsed lung) and a pulmonary contusion. Doctors also determined that Demetrius had been strangled. Although his wounds were life-threatening, Demetrius recovered.

The medical examiner testified that Mel Cotton had a total of 107 stab wounds that were inflicted during a drawn-out attack. Thirty-eight of the wounds were centered around Ms. Cotton's left breast, indicating "some degree of [the victim's] incapacitation or lack of movement." Another group of wounds were in her back. She had approximately thirteen defensive wounds to her hands and arms. Twenty of the wounds reached her internal organs.

She, like Demetrius, had been strangled. The medical examiner said that Ms. Cotton had probably been conscious for about ten to twenty minutes after her jugular vein had been cut.

Christina Pocharasang, Gobert's former girlfriend, learned of Ms. Cotton's murder later that day. She immediately suspected Gobert. Pocharasang testified that Ms. Cotton had helped her move out of Gobert's apartment two weeks earlier by arranging for a man named Kenneth to haul her heavy furniture. Gobert had

been furious and accused Ms. Cotton and Kenneth of stealing his things, including his vacuum cleaner.[1] Christina called Gobert to ask him about the murder. When he answered the phone, Gobert was breathing heavily and said that he had been in a fight with Kenneth, who had stabbed him in the stomach, causing an injury that required sixteen stitches. Christina then called the Austin police to report her suspicions.

Austin police discovered that Gobert had an outstanding parole-violation warrant and went to his apartment to arrest him. After peeking through his blinds, Gobert refused to open the door, so the officers made a forced entry. Gobert did not have a stab wound in his stomach, but he did have cuts on his right hand that looked like those made when an attacker loses his grip on a knife shaft and cuts his own hand.

Officers obtained a search warrant for Gobert's apartment and car. They found stain remover, bleach, and vinegar containers; a glove on top of the washing machine; and a glove, tennis shoes, and a striped shirt inside the washing machine. DNA consistent with that of Ms. Cotton's DNA was found on the left tennis shoe,

---

[1] Gobert left numerous threatening voicemails for Christina, saying such things as "Yeah, ho, you go on and do what you like. I don't give a f__ no more . But I bet you this one thing. You still got my shit, you keep that. That's yours. Since you distributed my shit to all this different mother f____ and shit. And gave my shit to these n____. You gave my shit to these n____. But bitch, one day you're going to look up, and you're going to see me. Bet that."

and DNA consistent with that of Gobert, Ms. Cotton, and an unknown male[2] was found on the glove on top of the washing machine. A latent fingerprint, matching Gobert's fingerprint, was found on Ms. Cotton's bedroom window blind.

While in jail, Gobert bragged to his cellmate about stabbing Ms. Cotton and Demetrius. He recounted details of the crime, including wrapping Ms. Cotton in an extension cord, washing his bloody clothes, and throwing the knife that he used in a lake.[3]

Gobert called a jail guard, Deputy Tasha Lass, to testify that the inmates did not have much privacy in their jail cells, thus suggesting that perhaps the cellmate could have learned details about the murder from reading Gobert's case files in his jail cell.

Gobert also made numerous phone calls from the jail to family members, suggesting to one brother that he might remember that he and Mel Cotton had a sexual relationship. Gobert's older brother told Gobert to stop asking him, his brother, and their mother to lie for him. These calls were recorded and played at trial.[4] In them, Gobert told various versions of the events.

---

2 When the DNA analysis was made, the technician did not have Demetrius's DNA.

3 During his punishment-stage testimony, Gobert confirmed that he threw the knife into the lake.

4 In one of them, Gobert told his brother that a jury would surely sentence him to death if they heard that he had attacked and stabbed his mother when he was nineteen, so he wanted his mother to lie about that event. "I can't have her up there. That's, that's suicide. . . . What am I going to look like in these folks' eyes? . . . I mean it's not about telling the truth, get up there and tell the truth, that's suicide, man. . . . How can you say if you love somebody that you're gonna

One of Gobert's brothers testified at trial to the version of events that Gobert told him.  According to Gobert, he and Mel Cotton had had sex that night, and then he went to sleep in her bed. She later woke him up, and they began arguing. She came at him with a knife, saying that she was going to shoot him with a gun. They struggled over the knife. He got the knife, but when he tried to get dressed and leave, she attacked him again. Demetrius came into the room and "fell" on the knife that his mother was holding. Gobert told his brother that he had stayed with the little boy, giving him pain pills, until Demetrius's aunt arrived the next morning. Gobert told his family members that "wasn't nothing wrong with [Demetrius], he was–he's alive and he wasn't seriously hurt. . . . He wasn't hurt bad at all. He went to school the next day."

The jury found Gobert guilty of capital murder.

## B)   Punishment Evidence

During the punishment phase, the State introduced Gobert's prior convictions for burglary of a habitation, robbery, false imprisonment, assault, and dating-violence assault.

Christina Pocharasang testified again and recounted three different violent episodes. One time, several months before the murder, Gobert punched her in her face because she did not want to cut her hair the way Gobert desired; Gobert

sit up there and, and, and get up there and, and, help go to the death chamber? That's suicide for me, man."

chased her into the bathroom and kept hitting her for about thirty minutes. Then, about two weeks before the murder, Gobert got angry when Christina asked him to go to his brother's church. He closed the bedroom door so Christina's son couldn't see him, and he choked Christina with both hands around her neck. Christina decided to move out of town, and she contacted her friend, Mel Cotton, who found Kenneth to help her move. But, in late September, Christina forgave Gobert and came back to Austin. One night, Gobert attacked her as she was driving. He punched her in the face five or six times, choked her neck, bit her on the shoulder,[5] hit her in her lower back about fifteen times, and crushed her cell phone so she couldn't call for help. He told Christina he was going to kill her. Christina finally escaped, drove to a hospital, and called the police. Nine days later, Gobert killed Mel Cotton.

Another woman testified that she had dated Gobert in 2002, but he got jealous and began hitting her and grabbing her by the neck when he was angry. She told him that she wanted nothing more to do with him. But one day he came over, and she got into his car to talk to him. Gobert became angry again and, after she jumped out of his moving car, he came after her and started hitting her in the face. Her father called the police and she filed assault charges against him.

_____

5 Six years later, Christina still had a scar from that bite.

A third woman testified that she had dated Gobert when they were both in high school. He was often verbally abusive to her, but one day he got jealous and hit her in the nose, then threatened to kill her as he forcibly took her back to his apartment. The next morning, she escaped by grabbing her car keys. She drove off, speeding and running red lights when she saw Gobert driving behind her. She stopped, got out of her car and started calling for help, but no one paid attention to her, so she raced back to her car. Gobert was on the roof of her car. She nevertheless drove to a friend's house, got out, and Gobert drove off in her car. Several years later, Gobert found her in Round Rock, burglarized her friend's home, stole a TV and purse, and kidnapped her. The police eventually found her at Gobert's apartment, and he went to prison for burglary. She related another incident in which Gobert choked her when he found out she was dating someone else.

A former cellmate testified that Gobert assaulted him while he was lying in his bunk. Gobert said that he was a Muslim and did not want to be in a cell with a Catholic. Gobert accused the cellmate of being flatulent while Gobert was praying, and then he began hitting the man in the chest, saying that he would kill him. The cellmate, in fear of his life, asked to be moved. Gobert had numerous instances of disruptive conduct while in jail and, at one point, was assessed fifteen days of administrative segregation for his actions.

23

A former female jailer who had given Gobert special privileges resigned when her superiors discovered that she had been "fraternizing" with Gobert. Thereafter, she visited Gobert in jail seventeen times in six months.

Tasha Lass, the female jailer whom Gobert had called to testify during the guilt stage, was called by the prosecution during the punishment stage. She admitted that she, too, had been fraternizing with Gobert for several weeks. She said that she had brought Gobert a cell phone so he could call her from the jail without their conversations being recorded. They talked on the phone every day, and Gobert repeatedly told Deputy Lass that he loved her. She testified that he was still talking to her every day on the smuggled cell phone.

Another jailer testified that, after Deputy Lass's testimony, he had searched Gobert's jail cell and found the cell phone stuffed into a bag of Cheetos inside Gobert's commissary bag. A cell phone charger was also found. Deputy Lass was then arrested and charged with the felony of bringing a prohibited item into a correctional facility.  Yet another officer testified that a piece of plastic had been wedged into Gobert's leg brace that he was required to wear as he was transported each day from the jail to the courtroom so that it would not lock. A different officer testified that Gobert had tampered with his leg brace on a second occasion as well. That time Gobert was walking around in the open courtroom with his leg brace unlocked.

24

After the defense offered several mitigation witnesses and rested, the State then recalled Tasha Lass to testify about "an escape plan." This time, Deputy Lass testified that she had originally been a missionary in Romania, and then had traveled to Sri Lanka, Australia, and England for eight years. She then became a police officer in Chattanooga, Tennessee, and was named Patrol Officer of the Year in 2008. She moved to Austin, became a deputy in June 2009, and first met Gobert near the end of that year. She listened to Gobert talk about his case, his family, and his problems in jail. He made her feel "needed." Gobert told her about his escape plan and wanted her to buy a storage shed so he could hide out "with food and stuff" until he escaped to Dubai. He chose Dubai because it is a Muslim country and he could not be extradited from there. He also wanted her a buy a .45 pistol with a silencer and four magazines and bring it into the jail "so he could shoot people and locks to get out."

Gobert told Deputy Lass that he planned to call Deputy Fernandes over to his cell at 2:30 a.m., shoot him, drag the deputy's body into the cell, change into his clothes, grab his car keys, shoot any other inmates who saw him, kill the control-room[6] operator,[7] take the keys to the fire closet, grab the bag inside that closet that contained a rope, then go to the top floor fire closet for another rope, go

---

6 Gobert told Ms. Lass that he had seen Deputy Fernandes drive in and out of the parking garage, so he knew which car was his and where it was parked.
7 Gobert wanted Ms. Lass to be in the control room so she could give him the keys.

out the roof door, tie the two ropes together and attach one end to the building, toss the rope over the edge and climb down, run over to the parking garage and drive away.  Gobert would "knock out" Deputy Lass and put her in the fire closet, but she did not believe that he would leave her alive. She said that she did not want to aid in this escape plan, but Gobert kept asking her every day.

The State also called Dr. Richard Coons who testified that, in his opinion, a hypothetical person with Gobert's history, conduct, and character would likely pose a danger of violence in the future.   Finally, Gobert testified in his own defense.  Gobert admitted that he had hurt a lot of women, had hit his brother over the head with a statue, and beaten his mother and other women that he loved. It was because of "anger issues and situations. . . . Maybe sometimes I go overboard."

Based on the jury's answers to the special issues, the trial judge sentenced Gobert to death.

## ARGUMENT AND AUTHORITIES

### Overview of Claims for Relief

### DETAILED ARGUMENTS

I.    **CLAIM I:** GOBERT's 6TH AND 14TH AMENDMENT RIGHTS WERE VIOLATED WHEN HE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AS A RESULT OF HIS LEGAL TEAM'S FAILURE TO ADEQUATELY INVESTIGATE THE FACTS OF THIS CASE AS

REQUIRED BY *STRICKLAND V. WASHINGTON*, 466 U.S. 668 (1984).

**EXHAUSTION:**

This claim was properly preserved for federal review, having been presented at pages 36-45 of the state writ as Claim One.

**ISSUE RESTATED:** The trial court's finding that trial counsel was not deficient in failing to interview Jason Gibson, who would have provided evidence of the existence of a prior relationship between Gobert and Cotton, thereby allowing Gobert to rebut the claim that he killed Cotton during the course of attempting to commit the robbery" was the product of an unreasonable analysis of the facts of this cause and how those facts apply against the backdrop of *Strickland*.

**A.      Facts Supporting Gobert's Claim**

Gobert's legal team failed to adequately investigate and present guilt/innocence evidence related to the "attempting to commit and committing robbery" allegation contained in the indictment.  As a result, Gobert was prevented from presenting a defense to the robbery allegation contained in the indictment.  Specifically, the facts and circumstances surrounding Gobert's trial and the pre-trial investigation show the following:

> a) Gobert's legal team failed to thoroughly investigate the facts and circumstances of Gobert's case when they failed to interview Jason Gibson, and

> b) Because of these failures, Gobert's legal team was not able to present a defense to the robbery element of the capital murder charge.

**B.  Lack of Thorough Factual Investigation**

27

Gobert received ineffective assistance of counsel because of counsel's failure to conduct an adequate factual investigation and the failure to present an adequate defense to the robbery allegation contained in the indictment and necessary to prove a capital murder. As seen herein, Gobert has demonstrated that (1) counsel's assistance was outside the range of competence demanded of attorneys in criminal cases, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Hernandez v. State,* 988 S.W.2d 770, 770 n. 3 (Tex. Crim. App. 1999) (applying *Strickland's* two-prong test to punishment phase). Gobert has also shown that there is reasonable probability that is sufficient to undermine confidence in the outcome of here trial. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *Thompson v. State,* 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).

Among counsel's duties is that of making an independent investigation of the facts of the client's case, although its scope may fluctuate under varying circumstances. *See Butler v. State,* 716 S.W.2d 48, 54 (Tex. Crim. App. 1986); *see also McFarland,* 928 S.W.2d at 502 (counsel has duty to make reasonable investigations or to make reasonable decision that makes particular investigations unnecessary); *Rangel v. State,* 972 S.W.2d 827, 838, n. 8 (Tex.App.-Corpus Christi 1998, pet. ref'd) (counsel who has duty to seek and investigate potential witnesses

28

for guilt/innocence phase, should have same duty during punishment phase). As part of this duty, counsel has a responsibility to seek out and interview potential witnesses and to present a defense, if one is available. *See Ex parte Welborn,* 785 S.W.2d 391, 393 (Tex. Crim. App. 1990).

### Jason Gibson

State habeas counsel provided an affidavit on behalf of Jason Gibson in support of Gobert's state habeas writ (SHCR 2/422-23).

Jason Gibson is a fact witness who has knowledge of relevant facts that were vital and important to Gobert's defense. Yet, these facts were undiscovered by Gobert's trial team. Indeed, Gobert's trial team failed to interview Mr. Gibson to determine whether he had knowledge of the events giving rise to this offense. The facts contained in Mr. Gibson's affidavit are as follows:

1. My name is Jason Gibson. I am over the age of 18 and competent to give this affidavit. No promises have been made to me in exchange for signing this affidavit.

2. I know Milton Dwayne Gobert. I first met him in 2003 or 2004 when we were both incarcerated in the Travis County Jail. I was there in 2003 or 2004 and Dwayne came later. We were in Travis County at the same time for about four or five months until I was transferred to San Angelo in 2004. I have not seen him since then. I once wrote him a letter once from the Holliday unit in 2004, but I don't recall him ever responding.

3. In jail, Dwayne was known as "ATL" because he talked a lot about how much time he spent in Atlanta. I didn't know him to have problems with

29

other prisoners or guards. He used to talk a lot about his plans for redemption if he ever got out of prison. He would talk about how he wanted to mentor at-risk youth if he ever got out.

4. Even though I met Dwayne for the first time in the Travis County Jail, this was not the first time I had seen him. I had some friends who, lived in an apartment complex in North Austin off of I-35. I was at this apartment complex a lot in 2002 and 2003. I would go there on and off for about a year, probably about once a week on average. Right after Dwayne got to Travis County, I told him that I thought he looked familiar. We started talking and figured out that we had known each other in passing from these apartments off I-35.

5. Prior to him being at Travis County, I saw Milton Gobert several times at the apartments off of I-35. I would see him in the hallway or the parking lot. At that time, we weren't friends and never talked aside from maybe saying hello if we passed each other.

6. I did not know Ms. Cotton personally but I knew her as someone who lived in the apartment complex. I would sometime see her in the parking lot with her son. She was a heavy set woman with medium skin complexion. She had shoulder-length, dark hair. We never talked, but I sometimes might nod "hello" to her. I don't know anything about her or what her reputation was like. I just knew that she lived there. When I saw her, she would be walking from her car to her apartment or from her apartment to her car.

7. I saw Milton Gobert and Mel Cotton together more than once. I thought they were a couple. I saw the two of them get into her car in the parking lot. Dwayne got into the driver's seat and Mel got into the passenger's seat. Mel used to park the car in the left side of the fence right as you turn into the apartment complex off the I-35 frontage road. It was either a black or red car and it was small. On this day, both Mel and Dwayne looked upset, like maybe they had just gotten into an argument. This is why I thought they were a couple. They didn't look like brother and sister to me. But I never heard them yell or scream at each other. It was just this one time I thought that maybe they had been in an argument. I remember I didn't say "hi" to either of them that day, I just stayed out of the way.

8. I learned that Dwayne was charged with capital murder of this woman when he came to Travis County. This was in 2003 or 2004.

9. I was never contacted by an investigator or by any of Milton Gobert's attorneys prior to his trial in 2010. Before signing this affidavit, I have never been asked about my knowledge of Milton Gobert or Mel Cotton. If I had been contacted, I would have told them everything I have stated in this affidavit, and I would have willingly testified to these facts at trial.

(SHCR 2/422-23).

Despite this vital and important knowledge, Mr. Gibson was never contacted by Gobert's lawyers, an investigator, or by any other person on Gobert's behalf prior to his trial. If Mr. Gibson had been contacted, he would have testified to these facts during Gobert's trial and been able to rebut the claim that Gobert killed Mel Cotton during the course of "attempting to commit and committing robbery." Instead, this evidence would have shown that Mel Cotton was not killed during the course of "attempting to commit and committing robbery." As a result, this vital and important information was not available to the jury during the guilt/innocence phase of Gobert's trial. Therefore, Gobert did not receive a fair trial because of his attorneys' omissions.

## C.    Argument and Authorities

The State's theory of the case was that Milton Gobert went to Mel Cotton's apartment with the intent to rob her. In support of this theory, the State's witnesses consistently denied that there was any relationship between Milton Gobert and Mel

31

Cotton.   For example, Sergeant De Los Santos testified that he spoke with Mel

Cotton's son in the hospital on the day of the crime and that, as far as he knew,

"there was no connection between [Mel Cotton] and Milton Dwayne Gobert"  (26

R.R. 167).   Eric Gobert, Dwayne's brother, testified that he never saw Dwayne

with Mel Cotton (26 RR 212).   Dwayne's ex-girlfriend, Christina Pocharasang,

said that she was not aware of Mel Cotton seeing Dwayne back in high school (27

R.R. 148).   Christina further stated that even though Dwayne had told her that he

had slept with Mel Cotton in the past, he did not always tell the truth (27 R.R.

152).   Dwayne's older brother, Michael Gobert, testified that in 1991 Dwayne went

to prom with someone named Mel but that he did not know her last name and did

not know whether Dwayne had a relationship with her in 2003 (27 R.R. 47-49).

The State correctly stated in closing argument that the defense had not

shown any evidence of a relationship between Mel Cotton and Milton Gobert,

despite their representation in opening argument that they would do just that.  Gary

Cobb, District Attorney for the State, stated:

> [H]e wants to talk about this supposed relationship.  Funny how
> his brothers don't know about this relationship.   There's no
> witnesses about this relationship.  It's all his talk after he's killed
> the victim about the relationship.  So do your life experiences
> match up with if someone is involved in a relationship like that,
> wouldn't somebody other than the last survivor of that relationship
> have heard something about it?  His brother Michael testified that
> back in 1991 the defendant went to a prom with somebody named

> Mel.   That's the extent of the relationship evidence that they promised to show you, and they did not.

(32 R.R. 24).

The State's theory was that Milton Gobert had his property taken by someone that Mel knew, he was upset about it, and the reason that he called her two days before the murder was to get back his vacuum cleaner. (32 R.R. 26).  The defense's theory that Milton Gobert went over there because they had a relationship, "no evidence supports that" (32 R.R. 30). Mr. Cobb stressed that if the defense is said to the jury that they would provide that a relationship exists, then they should have brought forward some evidence to show them the relationship exists (32 R.R. 50).

For Gobert to establish a violation of his Sixth Amendment right to effective assistance of counsel, he must show (1) that his counsel's performance fell below an objective standard of reasonableness and (2) there was a reasonable probability that but for his counsel's deficient performance, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 692-694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).   Courts are "not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Moore v. Johnson*, 194 F.3d 586,

33

604 (5th Cir.1999); *Loyd v. Whitley*, 977 F.2d 149, 158 (5th Cir. 1992) (noting that "whether counsel's omission served a strategic purpose is a pivotal point in *Strickland* and its progeny" and that this "crucial distinction between strategic judgment calls and plain omissions has echoed in the judgments of this court").

Counsel's performance in this case "did not measure up to the standard required under the holding of *Strickland*. As noted by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 389 (2000):

> [t]he statute directs federal courts to attend to every state-court judgment with utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law. If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody-or, as in this case, his sentence of death-violates the Constitution, that independent judgment should prevail.

*Id.*

In addition to falling below professional standards, counsel's failure investigate and call Gibson as a witness at trial invites a "reasonable probability" that the outcome of this case would have been different had Gibson been called to establish the prior existing relationship between Gobert and Cotton. Trial counsel's deficiency in this respect deprived Gobert of his Sixth Amendment right to the effective assistance of counsel.

The failure of Gobert's defense team to conduct an adequate factual investigation harmed Gobert and resulted in valuable information being unavailable to the jury.  The defense team failed to present the "complete picture" to the jury.  Since the jury did not understand the "complete picture" of the 'kidnapping' issue, they could be easily swayed by the limited evidence available to them when they found Gobert guilty of capital murder.

In this case, Gobert received ineffective assistance of counsel because his trial attorneys failed to conduct an adequate investigation of the facts of the case.  Particularly, Gobert's attorneys failed to investigate the facts and circumstances surrounding the 'robbery' allegation contained in the indictment.  Without this evidence, Gobert's attorneys were not able to present a defense to the robbery allegations contained in the indictment.

There is a reasonable probability that, if this evidence had been presented, the outcome would be different.  For example, the evidence supporting the robbery element of Gobert's conviction was testimony from Demetrius Cotton. According to Demetrius, he went into his mother's bedroom in response to some screaming and saw a man he had never seen before talking to his mother.  Demetrius' mother was telling the man, "Stop" (28 R.R 190-92).  The man had a knife and was wearing gloves, boxers, and boots (28 R.R 192-93).  His mother had duct tape on her face and mouth. 28 R.R 195.  Demetrius testified that the man had stabbed his

mother's upper arms and that his mother was trying to get away from him (28 R.R 194-95). He also testified that while he had been in his mother's bedroom the man had told his mother, "Give me the money" and Where is it at in your purse?" (28 R.R 202). This was the sum and substance of the evidence supporting the robbery allegation of Gobert's conviction.

Gobert was prevented from defending against the robbery charge because his attorneys failed to adequately investigate the facts surrounding the robbery allegation. If Gobert's attorneys would have presented the testimony of Jason Gibson, the jury would have had additional evidence to deny the robbery allegation and, would in a reasonable probability, would have found Gobert not guilty of capital murder. Since the evidence establishes that no reasonable juror would have convicted Gobert, there is reasonable probability that is sufficient to undermine confidence in the outcome of here trial. These failures resulted in a violation of Gobert's right to effective assistance of counsel pursuant to the Sixth and Fourteenth Amendments.

### D. Unreasonable Misapplication OF Federal Constitutional Law

The trial court's denial of relief as to this claim is the result of an unreasonable application of well-settled federal law under *Strickland* to the facts of the case. More particularly, no reasonable jurist could countenance the FFCL's

conclusion that "trial counsel's performance was not deficient for failing to investigate and present testimony from Jason Gibson."

Gobert submits that trial lawyers enjoy the professional discretion to call, or not to call, a witness once that person has been located and interviewed. But it is ineffective assistance not to find and locate relevant witnesses *a priori*.

"The failure to interview key defense witnesses is objectively unreasonable" under *Strickland*. *Poindexter v. Booker*, No. 07–1795, 301 Fed.Appx. 522, 528, 2008 WL 4997500, *5 (6th Cir. Nov. 24, 2008). "Constitutionally effective counsel must develop trial strategy in the true sense—not what bears a false label of 'strategy'—based on what investigation reveals witnesses will actually testify to, not based on what counsel guesses they might say in the absence of a full investigation." *Ramonez v. Berghuis*, 490 F.3d 482, 489 (6th Cir.2007).

In the particular context of robbery, in *United States v. Graves*, 951 F. Supp. 2d 758 (E.D. Pa. 2013), it was held that defense counsel's decision not to call bank robbery defendant's girlfriend at trial represented reasonable trial strategy (and therefore was not ineffective assistance) when counsel considered disadvantages of calling girlfriend as witness, including fact that she placed defendant in area at time of robbery and her testimony was not particularly credible.

By contrast, it is undisputed that Gobert's counsel never so much as sought out, much less interviewed, Jason Gibson before a strategic decision was made not to call him as a witness.

> **CLAIM II:** GOBERT HAS BEEN DENIED HIS RIGHT TO DUE PROCESS UNDER THE 5[TH] AND 14[TH] AMENDMENTS TO THE U.S. CONSTITUTION AS HE IS INCARCERATED FOR AN OFFENSE FOR WHICH HE IS "ACTUALLY INNOCENT"

EXHAUSTION: This claim was properly preserved for federal review. Gobert raised the violation of federal constitutional rights in his State habeas writ at pages 47-51. The trial court signed Findings of Fact and Conclusions of Law ("FFCL") denying relief as to this claim (SHCR1/158-59).

The CCA agreed with the trial court's findings. *Ex Parte Gobert*, No. WR-77,090-01 (Tex. Crim. App. 2015). The trial court held no evidentiary hearing in this case. Instead, the trial court adopted verbatim the State's proposed findings of facts and conclusions of law (SHCR 1/158-59).

**ISSUE RESTATED:** The State trial court's ruling denying this claim on the basis that Gibson's affidavit did not constitute "newly discovered" or "newly available" evidence and that Gobert failed to demonstrate that this evidence would have had an impact on the outcome of the case is the result of an unreasonable application of the well-settled federal authorities set forth supra to the facts of this case.

**A.    Governing Law – Innocence Claim**

A claim of actual innocence is "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the

merits." *Herrera v. Collins,* 506 U.S. 390, 400 (1993) (holding that actual innocence claims are cognizable on post-conviction writs of habeas corpus). In order for Gobert to obtain relief on this claim, "the evidence must establish *substantial* doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice unless his conviction was the product of a fair trial." *Schlup v. Delo,* 513 U.S. 298, 316, (1995) (emphasis added).

There are two types of "innocence" claims. The first–a *Herrera* claim–is a substantive claim in which the person asserts a "bare claim of innocence" based solely on newly discovered evidence. *Id*. at 390. The other type of innocence claim–a *Schlup* claim–is one that "does not by itself provide a basis for relief," but is intertwined with constitutional error that renders a person's conviction constitutionally invalid. See *Schlup*, 513 U.S. at 315.

To succeed in an actual innocence claim the Gobert must show "by clear and convincing evidence that, despite the evidence of guilt that supports the conviction, no reasonable juror could have found the Gobert guilty in light of the new evidence." *Ex parte Tuley*, 109 S.W.3d at 392; *see also State ex rel. Holmes*, 885 S.W.2d at 399 ("To be entitled to relief, however, petitioner would at the very least be required to show that based on proffered newly discovered evidence and the entire record before the jury that convicted him, 'no rational trier of fact could find proof of guilt beyond a reasonable doubt.'") (quoting *Jackson v. Virginia*, 443 U.S.

307, 324 (1979)). This showing must overcome the presumption that the conviction is valid and it must unquestionably establish Gobert's innocence. *See Jackson v. Virginia*, 443 U.S. at 324.   Not only must Gobert make a truly persuasive showing of innocence, he must also prove that the evidence he relies upon is "newly discovered" or "newly available."

The term "newly discovered evidence" refers to evidence that was not known to Gobert at the time of trial and could not be known to him even with the exercise of due diligence. For example, evidence of complaining witness's prior conviction, while impeaching, was of such serious nature that general rule that cumulative or impeaching evidence is insufficient to justify new trial on grounds of newly discovered evidence was inapplicable. *Gordon v. United States*, 383 F.2d 936, 938 n. 2 (D.C. Cir. 1967).

In *United States v. Atkinson*, newly discovered evidence, unknown to the prosecution in a drug case, in form of evidence that prosecution witness, who testified that he had but one conviction and had not been paid for his undercover informer work, had been convicted of numerous offenses, including court martial convictions, and had been paid for informer work, required new trial where witness was only one who testified to defendant's participation in transaction. 429 F. Supp. 880(E.D.N.C.1977).

In another example, where counts in indictment could not be sustained

without testimony of government witness who had been convicted of perjury in state court, and defendant was denied right to cross-examine witness relative to his conviction because at time of trial witness had not exhausted his right of appeal, proof that witness's conviction had been sustained on appeal and that witness had commenced service of his sentence required that defendant's motion for new trial following his conviction be granted in order to afford defendant privilege of developing fact that witness had been convicted of perjury. *United States v. Segelman*, 83 F. Supp. 890 (W.D. Pa. 1949).

### B.  Argument and Authority

In his state habeas writ, Gobert presented an affidavit sworn out by Jason Gibson stating facts that help to prove Milton Gobert did not kill Mel Cotton during the course of "attempting to commit and committing robbery" (SHCR 2/422-23).

Such evidence was not available at trial due to the ineffective assistance of Gobert's counsel.  Thus, Gobert has established that the evidence is "newly available."  Moreover, the newly discovered evidence establishes by clear and convincing evidence that no reasonable juror could have convicted him of the charged offense of capital murder. See *Ex parte Tuley*, 109 S.W.3d, at 392; *see also State ex rel. Holmes*, 885 S.W.2d at 399.

In the event the Court finds that the evidence obtained from Jason Gibson is not 'newly discovered' and thus, not a *Herrera* claim, Gobert urges this court to consider this as a *Schlup* claim. The evidence obtained from Gibson clearly shows that Gobert did not commit or attempt to commit a robbery. This evidence was not available because Gobert's attorneys failed to adequately investigate the facts of this case as described in Claim No. 1, thereby making this a *Schlup*-type claim. This new evidence is inexorably intertwined with Gobert's claim of ineffective assistance of trial counsel and mandates a new trial for Gobertt.

Realistically, it makes no difference whether Gobert's claim is a *Herrera* or a *Schlup* claim. In either way, the evidence from Jason Gibson establishes by clear and convincing evidence that no reasonable juror could have convicted Gobert of the charged offense of capital murder because no robbery occurred in this case. See *Ex parte Tuley*, 109 S.W.3d, at 392; *see also State ex rel. Holmes*, 885 S.W.2d at 399.

To commit the offense of robbery, the State had to establish, beyond a reasonable doubt, that Gobert killed Mel Cotton while in the course of committing theft. Tex. Penal Code § 29.02. As detailed above, the evidence—Demetrius's testimony—supporting the robbery element of in this case was slim, at best. This was the sum and substance of the evidence supporting the robbery allegation of

Gobert's conviction.  As a result, this evidence is insufficient, as a matter of law, to support his conviction for capital murder.

**CLAIM III:** GOBERT'S 6TH AND 14TH AMENDMENT RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL WERE VIOLATED WHERE HIS TRIAL COUNSEL FAILED TO ADEQUATELY INVESTIGATE AND PRESENT MITIGATION EVIDENCE AS REQUIRED UNDER *WIGGINS*.

EXHAUSTION: This claim was properly preserved for federal review. Gobert raised the violation of federal constitutional rights in his State habeas writ at pages 52-85.  The claim was presented in tripartite format; i.e., 3A, 3B, and 3C.

The trial court signed FFCL denying relief as to this claim (SHCR1/159-61). The CCA agreed with the trial court's findings. *Ex Parte Gobert*, No. WR-77,090-01 (Tex. Crim. App. 2015). The trial court held no evidentiary hearing in this case. Instead the trial court adopted verbatim the State's proposed findings of facts and conclusions of law (SHCR 1/159-61).

**ISSUE RESTATED:** The State trial court's ruling denying this claim on the basis trial counsel's *Wiggins* investigation in this case was not deficient and did not prejudice the outcome of this case is the result of an unreasonable application of *Strickland* and *Wiggins* to the facts in the prosecution of Gobert.

## A.    Legal Bases for Claim

To establish a claim that a petitioner was deprived of effective assistance of counsel in violation of the Sixth Amendment, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The standards set

forth in *Strickland* control the question of whether trial counsel conducted a constitutionally sufficient mitigation investigation. *See Wiggins v. Smith*, 539 U.S. 510, 537 (stating that *Strickland* applies to mitigation investigations).

In cases where a petitioner alleges that trial counsel failed to discover mitigating evidence, the inquiry turns not on the single issue of whether counsel should have presented a mitigation case, but whether the investigation supporting counsel's decision not to introduce mitigating evidence is itself reasonable. *Wiggins*, 539 U.S. at 523 (2003).   The principle that any decision to limit investigation must be reasonable under the circumstances of the case is rooted in *Strickland*.  *See Strickland*, 466 U.S. at 690 (strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation).

Prevailing norms of practice such as those reflected in the American and state bar associations are guides to determining the reasonableness of counsel's conduct.   *Strickland*, 466 U.S. at 688; *Williams v. Taylor*, 529 U.S. 362, 395 (2000).  Under these prevailing professional norms, it is "unquestioned" that trial counsel in a capital case has a duty to conduct a "thorough investigation of the defendant's background." *Porter v. McCollum*, 130 S. Ct. 447, 452 (2009). Specifically, counsel must investigate such that (s)he may present "medical history, educational history, employment and training history, family and social

44

history, prior adult and juvenile correctional experience, and religious and cultural influences." *Wiggins*, 539 U.S. at 524 (citations omitted).

In this case, the guidelines reflected in the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines"), the Supplementary Guidelines for the Defense Function of Defense Teams in Death Penalty Cases ("Supplementary Guidelines") and the Guidelines and Standards for Texas Capital Counsel promulgated by the State Bar of Texas ("Texas Guidelines") are relevant prevailing norms of practice.

The ABA Guidelines state unequivocally that lead counsel at any stage of capital representation should assemble a defense team as soon as possible after designation with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11). The previous Guidelines, adopted in 1989, similarly required counsel to begin investigation immediately upon counsel's entry into the case and to "discover all reasonably available mitigating evidence." (1989 Guideline 11.4.1.) The 1989 Guidelines also required counsel to retain experts for investigation and "preparation of mitigation" (1989 Guideline 11.4.1.(7)) The 1989 ABA Guidelines were recognized by the U.S. Supreme Court in *Wiggins* as

"well-defined norms." *Wiggins*, 539 U.S. at 524. "The new ABA Guidelines adopted in 2003 simply explain in greater detail than the 1989 Guidelines the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482 at 487 (6th Cir. 2003).

The 2003 Revised ABA Guidelines also provide that "counsel at every stage have an obligation to conduct thorough and independent investigations relating to issues of both guilt and penalty." (2003 Guideline 10.7(A)). Investigations of mitigating evidence necessarily include considering

- witnesses familiar with and evidence relating to the client's life and development, ***from conception to the time of sentencing***, that would be explanatory of the offense(s) for which the client is being sentenced, would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death.

- Expert and lay witnesses along with supporting documentation (e.g. school records, military records) to provide medical, psychological, sociological, cultural, or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s)...

(2003 Guideline 10.11(F)(1)-(2)) (emphasis added).

The State Bar of Texas Guidelines and Standards for Texas Capital Counsel, which closely mirror the ABA Guidelines, provide that "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." State Bar of Texas Guidelines and Standards

for Texas Capital Counsel 11.1(A), p. 15 (April 21, 2006). Investigation at the penalty phase should include:

(i.)    Development of character witnesses and family background evidence, and where applicable, relevant records and witnesses from additional sources, including military, school, hospital, past employment, etc., to corroborate the mitigating theory;

(ii.)    Development of expert witnesses on mental health issues, if any;

(iii.)    Development of rebuttal witnesses for State's extraneous evidence, if any.

*State Bar of Texas: Guidelines and Standards for Texas Capital Counsel: Standing Committee on Legal Services to the Poor in Criminal Matters Adopted by the State Bar Board of Directors April 21, 2006*, 69 TEX. B. J. 966 (2006) at 11.1(A)(3)(b)(i.)-(iii.).

The prejudice inquiry for an ineffective assistance of counsel claim is not outcome determinative. The *Strickland* Court itself expressly rejected an "outcome determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case. *Strickland*, 466 U.S. at 693-94. Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, ***even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome***." *Id.* (emphasis supplied). Thus, the "reasonable probability" standard—a probability sufficient to undermine confidence in the outcome—is a less onerous burden than

47

even the preponderance of the evidence standard.8  The Supreme Court reiterated this point in *Williams v. Taylor*, 529 U.S. 362 (2000), expressly noting that a state court's use of a preponderance of the evidence standard rather than the lesser reasonable probability standard would result in a decision that was contrary to federal law as determined by that Court. *Id*. at 405-06 ("a state court's rejection of a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that … the result of the proceeding would have been different.")

Federal courts have consistently held that trial counsel rendered ineffective assistance of counsel for failure to discover and present particularly sensitive information about a client's background, such as evidence of physical or sexual abuse of someone in the Gobert's family. *See Boyde v. Brown*, 404 F.3d 1159 (9th

---

8 In *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990), the Fifth Circuit observed that the prejudice prong imposes "a lower burden of proof than the preponderance standard." *Id*. at 595. Even when "the evidence arguably supports a different result under a preponderance standard," a reviewing court still can be "confident that it meets the 'reasonable probability' standard." *Id*. *See also Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006) (reciting *Strickland* prejudice standard of "reasonable probability" as "somewhat less than a preponderance of the evidence"); *Hodge v. Hurley*, 426 F.3d 368, 376 n. 18 (6th Cir. 2005) (*Strickland* standard "is a lesser standard than preponderance of evidence").

Cir. 2005) (vacating death sentence because of counsel's failure to develop and present evidence of petitioner's abuse as a child, that petitioner's sister was sexually molested, and that petitioner knew about the molestation); *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) (ineffective assistance of counsel for failure to present evidence that petitioner's father abused drugs and abused his mother, despite no evidence that petitioner was himself abused); *Karis v. Calderon*, -66-283 F.3d 1117 (9th Cir. 2002), *cert denied*, 539 U.S. 958 (2003) (penalty phase relief where counsel failed to discover that petitioner suffered abuse and watched his mother regularly and violently beaten by men); *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001) (counsel's performance was deficient where he failed to investigate, develop and present available evidence concerning Gobert's troubled background, emotional stability and what led to the development of the person who committed the crime).

## B.      Facts Supporting Gobert's Claim

The defense's principle theory at the punishment phase focused on a single incident in Milton Gobert's history.  The defense attempted to show that, as a result of Dwayne being struck by a newspaper delivery truck when he was five years old, he became angry and aggressive towards family members.  This defense attempted to diminish Dwayne's moral blameworthiness by showing that he simply lost control.

Both of Dwayne's older siblings, Michael Gobert and Michelle Sams, witnessed Dwayne get struck by a newspaper delivery truck when he was five years old (35 R.R. 211) (36 R.R. 9).   Dwayne was following his older brother Michael down the driveway on his Hot-Wheel (39 RR 9).   Michael, who was on his bicycle, swerved towards the curb when he saw a truck coming; Dwayne kept riding into the middle of the street and was hit by the car.  *Id*.  After the truck hit him, it drug him a few feet and then continued to drag his bike down the street while Dwayne lay there in a puddle of blood (35 R.R. 211).   Dwayne's mother did not see the accident, but she heard the crash and ran to the door (36 R.R. 76).   She saw the truck dragging Dwayne's bike and saw that Dwayne had been thrown to the other side of the street.  *Id*.  She ran to his aid and found him semiconscious, just rattling and not coherent.  *Id*. at 77.

Dwayne was taken to the hospital, where he remained for about one month (36 R.R. 77).  He had contusions on both legs and multiple injuries about his head. *Id*.  He had a scar that remained on his head for a long time after the injury.  *Id*.  He was in a full body cast with his arms and legs stretched out, "just hanging there like a mummy" (35 R.R. 212-13).

Dwayne acted strange while in the hospital, so much so that Mrs. Gobert thought the demons had gotten into her child (36 RR 77).   After the accident, Dwayne became more agitated and started getting in trouble more consistently in

school (35 R.R. 213).  He had more temper tantrums and got a little angry faster (36 R.R. 10).  Dwayne's Aunt Belinda Shavers, who was 18 at the time, took care of him after he was released from the hospital (36 R.R. 59).  She noticed that if she got on Dwayne for something, he would get mad.  *Id*. at 61.  He started cursing at her and calling her names, which was strange since she had never seen him act that way before.  *Id*. at 64-65.  After the two months that she took care of him, she got married and went on with her life and had no further interaction with Dwayne.  *Id*. at 66.  Dwayne did okay in school until the third grade, when he was sent to an alternative school because of his aggressive behavior (36 R.R. 82).

In addition to the testimony concerning Dwayne's car accident, the jury heard testimony that Dwayne's biological father, Milton Epperson, was not around when Milton was growing up and that he was very abusive with Dwayne's mother when she was with him (36 R.R. 72).  Milton Epperson beat Dwayne's mother when she was eight months pregnant and as a result, Dwayne was born prematurely.  *Id*.  Dwayne's mother tried to abort her pregnancy with him when she was about three months along.  *Id*. at 73.  Since Dwayne bore a striking resemblance to Milton Epperson, his mother often compared them, saying that Dwayne would wind up in the pen or become an alcoholic just like his father (35 R.R. 214-15).

The jury also heard that the Gobert children engaged in typical kind of sibling fights, but nothing particularly serious (35 R.R. 218).  They fought over many things, like what the children wanted to watch on TV (36 R.R. 19).  If they got into an argument over what to watch on TV, Michael might push Dwayne down the hallway, tell him to go to his room, or tell him to sit down, and eventually they would begin to scuffle and start wrestling.  *Id*.  As they got older, the confrontations got more and more physical, and the boys sometimes ended up putting a couple of holes in their mom's walls.  *Id*. at 19-20.  Outside the home, Michael and Dwayne used to get chased home by neighborhood bullies until one of their uncles finally taught them to fight back.  *Id*. at 11.  As the children got older, Michael took on the big brother role and took care of his siblings while their mother worked (36 R.R. 10).

When Dwayne was 11 or 12 years old, his mother would give him whippings to deal with his aggression and cursing (36 R.R. 94-95).  She once accidentally cut his arm with a curtain rod because Dwayne refused to do something she had asked him to do.  *Id*. at 94.  She testified that she applied steri-strips instead of taking him to the doctor because she didn't want them to think that she was abusing him.  *Id*. at 96.

Talicia Gobert, Dwayne's 21-year old niece, testified that growing up, she would write to Dwayne when he was in prison and that he would write back and

encourage her in her studies and participation in sports.  35 R.R. 231.  After the age of six, Talicia did not know Dwayne outside of prison, and most of her contact with him throughout her life was through letters.  *Id*. at 239.

On cross-examination, the State undermined the defense's theory that as a result of the car accident, Dwayne could not control his aggressive behavior.  The State questioned Dwayne's sister, Michelle Sams, about whether she thought that Dwayne had the ability to control himself:

> MR. COBB:  I'm asking you about your brother and his ability to control himself.  Do you believe your brother can control himself?  Does he have control over what he does?
>
> MS. SAMS:  I don't -- you will have to ask him that question.

> MR. COBB:  Well you grew up with him.  And they called you in here to testify, so I am going to ask you that question, Ms. Sams. Can your brother control himself, based on what you have observed being around him?
>
> MS. SAMS:  Can he control himself?
>
> MR. COBB:  Yes, ma'am.
>
> MS. SAMS:  Like I said, I believe he can like everyone has control to a certain extent.
>
> …
>
> MR. COBB:  So you have seen your brother angry:
>
> MS. SAMS:  Yes, sir.
>
> MR. COBB:  When you have seen him angry, does he go grab weapons and start attacking people?

MS. SAMS:   No.

MR. COBB:   What does he do when he's angry that you have seen?

MS. SAMS:   In what situation?

MR. COBB:   In any situation you want to tell us about.

MS. SAMS:   I have never seen him grab a weapon.

MR. COBB:   Okay.  What does he do when you have seen him angry?

MS. SAMS:   I guess like normal people, he show his anger; his face tense up; he gets mad.

MR. COBB:   That kind of stuff is just normal getting angry stuff?

MS. SAMS:   I believe, yeah.

(35 R.R. 226-27).

Similarly, the State asked Talicia Gobert whether she thought that he was someone who was able to control himself, but she could not respond since they only communicated through letters.  35 R.R. 239.  When Michael Gobert was asked whether he thought that Dwayne's altercations with women was a lack of impulse control, he said that he could not answer.  36 R.R. 52.  When Michael was asked to give an example of where he thought that Dwayne was out of control, the State suggested that the behavior Michael described was not out of control, since the person with whom Dwayne had fought survived the fight:

MR. COBB:        Tell me a situation where you've seen your brother out of control.

MICHAEL GOBERT: Where he's out of control?

MR. COBB:                    Yes, sir, when he's out of control.

MICHAEL GOBERT: He had a fight in the neighborhood.

MR. COBB:                    How old was he then?

MICHAEL GOBERT: He was about 10, maybe 11 years old.

MR. COBB:                    Okay.  And who did he kill?

MICHAEL GOBERT: He didn't kill anyone.  He didn't kill him.

MR. COBB:                    How bad did he hurt him?

MICHAEL GOBERT: He bloodied them up.  He bloodied them up.  We
                    pulled them apart.  We had to pull them apart.

MR. COBB:                    What happened after you pulled them apart?

MICHAEL GOBERT: I took him home.

MR. COBB:                    That's out of control for you?

MICHAEL GOBERT: Well, I mean, had he not -- I mean, when he got
                    angry and goes into that type of mode, he's not
                    going to stop unless you're able to either stop him
                    or figure out how to, you know, get him away.

MR. COBB:                    Did that male walk away from the fight after it was
                    over?

MICHAEL GOBERT: Something like that, yes.  He didn't walk away --
                    he didn't walk away without major injuries, no, but
                    he walked away.

MR. COBB:                    He limped away?

MICHAEL GOBERT: Yeah, I would say that.

MR. COBB:          He survived the fight, though, right?

MICHAEL GOBERT: Yeah, he survived it.

36 R.R.  40-41.

The State stressed to the jury in closing that the family wanted the jury to believe that Dwayne's behavior must be associated with the accident because if it's not, then Dwayne is just "violent and evil and he's going to hurt people."  38 R.R. 227.

1. **Teachers Who Were Never Contacted Could Have Testified About Dwayne's Lack of Impulse Control.**

At least three teachers from Gobert's childhood who were never contacted could have testified about academic and behavioral problems in school, and in particular, how those problems related to what they perceived to be a lack of impulse control.

For example, Jane Allred-May recalled that Gobert came to the Houston Student Achievement Center when he was in the second or third grade and remained a student there for about three years before being sent back to his home campus. *See* Affidavit of Jane Allred-May (SHCR 434-39).[9] The Houston Student

---

9   Although Ms. Allred-May was never contacted by any of Dwayne's attorneys prior to trial, she was still living in Abilene and after the trial was over, she was contacted and interviewed by a reporter from the Abilene News Reporter.  *Id*. at ¶ 22.

Achievement Center was an alternative school for students in Special Education who needed assistance in the areas of behavior management and social skills training. *Id.* Ms. Allred-May was lead teacher at the time, and because the school was small, she knew all the students who attended. *Id.* at ¶ 16. Gobert was referred there because he was a Special Education student who needed help managing his behavior. *Id.* at ¶ 7. He needed a small classroom setting with individualized attention. *Id.*

Gobert was taught in a small, self-contained classroom with anywhere from six to ten students. *Id.* at ¶ 11. The teachers worked with him on a daily point sheet where he earned points for appropriate behavior — following directions, respecting the rights, feelings and property of others, and completing his work at his level of functioning. *Id.* Gobert was taught by an Individual Educational Plan, or IEP, which is an educational plan designed to meet the unique educational needs of a child. *Id.* at ¶ 12.

Ms. Allred-May recalled that Gobert did not have much impulse control. *Id.* at ¶ 15. If something made him mad, Gobert would take off running, and the teachers would have to chase him down and bring him back to school. *Id.* He did this more than once, and it was something that the teachers tried to work with him on. *Id.* Ms. Allred-May has been an educator for 39 years, has worked with

Special Education students for most of that time, and is qualified to work with mentally retarded and emotionally disturbed students. *Id.* at ¶ 2. In her view, students who lack impulse control have a tendency to overreact. *Id.* at ¶ 16. She stated that with such students, it's all about perception: "If someone looks at them and they perceive that look as threatening in some way, then they react to that perception." *Id.* She also recalled that Gobert had a difficulty making a connection with people. *Id.* at ¶ 18. While Gobert could be personable at times, he did not develop a real nurturing connection with his teachers. *Id.* She finally stated that it always appeared that Gobert was trying to be tough, which could have stemmed from who his role model was at home or what he was being taught at home. *Id.* at ¶ 19.

Gobert attended Abilene Christian School during the fall of his senior year. Phyllis Gilbreth,[10] his English teacher, recalled that he came to ACS with some educational gaps and, as a result, she gave him individualized attention before or after school to help him get up to speed. The grades he received in her class, however, indicated that she bumped up his grades to make sure that he would pass with a grade of 70. She stated that Dwayne struggled academically. He was taking English III instead of English IV, a further indication that he was behind academically. Gobert was able to attend the school with some financial assistance.

---

10 *See* Affidavit of Phyllis Gilbreth (SHCR ).

Kay Robbins[11] was Gobert's Fine Arts teacher.  She recalled that Gobert was so good in football that the students gave him the nickname "Bullet."  Ms. Robbins did not have any problems with Gobert until he got into a fight with another student who made a racially insensitive comment.  As a result of this fight, Abilene Christian Schools came to the decision that Gobert could not be allowed to stay more than one semester.  For the remainder of the semester, Gobert sat off to the side of the class by himself while Ms. Robbins taught the rest of the class.

According to Ms. Robbins, she had never seen someone react "in seconds" the way that Gobert did, and she stated that he had no impulse control.  She perceived that Gobert came from a place where you can't be pushed around; if there is anything that can be perceived as an insult, you protected yourself immediately otherwise you are perceived as "weak."  She further stated that Gobert did not realize that a teacher would be able to help him resolve conflict.  She stated, "I don't think that Gobert realized that I could have helped him resolve that conflict…[i]t seemed to me that Dwayne did not realize that somebody would intervene for him in a situation like that."  Furthermore, Abilene Christian School was not equipped to handle kids with the kinds of problems that Gobert presented; they school could not give him the structure that he needed.  Ms. Robbins did not

---

11 *See* affidavit of Kay Robbins (SHCR ).

recall meeting Gobert's mother or father and stated that she did not perceive there to be the necessary structure at home that he needed.  She stated,

> It was unfortunate that Dwayne lasted only one semester because I believe that he really wanted to make it.  I call that he enrolled at ACS with two other minority students.  One of the students left right after registration because the curriculum was too demanding for him.  The other student lasted a couple of weeks and then quit, too, also because the curriculum was too hard.  Even though Dwayne left after one semester, he lasted longer than the other two students.  It seemed to me that Dwayne really wanted to stay and do well.  I think he saw football as the way he was going to make it.  At the same time, ….  Dwayne was too shortsighted to be able to visualize how this could have helped his future.

### 2. Family Members Could Have Provided a Wealth of Mitigating Evidence Concerning Mr. Gobert's Background.

Although Gobert's mother testified at trial about receiving a beating from Gobert's biological father in her eighth month of pregnancy with Gobert, the information she could have provided about the extent of the physical, emotional and psychological abuse she suffered at the hands of Milton Epperson would have painted a far different picture than what the jury heard.  Gobert's mother was not only beaten during her pregnancy with Gobert; she was beaten all the time by Gobert, and she lived in fear the whole time that they were married. *See* Affidavit of Alice Faye Gobert (SHCR ).  Gobert would use his fists to hit her on her head, her face, and all over her body.  *Id.*  She went to the hospital two or three times after he beat her but, usually, she would not report him because it would only make

the beatings worse. *Id.* Milton Epperson was a heavy drinker and was all the more explosive and belligerent when he drank. *Id.* at ¶ 19. He would throw things, break TV's, and turn over furniture. *Id.* at ¶ 20. As a result of the beatings, Gobert's mother became very depressed and once contemplated committing suicide by driving her car off of an overpass. *Id.* at ¶ 18.

Milton Epperson could not keep a job because of his heavy drinking and drug use. *Id.* at ¶ 29. After losing a job, Gobert would disappear for days or weeks at a time. *Id.* at ¶ 13. He would take Faye's car and drive it to Waco, leaving her without any transportation to and from the West Texas Medial Center, where she worked full-time as a nurse. *Id.* at ¶ 12-14. When her night shift ended at 10:00 p.m. and Milton wouldn't come for her, Gobert's mother would walk nearly two miles home by herself. *Id.* at ¶ 14. The last time she did that, she was full-term with Gobert's older sister, Michelle. *Id.* Gobert's mother did not want to tell her mother and father because they already hated Gobert and would only hate him even more. *Id.*

Milton Epperson went back and forth from Abilene to Waco like this, never telling her where he had been or why he had stayed gone for so long, Id. at ¶ 13, until he convinced Faye to move out to Waco with him for good. *Id.* at ¶ 27. She did and things were fine for a while, until she realized that Gobert had lost his job again because he was not paying the rent. *Id.* Faye remembers almost starving to

death the time she lived in Waco. *Id.* at ¶ 30. Gobert's mother once brought them a chicken and a pack of beans, which she and her two children lived off of for a week. *Id.* At that time, she was still pregnant with Gobert. *Id.* It was also around this time that Milton beat Faye, causing Gobert to be born prematurely, which she testified about at trial. *Id.* at ¶ 31.

Gobert's mother was not asked to explain in detail the beating she suffered from Milton Epperson that day. If she had been asked, Faye would have told the jury that Gobert had gotten so angry over something that he dragged Faye out of the house by her hair. *Id.* at ¶ 32. Faye fell over the front porch onto the lawn, and Gobert started punching and kicking her while she lay on the ground. *Id.* Gobert's mother, Mae, stood there and watched but then eventually ran inside the house and locked the door so that Faye could not get inside. *Id.* Gobert only stopped beating Faye when two girls across the street who were witnessing all of this said that they were calling the police. *Id.* The police arrived and escorted Faye to the apartment where they were living at the time. *Id.* Faye packed her and her children's belongings and asked the couple across the hall if she and her two children could stay with them that night, which they allowed her to do. *Id.* at ¶ 33. Later that night, Milton Epperson came banging on the door demanding to talk to "his wife," but he was told that Faye was not there. *Id.* The next day, Faye and her children got a ride to Abilene from the woman's sister. *Id.*

Milton Epperson was not the only alcoholic that Gobert's mother married. Her first husband and father of Dwayne's older brother Michael, George Davis, was also an alcoholic. *Id.* at ¶ 7. Faye met George Davis when she was 23 years old and he was 37. *Id.* at ¶ 5-6. Even though George's family warned Gobert's mother against marrying George because he was an alcoholic, they got married six months later. *Id.* at ¶ 6-7. George would hide bottles of liquor in the closet or under the bed; sometimes, he missed work because he was so hung over. *Id.* at ¶ 7. Because of his drinking, Gobert's mother divorced him less than a year later, when she was pregnant with Michael. *Id.* at ¶ 8.

 The last man that Faye married was Johnny Gobert, and they remained married for about 10 years. *Id.* at ¶ 42. Although Gobert's mother never saw Johnny drink, she would sometimes find liquor bottles in his closet. *Id.* at ¶ 43. Johnny left after Faye found out that he had cheated on her with another woman; he packed up his things, left without saying goodbye to the children, and never came back. *Id*. Gobert's mother became depressed again. *Id.* at ¶ 45.

When Johnny Gobert left the family, Gobert's older brother, Michael, stepped into the role of a father figure at the age of 14. Exhibit 2 (Affidavit of Michael Gobert) at ¶ 19. Michael testified that because his mother was by herself, as he got older he took on a big brother role and took care of his siblings while she worked. 36 R.R.10. Michael further testified that the neighborhood they grew up

in was rough; he and Gobert used to get chased home by neighborhood bullies until one of their uncles finally taught Michael to fight back. *Id.* at 11. Michael also taught Gobert to fight in order to defense himself. *Id.* Michelle testified that they engaged in the "typical" kind of sibling fights, but nothing particularly serious. *Id.* at 218.

## C. Harm Analysis

A reasonable mitigation investigation would have armed trial counsel with abundant mitigating evidence regarding Gobert's background and upbringing, and that evidence would have also allowed counsel to confront Gobert's problematic prone to aggression differently during the punishment phase.[12] Counsel could have

---

12 *See also Williams v. Taylor*, 529 U.S. 362, 395, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (finding counsel's performance deficient where counsel failed to investigate or otherwise prepare for mitigation until a week before trial and failed to "conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood"); *Harries v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005) (finding that counsel failed to conduct an adequate investigation where counsel limited their investigation to contacting by telephone the petitioner's mother and brother, sent requests for information to some institutions in which the petitioner had been confined, interviewed only four witnesses-the petitioner, his co-defendant, and two state witnesses, and declined to seek the assistance of a mental health expert or to conduct a thorough investigation into the petitioner's history of mental health or family background); *Hamblin v. Mitchell*, 354 F.3d 482, 488 (6th Cir. 2003) (adopting the 1989 and 2003 standard for attorneys representing death penalty prisoners in 1982 and holding that counsel's failure to adhere to those guidelines constituted ineffective assistance of counsel; finding that had counsel investigated the case, counsel would have found a large body of mitigating evidence including fact that the petitioner grew up in a poor and unstable environment and likely suffered from a mental disability or disorder); *Powell v. Collins*, 332 F.3d 376, 399 (6th Cir. 2003) (holding that trial counsel's failure to construct the defendant's social history through access to background records and interviews with family and friends constituted deficient performance); *Coleman v. Mitchell*, 268 F.3d 417, 452 (6th Cir. 2001) (holding that trial counsel were ineffective for failing to investigate and present the petitioner's highly traumatic childhood, two head injuries, psychological history showing a borderline retarded range IQ and mixed personality disorder); *Carter v. Bell*, 218 F.3d 581, 597, 599 (6th Cir. 2000) (finding deficient performance because counsel failed to investigate and present at mitigation evidence of the defendant's illegitimacy, family history, limited education, low IQ, mental condition and positive relationships with children); *Austin v. Bell*, 126 F.3d 843, 849 (6th Cir. 1997) (holding that counsel's failure to investigate and present mitigation "because he didn't think it would do any good" rendered death sentence unreliable); *Glenn v. Tate*, 71 F.3d 1204, 1208-11 (6th Cir. 1995) (holding that counsel's investigation was deficient where the attorneys presented some, but failed to uncover more convincing mitigating evidence, including evidence of the petitioner's mental retardation, his neurological impairment, and his need for attention and susceptibility to the influence of his brother). Counsel's failure to investigate is not excused by the fact that Poindexter could have provided much of this information. *Cf.*

made informed choices, knowing that Gobert's childhood was subject to beatings, emotional abuse, physical abuse, and 'fighting for survival.'

The defense trial team did not present readily available mitigating information, including Gobert's mental and emotional instability a year prior to the crime and after just being released from prison after nine years of incarceration; Gobert's constant and persistent fear of being "possessed" by demons; Gobert's lack of impulse control as witnessed by elementary and high school teachers; details about the extent of abuse suffered by Gobert's mother before and after her pregnancy with Gobert; and how Gobert suffered physical torture, both from bullies in the neighborhood and from his older brother, Michael.

A laundry list of mitigating factors that could have been, but not presented include:

- Family history of substance abuse
- Family and personal history of depression
- Suicide ideation
- Gobert's Suicide Attempt
- Gobert's Substance Abuse
- Academic Problems
- Physical Abuse
- Gobert's mother had a series of marriages to abusive and alcoholic men.
- Gobert's mother suffered severe physical, emotional, and psychological abuse from Gobert's biological father

---

*Hamblin*, 354 F.3d at 492 (noting that "ABA and judicial standards do not permit the courts to excuse counsel's failure to investigate or prepare because the defendant so requested"; and cases cited therein). *See also Dickerson v. Bagley*, 453 F.3d 690 (6th Cir. 2006).

- Gobert was physically abused by his older brother

The State's focus on whether Gobert's behavior was caused by the accident is misguided and limited the effectiveness of the mitigation presentation. During the mitigation presentation, the issues are: What was Gobert's behavior like? What are the potential causes of Gobert's behavior? Did those causes contribute to this crime?

Had trial counsel presented the evidence submitted within the state habeas writ there is a more than "reasonable probability" that it would have influenced at least one of the jurors in Gobert's punishment trial on the issue of his moral culpability under the Texas mitigation issue. *See Lewis v. Dretke*, 355 F.3d 364, 369 (5th Cir. 2003) (affirming single juror standard for *Wiggins* prejudice). The State trial court's failure to grant relief on this claim is the result of an unreasonable application of the facts of this case to well-settled Supreme Court precedent.

> CLAIM IV: GOBERT'S 6TH AND 14TH AMENDMENT RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL WERE VIOLATED WHERE APPELLATE COUNSEL FAILED TO RAISE LEGALLY COGNIZABLE AND VIABLE CLAIMS ON DIRECT APPEAL.

**Exhaustion**: This claim was properly preserved for federal review. Gobert raised the violation of federal constitutional rights in his State habeas writ at pages

86-95. The trial court signed FFCL denying relief as to this claim (SHCR1/162-64).

The CCA agreed with the trial court's findings. *Ex Parte Gobert*, No. WR-77,090-01 (Tex. Crim. App. 2015). The trial court held no evidentiary hearing in this case. Instead the trial court adopted verbatim the State's proposed findings of facts and conclusions of law (SHCR 1/162-64).

**ISSUE RESTATED:** The State trial court's ruling denying Gobert's ineffective appellate counsel claim on the basis that 1) it was not error to admit the testimony of paramedic Brian Mason that Demetrius's injuries were consistent with someone trying to kill him; 2) it was not error to exclude the hearsay testimony of Detective de los Santos under *Crawford v. Washington*; and 3) it was not error to admit a video recording showing Demetrious's physical condition as he was being interviewed at the hospital is the result of an reasonable application of *Strickland* and *Wiggins* to the facts of this case.

### A. Inadmissibility of The Testimony of Paramedic Brian Mason

#### 1. Statement at Issue

Bryan Mason, a paramedic for Austin Travis County EMS, was dispatched to the Woodland Heights Apartments on the morning of October 6, 2003. 26 R.R. 66. He noticed Mel Cotton's son, Demetrius McCann Cotton, with some visible injuries, and he began to assess him as soon as he walked into the apartment. *Id*. at 68, 70. Mason saw what looked to be three penetrating stab wounds over Demetrius' left anterior chest wall. *Id*. at 73. The wounds were "very concerning" and deep in nature. *Id*. He was surprised that his lung sounds were normal,

because of how deep the wounds looked.  *Id*.  The State asked Mr. Mason, "Based on the injuries to this child that you observed, in your opinion, did it seem to be consistent with someone who was trying to kill him?" *Id*. at 87.  Mason responded, "Absolutely." *Id*. at 88.

Defense counsel objected on the basis that the answer called for speculation and was outside of the witness's expertise.  *Id*. at 88.  The State responded that because Mason had testified about where the injuries were, how many there were, and how deep they went, he was making a medical opinion.  *Id*.  Defense counsel responded that the witness was not qualified to make a medical opinion or diagnosis or do the job of a pathologist, and that he was speculating at this point. *Id*.  The Court found the State's questioning objectionable under Rule 704 after a bench discussion:

The Court:        The question that you asked him was did he --

Ms. Wetzel:      Were these injuries consistent with someone trying to kill him. And what he's testified is that he has 12 years as a paramedic and that this child was stabbed at least three times in the chest in the area of his heart.  It's not a -- it's a kind of common sense.

Mr. Martinez:    He can't testify under -- he cannot, under Rule 704, testify as to what somebody's state of mind might have been, like their mental state, like intentional or --

The Court:        She says that the question that she asked was whether or not the injuries were consistent with somebody trying to kill him.  I think he can answer that.

Mr. Martinez:    I don't think so.

The Court:    **In terms of, you know, state of mind of somebody else and everything, I think that's clearly objectionable**.  But in terms of whether or not the injuries were consistent, I think he can testify on that.

*Id*. at 88-89 (emphasis added).

The State then asked again whether the injuries he observed on Demetrius were consistent with someone who trying to kill him, *id*. at 89, to which Mason responded that they were.

### 2.    Error In The Admission of Mason's Statement

The Texas Rules of Evidence set out three separate conditions regarding admissibility of expert testimony.  First, Rule 104(a) requires that "[p]reliminary questions concerning the qualification of a person to be a witness ... be determined by the court...." TEX. R. EVID. 104(a).  Second, Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex. R. Evid. 702.   And third, Rules 401 and 402 render testimony admissible only if it "tend[s] to make the existence of any fact that is of consequence to the determination of the action more probable or less

probable than it would be without the evidence." TEX. R. EVID. 401, 402.   *Vela v. State*, 209 S.W.3d 128, 130-31 (Tex. Crim. App. 2006).

In the prosecution of Gobert, the State did not satisfy the requirements for the opinion of Bryan Mason, a paramedic, to be admissible because this testimony does not meet the three requirements discussed above. *Vela*, 209 S.W.3d at 130-31. First, there are insufficient facts to show that Mr. Mason had the necessary qualifications to provide the opinion.   Second, Mr. Mason lacked the necessary scientific, technical, or other specialized knowledge that would assist the trier of fact to understand the evidence or to determine a fact in issue.   Finally, the opinion did not tend to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.   As a result, the trial court erred in overruling Gobert's objection and allowing Bryan Mason to state an opinion that Demetrius' injuries were consistent with someone trying to kill him.

### 3.    Harm Analysis

Gobert was harmed by the improper admission of Bryan Mason's opinion that Demetrius's injuries were consistent with someone trying to kill him because that evidence was extremely inflammatory.   Because of its ultimate and extreme inflammatory nature, the prejudice caused by the admission of this evidence, *i.e.*, the likelihood that the jury would use it improperly outweighed its probative value.

The inflammatory nature of this type of evidence is so extreme there is no reasonable inference other than the jury would have improperly considered it when it was determining Gobert's guilt. Ultimately, this evidence was such as to encourage resolution of material issues on an emotional and improper basis rather than on the basis of the evidence on which the allegations of wrongdoing were grounded. Gobert was improperly convicted of this offense based on character evidence, that is, of being a 'bad person' in violation of the Texas Rules of Evidence. *Santellan v. State,* 939 S.W.2d at 168. *Smith v. State,* 12 S.W.3d 149, 152 (Tex. App. -- El Paso 2000, pet. ref'd). "This prohibition is not only a substantial right, but a basic tenet of our criminal justice system." *Smith v. State,* 12 S.W.3d at 152.

The trial court abused its discretion by allowing by the improper admission of Bryan Mason's opinion that Demetrius' injuries consistent with someone trying to kill him. When such evidence is presented to a jury, for the reasons set out above, it necessarily falls within the harm parameters set out by Tex. R. App. P. 44.2 as an error affecting the substantial rights of the accused to a fair trial. The result of the improper and inflammatory evidence admitted in this case is a guilty verdict that is clearly wrong and unjust that "shocks the conscience" and "clearly demonstrates bias." *Santellan v. State, 939 S.W.2d* at 164. Thus, Gobert was

harmed and this harm requires he be given a new trial.  *Enriquez v. State*, 56 S.W.3d 596 (App. 13 Dist. 2001, pet. ref'd.).

### 4.    Conclusion

Appellate counsel was ineffective for failing to claim on appeal that the trial court erroneously overruled trial counsel's objection to Bryan Mason's testimony that Demetrius Cotton's injuries were consistent with someone who was trying to kill him.  If Appellate counsel had raised this claim on appeal, the Texas Court of Criminal Appeals would have reversed Gobert's conviction and given him a new trial.   But for Appellate counsel's unprofessional errors, the result of Gobert's would have been different.  *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  The trial court's failure to grant relief as to this claim is the result of unreasonable application of well-settled Supreme Court precedent to the facts of this case.

### B.    The Testimony of Detective De Los Santos's Testimony Under *Crawford v. Washington*

### 1.    Introduction

Eric De Los Santos testified that Demetrius told him, as he was lying in a hospital bed, that the man who stabbed his mother "took all my mama's purse and money."  The trial court overruled Gobert's objection that this testimony violated his right to cross examine the witness in violation of his rights under the Sixth

Amendment.

### 2. Argument

The Sixth Amendment guarantees a criminal defendant the right to confront "the witnesses against him." This is the same protection guaranteed in the Texas Constitution. Tex. Const. Art. I§10. The Sixth Amendment protection extends to out-of-court statements used as evidence against the accused. *Crawford v. Washington,* 541 U.S. 36, 51, 124 S.Ct. 1354, 1364, 158 L.Ed.2d 177 (2004). Out-of-court statements deemed as "testimonial" are impermissible as evidence against the accused. *Id.* Out-of-court statements taken by police officers in the course of interrogations are generally deemed "testimonial" under Sixth Amendment Confrontation Clause standards. *Id.*; *Davis v. Washington,* 547 U.S. 813, 822; (2006) (defining statements as testimonial when "the circumstances objectively indicate that there is no such ongoing emergency and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecutions").

When deciding cases involving the federal constitution, Texas courts are bound by United States Supreme Court decisions interpreting the federal constitution. *State v. Guzman,* 959 S.W.2d 631, 633 (Tex. Crim. App. 1998). The United States Supreme Court has held that "[t]estimonial statements of witnesses absent from trial [may be] admitted only where the declarant is unavailable, and

only where the defendant has had a prior opportunity to cross-examine." *Crawford v. Washington,* 541 U.S. 36, 59; 124 S.Ct. 1354; 158 L.Ed.2d 177 (2004).

### 3.    Harm Analysis

Having shown the admission of the Eric De Los Santos statement violated Gobert's constitutional confrontation rights, it is next demonstrated how its admission harmed him.  Federal constitutional error is harmless and not reversible only if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  *Chapman v. California,* 386 U.S. 18, 24 (1967).  A federal constitutional error "did not contribute to the verdict obtained' if the verdict 'would have been the same absent the error." *Neder v. U.S.,* 527 U.S. 1 (1999).   The so-called *Chapman* test is codified in Texas Rules of Appellate Procedure 44.2(a). *Clay v. State,* 240 S.W.3d at 904.

To assess the likelihood that, absent the trial court's error in admitting the evidence, the jury's verdict would have been the same, the reviewing court must examine the entire record.  *Clay v. State,* 240 S.W.3d at 904.  Among the factors to be considered are (1) the importance of the evidence to the State's case; (2) whether the evidence was cumulative of other evidence; (3) the presence or absence of other evidence corroborating or contradicting the evidence on material points; and, (4) the overall strength of the State's case.  *Id.*  The court must also

consider any other factor in the record that may shed light on the probable impact of the trial court's error on the minds of average jurors.  *Id.*

The harmful impact of the Eric De Los Santos statement is obvious.  This statement supported the robbery allegation and the jury's finding that Gobert was guilty of a capital murder.  As described above, the only evidence even remotely supporting the robbery finding was evidence from Demetrius.  The De Le Santos inadmissible statement corroborated Demetrius's testimony and made it more believable.

### 4.    Conclusion

Appellate counsel was ineffective for failing to claim on appeal that the trial court erroneously overruled trial counsel's objection to this testimony.   If Appellate counsel had raised this claim on appeal, the Texas Court of Criminal Appeals would have reversed Gobert's conviction and granted him a new trial. But for Appellate counsel's unprofessional errors, the result of Gobert's appeal would have been different.  *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

## A.    The Admissibility of the Demetrious Cotton Hospital Video

State's Exhibit 12 is the videotape of an injured Demetrius in his hospital bed.  There is no sound to the video, only picture.  The State claimed this evidence was admissible and relevant because it demonstrated Demetrius's physical state at

the time he was interviewed.  Trial counsel made a relevance objection.  When that objection was overruled, counsel objected under Rule 403 of the Texas Rules of Evidence, arguing that prejudice will substantially outweigh the video's probative value.  This objection was also overruled and the videotape was admitted. 26 R.R. 159.

## B.  Argument and Authorities

Evidence is relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence.  Tex. R. Evid. 401.  The admission of relevant evidence is largely left to the discretion of the trial court.  *Moreno v. State,* 858 S.W.2d 453, 463 (Tex. Crim. App. 1993).  Absent an abuse of discretion, the trial court's decision will not be reversed on appeal.  *Id.*  Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.  Tex. R. Evid. 403.  Therefore, upon further objection from the opponent of the evidence based on Rule 403, the trial court must weigh the probative value of the evidence against the potential for unfair prejudice. *Montgomery v. State,* 810 S.W.2d 372, 389 (Tex. Crim. App. 1990).  In keeping with the presumption of admissibility of relevant evidence, there is a presumption that relevant evidence is more probative that prejudicial.  *Santellan v. State,* 939 S.W.2d 155, 169 (Tex. Crim. App. 1997).  The trial court's ruling whether to

exclude evidence under Rule 403 is also measured by an abuse of discretion standard and will not be reversed if the ruling is within the zone of reasonable disagreement. *Montgomery v. State,* 810 S.W.2d at 391.

Evidence that does not have relevance apart from character conformity is inadmissible. Tex. R. Evid.404(a). Character evidence is not admissible under Rule 404(b) if the extraneous-offense evidence is relevant to a fact of consequence apart from its tendency to show conduct in conformity with character. *Johnston v. State,* 145 S.W.3d 215 (Tex. Crim. App. 2004).

Once a trial court rules that evidence is not barred under Rule 404(b), the opponent of the evidence may further object under Rule 403. *Santellan v. State,* 939 S.W.2d 155, 169-70 (Tex. Crim. App. 1997). Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403. Relevant evidence is generally admissible, but it is properly excluded under Rule 403 when its probative value is substantially outweighed by the danger of unfair prejudice. In keeping with the presumption of admissibility of relevant evidence, trial courts should favor admission inn close cases. *Montgomery v. State,* 810 S.W.2d at 389.

The term "probative value" refers to the inherent probative force of an item of evidence - that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation - coupled with the proponent's need for that item of evidence.  *Gigliobianco v. State,* 210 S.W.3d 637, 641 (Tex. Crim. App. 2006).  When conducting the balancing test under Rule 403, the trial court determines whether the probative value of the evidence is substantially outweighed by one of the following countervailing considerations listed in the rule. *Crank v. State,* 761 S.W.2d 328, 342 n.5 (Tex. Crim. App. 1988), overruled on other grounds by, *Alford v. State,* 866 S.W.2d 619, 624 (Tex. Crim. App. 1993).

"Unfair prejudice" refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.  *Gigliobianco v. State,* 210 S.W.3d 637 at 641 (citing *Montgomery v. State,* 810 S.W.2d at 389).  Evidence might be unfairly prejudicial if, for example, it arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence. *Id.* at 641.

"Confusion of the issues" refers to a tendency to confuse or distract the jury from the main issues in the case.  *Gigliobianco v. State,* 210 S.W.3d 637 at 641. Evidence that consumes an inordinate amount of time to present or answer, for example, might tend to confuse or distract the jury from the main issues. "Misleading the jury" refers to a tendency of an item of evidence to be given undue

weight by the jury on other than emotional grounds. For example, "scientific" evidence might mislead a jury that is not properly equipped to judge the probative force of the evidence. *Id.* "Undue delay" and "needless presentation of cumulative evidence" concern the efficiency of the trial proceeding rather than the threat of an inaccurate decision. *Id.*

A trial court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or repeat evidence already admitted. *Id.* at 641-42.

When the opponent of evidence satisfactorily demonstrates that its probative value is far less than the danger of unfair prejudice it poses, and he objects to its receipt on that basis, the trial judge must not admit it. *Fuller v. State,* 829 S.W.2d 191, 206 (Tex. Crim. App. 1992), *overruled on other grounds by Castillo v. State,* 913 S.W.2d 529 (Tex. Crim. App. 1995). In making this determination, the trial judge should consider the inherent tendency that some evidence may have to encourage resolution of material issues on an inappropriate

basis and should balance carefully against it if the host of factors affecting probativeness, including weight of the evidence and the degree to which its proponent might be disadvantaged without it. *Id.*

State's Exhibit 12 constitutes evidence that is not relevant to any issue in the trial - other than an attempt to invoke sympathy because Demetrius was grievously injured by Gobert. an attempt to invoke sympathy is the principal evil to be avoided when it comes to Rule 404(a) evidence. Therefore, the admission of State's Exhibit 12 violates Rule 401 of the Texas Rules of Evidence because it is not relevant and the Trial Judge erred in admitting it.

Even if State's Exhibit 12 is relevant and is not inadmissible character evidence, its probative value is far less than the danger of its unfair prejudice. It is this 'unfair prejudice' that violates Rule 403 of the Texas Rules of Evidence. Tex. R. Evid. 401. The State was not satisfied with merely proving that Gobert had injured Demetrius. Instead, the State chose to introduce Exhibit 12 to invoke sympathy and unfairly prejudice Gobert before the jury.

Finally, the Trial Judge failed to perform the required balancing test to determine whether the probative value outweighed its prejudice as required by Rule 403 and *Montgomery.* Tex. R. Evid. 403; *Montgomery v. State,* 810 S.W.2d at 389. Without this balancing test, it is impossible for this Court to determine the efficacy of the following factors: (1) the inherent probative force of the proffered

item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or repeat evidence already admitted.  *Montgomery v. State,* 810 S.W.2d at 389.

### C. Harm Analysis

Because of its ultimate and extreme inflammatory nature, the prejudice caused by the admission of State's Exhibit 12, i.e., the likelihood that the jury would use it improperly outweighed its probative value.  The inflammatory nature of this type of evidence is so extreme there is no reasonable inference other than the jury would have improperly considered it when it was determining Gobert's guilt.  Ultimately, this evidence was such as to encourage resolution of material issues on an emotional and improper basis rather than on the basis of the evidence on which the allegations of wrongdoing were grounded.  Gobert was improperly convicted of this offense based on this irrelevant and prejudicial evidence in violation of the Texas Rules of Evidence.  *Santellan v. State,* 939 S.W.2d at 168. *Smith v. State,* 12 S.W.3d 149, 152 (Tex. App. -- El Paso 2000, pet. ref'd).  "This

81

prohibition is not only a substantial right, but a basic tenet of our criminal justice system." *Smith v. State,* 12 S.W.3d at 152.

The trial court abused its discretion by allowing State's Exhibit 12 into evidence. When such evidence is presented to a jury, for the reasons set out above, it necessarily falls within the harm parameters set out by Texas. R. App. P. 44.2 as an error affecting the substantial rights of the accused to a fair trial. The result of the improper and inflammatory evidence admitted in this case is a guilty verdict that is clearly wrong and unjust that "shocks the conscience" and "clearly demonstrates bias." *Santellan v. State, 939 S.W.2d* at 164. As a result, the trial court erred when it failed to grant habeas relief on this issue and no reasonable jurist can countenance this misapplication of federal constitutional law.

### D. Conclusion

Appellate counsel was ineffective for failing to claim on appeal that the trial court erroneously overruled trial counsel's objection. If Appellate counsel had raised this claim on appeal, the Texas Court of Criminal Appeals would have reversed Gobert's conviction and given him a new trial. But for Appellate counsel's unprofessional errors, the result of Gobert's appeal would have been different. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The trial court's finding that Appellant counsel was not ineffective in failing to raise this issue is the result of a misapplication of the facts of this case to well-settled federal law under *Strickland*.

> **CLAIM NUMBER V:** **STATE HABEAS COUNSEL WAS INEFFECTIVE UNDER *MARTINEZ V. RYAN* FOR FAILING TO FULLY INVESTIGATE AND DEVELOP CLAIM FIVE IN THE STATE HABEAS WRIT ADDRESSING WHETHER TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO THOROUGHLY INVESTIGATE THE TESTIMONY OF TASHA LASS PRIOR TO CALLING HER AS A DEFENSE WITNESS DURING THE GUILT/INNOCENCE PHASE OF TRIAL.**

## A.    *Martinez* Unexhausted Claim Standard

Due to the ineffective assistance of State habeas counsel, this claim was not fully adjudicated in the State courts.  Although State habeas counsel raised this claim in Gobert's State habeas writ, he failed to adequately investigate and raise facts in the state court in support of this claim. As consequence, this claim remains essentially unexhausted.

In *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014), an *en banc* panel of the Ninth Circuit held that an IAC claim adjudicated on the merits in state court is nonetheless unexhausted, and may be procedurally defaulted, if it is fundamentally altered by new facts alleged in a federal habeas petition.  In *Dickens,* the petitioner argued in state court that his sentencing counsel provided ineffective assistance by failing to direct the work of a court-appointed psychologist and to adequately

investigate the petitioner's background. *Id.* at 1317. The state court denied the claim on the merits, finding that counsel's performance was not deficient and that the petitioner had failed to demonstrate he was prejudiced. *Id*. In his federal habeas petition, however, the petitioner "changed his claim to include **extensive factual allegations** suggesting Dickens suffered from FAS and organic brain damage." *Id*. (emphasis added).

In determining whether the petitioner's claim was unexhausted, the court in *Dickens* explained that factual allegations not presented to a state court may render a claim unexhausted if the allegations "fundamentally alter" the legal claim presented and considered by the state courts. *Id.* at 1317 (citing *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986)). It further observed that new evidence fundamentally alters a claim if it places the claim in a significantly different and stronger evidentiary posture than it was in state court. *See Aiken v. Spalding*, 841 F.2d 881, 883, 884 n.3 (9th Cir. 1988).

In accordance with *Dickens*, counsel raises this unexhausted and procedurally defaulted claim under the Supreme Court's holding in *Trevino*. Recently, in *Trevino v. Thaler,* the Supreme Court held that the holding of *Martinez* applies to Texas: "[A] procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that

proceeding was ineffective." *Trevino v. Thaler*, 133 S. Ct. 1911 (U.S. 2013) (*citing Martinez v. Ryan*, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012)). Gobert submits that State habeas counsel was ineffective for failing to present this claim in his State writ of habeas corpus.

State habeas counsel should have fully developed this claim prior to raising it in the State habeas writ. As a consequence, State habeas counsel's performance was deficient.  The State Bar of Texas has identified the "Duties of Habeas Corpus Counsel" in the State Bar of Texas' Guidelines and Standards for Texas Capital Counsel.

http://www.texasbar.com/Content/NavigationMenu/ForLawyers/Committees/TexasCapitalGuidelines.pdf).

The Texas State Bar, in identifying the duties of capital habeas counsel, identified one duty as follows: Habeas corpus counsel cannot rely on the previously compiled record, but must conduct a thorough and independent investigation.  Specifically, habeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the post-conviction investigation. Counsel must not assume that the trial record presents either a complete or accurate picture of the facts and issues in the case.  Further, the State Bar has also stated that state habeas "counsel has a duty to conduct a searching inquiry to assess whether any constitutional violations may have taken place." *Id.*

It should have been obvious to trial counsel that by failing to thoroughly investigate Gobert's jail record, including his history of inappropriate relations with a female jailer, that it was a disastrous move to call Deputy Lass to testify at trial as to a trivial issue concerning the lack of privacy of inmate's property while in jail.   State habeas counsel failed to even raise this point in the state court, thereby leaving this claim unexhausted at the federal habeas level.

**B.      Facts in Support of Unexhausted Claim**

In the state habeas writ, counsel argued that trial counsel was ineffective in failing to investigate Tasha Lass prior to calling her as a defense witness during the guilt/innocence phase of trial and that her recall by the State during the punishment phase of the trial prejudiced the outcome of the penalty phase of trial (SHCR 2/369).   State habeas counsel ("SHC") raised the scantest of facts in support of the IAC claim.   Rather than developing the underlying facts in support of this claim from the record, SHC simply copied a brief summary of the facts about Lass's testimony out of the Texas Court of Criminal Appeal's direct appeal opinion. *Gobert v. State*, 2011 WL 5881601, *2 (Tex. Crim. App. 2011).   The State, in its answer to the state habeas writ, also pointed out this fact to the trial court.

> The Gobert admits his claim was denied on direct appeal and makes no claim that the record was incomplete at that time, or that additional information has been or could be gathered to substantiate this claim. In fact, in summarizing the facts supporting this ground, the Gobert copied four paragraphs from the Court of Criminal Appeals' opinion

on direct appeal verbatim, with the addition of one citation to the record and one switch of the word appellant to Gobert.

State's Answer to Habeas Writ at 31.

Rather than expanding upon the direct appeal issue with additional facts in support of the claim, SHC simply argued that "Gobert's trial counsel admitted to the trial judge [during the punishment trial and after they'd already called Lass as a defense witness in the guilt/innocence phase] that he failed to conduct any investigation into the background of Lass or her relationship with Appellant" (SHCR 2/368). Although SHC explained that the defense team called Lass (without knowing what her testimony would be) for the sole purpose of establishing the lack of privacy of inmates in the Travis County jail, he failed to offer any facts supporting exactly why this was subpar conduct by trial counsel (31 RR 5). By failing to do so, SHC guaranteed that the CCA, the very court that already rejected the claim on direct appeal, would again summarily rejected the claim on state habeas review.

At the time the defense called Deputy Lass, she was employed as a jail guard with the Travis County Sheriff's Office (31 RR 5). Lass testified that she worked at the Travis County downtown jail (31 RR 6). The defense called Lass in the hope of contradicting the testimony of a prior State witness, Homero Carrillo, an inmate who was briefly housed in the Travis County Jail with Gobert (29 RR 26),

and to show the jury just how easy it would be for Carrillo to gain access to his cellmate, Gobert's, legal papers and learn the facts of his case.

The State called Carrillo to testify that while he was in custody with Gobert, he bragged about how he repeatedly stabbed his girlfriend and her son (29 RR 28). Gobert bragged to Carrillo about how he was manipulating the system and that there was not enough evidence to prove his guilt for the murder (29 RR 28). Gobert also bragged that he had no remorse for what he did (29 RR 29).  Carrillo testified to details about the crime including how Gobert wrapped up Cotton with an extension cord and that he took a knife and some bloody clothes from the crime scene (29 RR 30).  Carrillo added that the police were never able to recover this evidence because Gobert washed the bloody clothes and discarded the knife (29 RR 30).

On cross-examination, the defense team simply established that Gobert and Carrillo were only cellmates for a month (29 RR 33).  Defense counsel did not question Carrillo concerning the issue of whether he in fact had access to any of Gobert's discovery or trial materials during the time they were cellmates.  Instead, defense counsel simply asked him if it was true that "in a jailhouse, … if people are getting along, may times they'll share stuff, like commissary, like food or little things like that …." (29 RR 33).  Defense counsel did nothing to raise the possibility in the jury's eyes that Carrillo learned all the above details about

Gobert's offense from seeing his legal papers and not because Gobert made all those damning admissions alleged supra. This sort of thorough cross-examination by counsel would have all but negated the need to even call Lass to testify in the first place.

SHC stated none of the above record facts in the writ. These facts were critical to painting the correct picture as to what might have been the reasoning for the defense electing to call Lass to testify. More troubling than this lapse, is the fact that SHC failed to point out that Lass worked at the Travis County downtown jail (31 RR 6) and Carrillo and Gobert were housed together at the Del Valle complex (29 RR 28). Trial counsel called Lass, a jailer at the Travis County downtown jail, to testify about inmate housing conditions and the lack of privacy of inmate materials in the Del Valle Complex ("and just for the jurors information, there is a Travis County Jail downtown and then there is the Travis County Correctional Complex which is out in Del Valle….") (31 RR 6). State habeas counsel utterly failed to raise the fact that testimony by Deputy Lass concerning jail cell conditions at the Travis County downtown jail offered nothing of relevance to the issue of what those conditions were like at the Del Valle facility where Gobert and Carrillo were cellmates.

> Q.     All right, And let me cover a couple of questions with
> you, Ms. Lass. At least until recently, was it common practice
> that more than one inmate would be housed in the same cell?

A.    Yes, sir.

Q.    And how many typically in **Travis County Jail**, if there were more than one? How many would the cells be usually?

A.    Two, two per cell.

Q.    So two inmates?

A.    Yes, sir.

Q.    Does an inmate have any, say, closet or desk or any kind of secure container or anything that they can keep their papers, their commissary, that kind of thing?

A.    No, sir.

…

Q.    So if an inmate is off, say, visiting his mama at visitation time or visiting his lawyer or whatever and his cellmate is left in his cell, is it possible for a cellmate to have access to the other person's papers, commissary, whatever?

A.    Yes, sir.

(31 RR 7) (emphasis added).

All of trial counsel's questions were premised on what conditions were like at the Travis County Jail, not what cell conditions were like at the Travis County Correctional Complex in Del Valle.  Rather than calling a jailer who could offer relevant testimony concerning the privacy and cellmate issues at the downtown jail where Carrillo and Gobert were housed, trial counsel called Lass to testify to conditions at a totally different facility.  Trial counsel claimed in his affidavit that

Lass was the only jailer that his investigator was able to contact (SHCR 1/165). The fact that Lass was a witness of last resort, in no way excuses counsel's decision to call her to testify without properly vetting her. Counsel could easily have served a subpoena on any number of jailers at the Del Valle complex who could have testified as the issue of jail cell privacy.

SHC failed to mention or raise any of the above points in support of his claim that Gobert's trial counsel was ineffective in failing to properly investigate Lass prior to calling her to testify. Instead SHC simply cut-and-pasted a few general facts from the direct appeal brief and adopted the same exact argument raised by appellate counsel. This is troubling because the direct appeal brief also failed to raise any of the above facts. This failure by SHC created in an insufficient factual record before the state courts and renders this claim essentially unexhausted.

The State's answer to Gobert's writ also failed to raise these critical facts and points from the record. As a consequence, the trial court made findings of fact and conclusions of law relating to this claim on less than a full factual record. Left with no new information to substantiate this claim, the CCA adopted the trial court's findings. The FFCL reinforces the point that SHC did nothing to develop this claim by noting that "Gobert does not contend there is any additional information available at this time that was not available at the time of the direct

appeal" regarding this claim (SHCR 1/164). The FFCL goes on to note that:

> According to Anschutz, Gobert provided Lass's name, along with several others, when counsel asked him for the names of Travis County Jail staff who may have positive things to say about him. Aff. Of Kent Anschutz. Lass was the only person on the list whom counsel's investigator was able to reach, and she agreed to testify about jail procedures to rebut a state witness. According to Anschutz, counsel had no reason to suspect any secret relationship between Gobert and Lass, and even after they conducted an investigation into her background during the day-long continuance, they discovered nothing in her background that would have raised any suspicions even if known before calling her as a witness.

(SHCR 1/164).

These comments by trial counsel confirm that an investigator actually made contact with Lass prior to her being called to testify.  That means trial counsel had an opportunity to confirm that Lass's testimony at trial would have no relevance or bearing whatsoever on the issue of cell conditions at the Del Valle complex prior to calling her to testify.

The FFCL next notes that trial counsel Paul Quinzi "confirmed that it was Gobert's idea to call Lass as a witness, and they did so for the limited purpose of showing he did not have an expectation of privacy in **his** jail cell. Aff. Of Paul Quinzi" (SHCR 1/164) (emphasis added). It should have been  obvious to the entire trial team prior to calling Lass to testify that she worked at a different facility than where Gobert and Carrillo were cellmates (Carrillo testified earlier in the trial that he met Gobert in the Del Valle complex) (29 RR 28).

According to the FFCL, trial counsel Martinez went further in adding that not only did Gobert insist that Lass be called to testify, but that he also "believed that standby appellate counsel Karyl Krug was undermining his efforts and knew of a relationship between Lass and Gobert (SHCR 1/165). Martinez essentially retreats from his absolute discretion as trial counsel in deciding which witness should be called to testify and passes the blame for calling Lass to testify onto Gobert.

The entire defense team in fact goes to great lengths to suggest that they were completely caught off guard by the inappropriate relationship between Gobert and Lass. It is, however, difficult to accept this premise in lieu of all the information counsel likely knew about Gobert's conduct while in the Travis County Jail. In the course of preparing the punishment case, the trial team must have been aware that Gobert was involved in an inappropriate relationship with at least one other female jailer, Patricia Wieczoerk (34 RR 46-53). According to Wiecoerk's superior at the Travis County Sheriff's Office, Captain Lisa Brown, Wiecoerk was reprimanded and placed on restrictive duty as a result of an inappropriate relationship with Gobert (34 RR 47-49).

Q.    And did—was Wiecoerk upset when you and her sergeant confronted her with this relationship?

A.    Yes, she was upset about—I don't think she was upset about the relationship so much as the fact that she was going to be placed on

restricted duty and **everybody would know why.**

(34 RR 49-50) (emphasis added).

Rather than be placed on restrictive duty, Wieczoek resigned the next day (34 RR 50). After she resigned, Wieczoek returned to the jail to visit Gobert 17 times. *Id.* Captain Brown acknowledged that although she did not listen to the recordings of the calls between Wieczoek and Gobert, she was "told that they were of a romantic nature" (34 RR 52).[13] Defense counsel asked no questions of Captain Brown on cross-examination (34 RR 53).

It is unimaginable that Gobert's trial team would have been unaware of his inappropriate relationship with a jailer during their investigation and preparation of Gobert's punishment phase case.  It is certainly standard operating procedure in a death penalty case for counsel to become familiar with an inmate's disciplinary record while in custody awaiting trial to seek out areas that may prove problematic during the punishment phase.  As a consequence, the entire defense team should have been on notice that Gobert exploited openings to have inappropriate relationships with female jailers to suit his needs ("Yeah, but if a guard give me [Gobert] an opportunity as a woman to be with her, of course, I would accept that. I'm not going to sit up here and lie and say I wouldn't") (38 RR 193).

---

13 This testimony by Captain Brown begs the question of whether the defense reviewed these calls as part of its trial preparation in this case.

If counsel had conducted a thorough investigation in this case, then most certainly would have seen a potential problem with calling Lass.  The first red flag to counsel should have been that Lass, a deputy sheriff, agreed to come in and testify on behalf of the defendant in a capital murder trial without the need for a subpoena ("Lass was the only person on the list whom counsel's investigator was able to reach, and she agreed to testify about jail procedures to **rebut a witness for the State**") (Affidavit of Anschutz) (emphasis added). It utterly defies logic and common trial practice in a criminal case that an agent of the State, a deputy sheriff, would willing come into a courtroom in a death penalty trial and offer testimony unfavorable to the State and of benefit to the defendant unless forced to do so by an official subpoena.  Couple this clear breach with common practice with the fact this same agent of the State, Deputy Lass, testified at trial in civilian clothes and thereafter lingered in the courtroom commiserated with the defendant's family (34 RR 60). Despite all these obvious red flags, defense counsel now maintains that they had no reason to believe that there was some sort of inappropriate relationship between Gobert and Lass and that calling her to testify on his behalf about matters to which she had no first-hand familiarity (cellmate conditions in the De Valle Complex), was nothing short of sound trial strategy.  Compounding the problem with all this is the fact that SHC raised none of these points in Gobert's writ.

The full extent of the damage to Gobert's case occasioned by Lass's

testimony did not materialize until she was recalled by the State to testify during the punishment trial. Lass was first called to testify by the State on March 4, 2010 (34 RR 54). She acknowledged that she was involved in an  ongoing affair with Gobert and that he proclaimed his love for her (34 RR 59). Lass testified that she smuggled a cellphone into the jail so that Gobert could regularly talk to her during the course of the trial (34 RR 68).

After the defense rested its punishment case, the State moved to reopen their case and recall Lass (36 RR 145).  After Lass testified on March 4, 2010, she was arrested and charged with introducing contraband into a jail facility (36 RR 146). On Sunday, March 7, 2010, Lass met with a defense attorney and allegedly disclosed to her counsel that Gobert recruited her to help him escape from custody (36 RR 147). Her counsel immediately sought a meeting with Travis County District Attorney's Office to make them aware of this bombshell evidence. *Id.* When Lass was recalled to testify for the State on Monday, March 8, 2010, she went into graphic and horrific detail about Gobert's escape plan. She recounted to the jury that Gobert wanted her to smuggle a .45 caliber firearm, silencer and four magazines of ammunition to use in his escape (34 RR 163). She told jurors that Gobert allegedly planned to get the attention of the post officer, Deputy Fernandes, after the jail hand been cleaned for the night (34 RR 165). Gobert would then shoot Fernandes, drag his dead body into the cell and then change into his uniform (34

RR 170-71). Lass added that Gobert planned to shoot any jailer or inmate who thereafter got in the way of his escape (34 RR 171-73).  After hearing all these horrific details, there was utterly no chance that Gobert would escape imposition of the death penalty.

### C.    Cause and Prejudice under *Trevino* and *Martinez*

There can be no doubt that by failing to properly investigate Lass prior to calling her to testify as to a trivial matter concerning jail privacy, the trial team rendered ineffective assistance of counsel that prejudiced the outcome of the punishment trial. SHC failed to properly investigate, develop and present this viable ineffectiveness claim. Thus, under the principle established in *Trevino,* this claim, at least as it applies to the ineffectiveness of trial counsel, is not barred from this court's review.  However, the principles established in *Trevino* and *Martinez* are also applicable to this claim as a whole, including the Due Process arguments. *Trevino* pointed out that generally, "if a convicted state criminal defendant can show a federal habeas court that his conviction rests upon a violation of the Federal Constitution, he may well obtain a writ of habeas corpus that requires a new trial, a new sentence, or release." *Trevino*, 133 S. Ct. at 1911.  Of course, there are many traps for the unwary defendant, one being the general requirement that claims first be presented to the state courts, this is referred to as procedural default. *Id.* However, the Supreme Court has pointed out "the doctrine barring procedurally

defaulted claims from being heard is not without exceptions.   A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Id.* (internal quotations omitted).

To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, Mr. Gobert must show that (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit," *Martinez,* 132 S.Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.; Trevino,* 133 S.Ct. at 1921. *See Preyor v. Stephens*, 12-70024, 2013 WL 3830160 (5th Cir. July 25, 2013).

As stated supra, SHC presented scant and insufficient factual allegations in support of this IAC claim in state court. SHC's ineffectiveness in this respect renders this claim unexhausted because all the never-before-raised facts in the present claim "fundamentally alter" the legal claim presented and considered by the state courts. *See Dickens*, 740 F.3d at 1317.   The new facts and evidence presented in this writ are significantly different and stronger than the evidence presented by SHC in state court and therefore fundamentally alter this claim on federal habeas review. *See Aiken*, 841 F.2d at 884.

A properly investigated and well-reasoned writ by SHC on this claim would have likely exhausted the issue in the state courts. That, however, is not the case. By simply cribbing the direct appeal brief, SHC failed to adequately develop and present this claim in state court. As a consequence, this claim remains essentially unexhausted. SHC's failure to adequately raise this claim therefore amounts to a total deprivation of Mr. Gobert's right to counsel under the Sixth Amendment. This claim therefore meets the "substantial" requirement set forth in *Martinez* because such a fundamental deprivation of counsel at both the trial and habeas level shakes the very "bedrock" of our justice system.

To demonstrate prejudice, Mr. Gobert must also show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter,* 562 U.S. 86, 131 S.Ct. 770, 792, 178 L.Ed.2d 624 (2013). In the present case, Mr. Gobert meets this very high burden of prejudice. If trial counsel had thoroughly investigated Gobert's jail conduct, they would have known and foreseen the risk akin to calling Lass as a witness at trial. SHC's failure to even suggest these facts to the state court further compounds this inequity.

Accordingly, Mr. Gobert has established that the cause for the default of his ineffective assistance of trial counsel was the result of his State habeas counsel's ineffectiveness. He is therefore entitled to consideration by this Court of the merits of this otherwise procedurally defaulted claim. *Martinez,* 132 S.Ct. at 1320.

> **CLAIM V(A):** GOBERT'S 6th AMENDMENT RIGHT TO COUNSEL WAS VIOLATED WHEN HE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AS A RESULT OF HIS LEGAL TEAM CALLING TASHA LASS TO TESTIFY DURING THE GUILT-PHASE AND THEREBY FAILING TO ADEQUATELY INVESTIGATE THE FACTS OF THE PUNISHMENT CASE AS REQUIRED BY *STRICKLAND V. WASHINGTON*, 466 U.S. 668 (1984).

### EXHAUSTION:

The undersigned hereby incorporated the facts and legal arguments set forth supra in Claim V. Assuming arguendo that the Court finds that Claim 5 was exhausted in the state courts, Gobert raises this claim in the alternative. This claim was properly preserved for federal review, having been presented in the State habeas writ as Claim V (SHCR 2/369). The trial court entered FFCLs denying this claim (SHCR 1/165).

**ISSUE RESTATED:** The trial court's FFCL that this claim was barred because Gobert's appellate counsel raised this claim on direct appeal and state habeas counsel failed to offer new evidence and that trial counsel was nevertheless not ineffective for failing to thoroughly investigate Lass is the result of a misapplication of the facts of this case to well-settled federal law under *Strickland*.

### A.      Facts Supporting Gobert's Claim

Under the standards recognized by the court in *Strickland v. Washington*, 466 U.S. 668 (1984), Gobert received ineffective assistance of counsel as a result of his legal team's failure to investigate its own witness, Tasha Lass, prior to putting her on the stand to testify about jail conditions.   Gobert also received ineffective assistance of counsel when trial counsel failed to prepare him to testify during the punishment phase of his trial.

A habeas petitioner claiming ineffective assistance of counsel must prove that counsel's performance was unconstitutionally deficient and that the deficient performance prejudiced her defense.  See *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "'Counsel's performance is considered deficient if it falls below an objective standard of reasonableness as measured by professional norms.'"  *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (en banc) (quoting *Strickland*).   This Court "must determine whether there is a gap between what counsel actually did and what a reasonable attorney would have done under the circumstances."  *Id*.

To establish prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id*. at 391; *See also Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000).   The relevant query is whether one

juror's mind might have been changed had counsel performed adequately. *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993).

The *Strickland* standard applies in both the guilt/innocence and punishment phases of a trial.  *Strickland*, 466 U.S. at 686-87.

## B      Facts Supporting Gobert's Claim

### 1. Tasha Lass

The defense called Deputy Tasha Lass in the guilt stage to testify to the lack of privacy in the Travis County jail cells.  Her testimony could explain how appellant's cellmate might have learned about the details of the capital murder from a source other than appellant's confession to him.  When the defense requested that Deputy Lass be allowed to remain in the courtroom after her short testimony was complete, however, the prosecutors' suspicion were aroused.  They investigated and later called Deputy Lass during the punishment phase to testify to her improper relationship with appellant and to the fact that appellant had manipulated her into sneaking a cell phone into the jail for him.  The State called her again when, at the suggestion of her own attorney, she admitted that appellant had tried to talk her into bringing him a .45 pistol, silencer, and four magazines of ammunition to help him implement his escape plan.

After hearing the testimony of the escape plan, Gobert's trial counsel made an oral motion for continuance because Deputy Lass's testimony was "highly

inflammatory" and "devastating, to say the least. . . . I mean, for all we know she may be psychotic." Counsel explained, "We need to have my investigator check her background, check some of the stuff she said, whether or not it's true, classic impeachment stuff that we're now being denied because all of a sudden this stuff just came up." 37 R.R. 4

The trial judge told the prosecutors to give defense counsel any criminal record they could find on Deputy Lass, and he suggested that counsel take her on voir dire to "establish a baseline" for impeachment research.  After completing that voir dire, the trial judge postponed cross-examination until the next day to give the defense time to research possible avenues of impeachment.  The next day, defense counsel said that they had not had enough time to make a thorough investigation, so the trial judge gave them a daylong continuance and ordered jailers to permit defense counsel to view appellant's cell and the jail layout.

When the court reconvened, defense counsel made another oral motion for continuance.  At that point, the trial judge overruled the motion, stating that cross-examination was likely the best means of discovering information because he would not allow other witnesses to impeach Deputy Lass on collateral matters.

2. Failure to Prepare Gobert to Testify

Prior to starting trial, Gobert's trial attorney knew that Gobert was intending to testify.  In fact, in a interview for the *Austin-American Statesman* on February 21, 2010, (before trial started) trial counsel stated the following:

> "Gobert will testify that he killed Cotton, said Leonard Martinez, one of his lawyers.  Martinez said that the two had a long and at times intimate relationship and that the fatal stabbing came in a fit of passion."14

Despite knowing that Gobert was intending to testify, trial counsel did not prepare him to testify and, basically, "threw him to the wolves."

## C   Argument and Authorities

Trial counsel carries the obligation to make an *independent* investigation of the facts of the case and not blindly rely on the veracity either of his client's version of the facts or witness statements in the State's file. "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, *supra*, 466 U.S. at 691.

Gobert's trial counsel admitted to the trial judge that he did not conduct any investigation into the background of Lass or her relationship with Gobert prior to calling her to testify.  This failure to investigate, or even question, Lass prior to her

---

14 Kreytak, Seven, "*After years of delays, capital murder trial begins today*," Austin-American Statesman (Feb. 21, 2010), available at: www.statesman.com/news/local/after-years-of-delays-capital-murder-trial-begins-265379.html

testimony proved to be a critical mistake when she testified about her relationship to Gobert and the escape plan.

The Texas Court of Criminal Appeals denied this claim on direct appeal. In denying this claim, the Court excused trial counsel's failure to investigate Lass because: "Appellant's counsel had no reason to suspect any secret relationship between appellant and a law-enforcement officer and thus no reason to investigate that relationship or the officer's background." *Gobert v. State*, No. AP-76,345 (Tex. Crim. App. - 2010) (page 25).[15]   However, it defies imagination that an experienced trial attorney would not question why a jailer would voluntarily, without a subpoena, testify on behalf of a capital murder defendant. Indeed, the prosecutors quickly figured this out and investigated Lass overnight thereby discovering her relationship with Gobert.

## D   Summary of Ineffective Investigation Argument

It is well settled that a criminal defense lawyer must have a firm command of the facts of the case as well as governing law before he can render reasonably effective assistance of counsel. A natural consequence of this notion is that counsel has the responsibility to seek out and interview potential witnesses. The failure to interview witnesses is not trial strategy unless and until the trial attorney has conducted the necessary legal and factual investigation which would enable

---

15 As noted supra in Claim V, state habeas counsel added nothing of substance to the claim raised by appellate counsel.

him to make an informed rational decision.  Counsel has a duty to bring to bear such skill and knowledge as will render the trial a "reliable adversarial testing process." *Strickland*, 466 U.S. at 688.

The failure of Gobert's defense team to conduct an adequate punishment investigation resulted in grievous harm to Gobert.   There is a reasonable probability that, if this evidence had been presented, the outcome would be different.   The trial court's FFCL are therefore the result of a misapplication of well-settled federal law under *Strickland* to the facts of this case.

> **CLAIM NUMBER VI:  STATE HABEAS COUNSEL WAS INEFFECTIVE UNDER *MARTINEZ V. RYAN* FOR FAILING TO RAISE THE ISSUE OF WHETHER TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO TIMELY PURSUE THE INVESTIGATION AND FILING OF A MOTION FOR NEW TRIAL AND THEREAFTER MOVING TO WITHDRAW FIVE DAYS PRIOR TO THE FILING DEADLINE FOR SAID MOTION.**

Mr. Gobert hereby reiterates the facts set out in Claims I and II for relief and hereby incorporates them by reference in support of this claim.

**A.    *Martinez* Unexhausted Claim Standard**

Due to the ineffective assistance of State habeas counsel, this claim was not adjudicated in the State courts.   State habeas counsel failed to raise this issue in Mr. Gobert's State habeas writ. As a consequence, counsel raises this unexhausted and procedurally defaulted claim under the Supreme Court's holding in *Trevino*. Recently, in *Trevino v. Thaler,* the Supreme Court held that the holding of

*Martinez* applies to Texas: "[A] procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Trevino v. Thaler*, 133 S. Ct. 1911 (U.S. 2013) (*citing Martinez v. Ryan*, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012)). Gobert submits that State habeas counsel was ineffective for failing to present this claim in his State writ of habeas corpus.

State habeas counsel should have discovered and raised this claim. As a consequence, State habeas counsel's performance was deficient. The State Bar of Texas has identified the "Duties of Habeas Corpus Counsel" in the State Bar of Texas' Guidelines and Standards for Texas Capital Counsel. http://www.texasbar.com/Content/NavigationMenu/ForLawyers/Committees/TexasCapitalGuidelines.pdf).

The Texas State Bar, in identifying the duties of capital habeas counsel, identified one duty as follows: Habeas corpus counsel cannot rely on the previously compiled record, but must conduct a thorough and independent investigation. Specifically, habeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the post-conviction investigation. Counsel must not assume that the trial record presents either a complete or accurate picture of the facts and issues in the case. Further, the State

Bar has also stated that state habeas "counsel has a duty to conduct a searching inquiry to assess whether any constitutional violations may have taken place." *Id.*

It should have been obvious to trial counsel that      .

The record establishes that at trial, defense counsel offered the audiovisual recording of appellant's oral statement without qualification and for all purposes while cross-examining one of the detectives who interviewed appellant. The prosecutor did not object, and the recording was published to the jury. By offering his oral statement into evidence, appellant waived error concerning the trial court's ruling on his motion to suppress this statement.

*Soliz v. State*, 432 S.W.3d 895, 903 (Tex. Crim. App. 2014) *cert. denied,* 135 S. Ct. 1154, 190 L. Ed. 2d 915 (2015).

## B.     Facts in Support of Unexhausted Claim

After sentencing, the trial court entered a certification of the defendant's right to Appeal (SHCR 1/94).   On March 15, 2010, trial court appointed Karyl Krug as Gobert's direct appeal counsel (SHRC 1/96).   On March 30, 2010, Gobert's trial counsel, Leonard Martinez, filed a motion seeking to have Ms. Krug removed as appellate counsel and requesting the appointment of "qualified" appellate counsel (SHCR 1/98-103).   Mr. Martinez claims in the motion that after Ms. Krug was appointed to handle the interlocutory appeal of Gobert's suppression motion, the two counsel "developed a personal conflict over another unrelated case" (SHCR 1/99).   To summarize, Mr. Martinez claimed that as a result of this conflict, Ms. Krug had: 1) failed to maintain communication with lead trial

counsel; 2) failed to communicate to lead counsel any issues Gobert may communicated to appellate counsel; 3) appellate counsel failed to offer "any assistance or ask for any information to determine whether there were any deficiencies that need to be addressed"; 4) appellate counsel failed to advise lead trial counsel that she continued to have contact with the Defendant and "that she was providing the Defendant any information or advice; and 4) appellate counsel "never advised the Defendant that there had developed a personal conflict between her and lead counsel" (SHCR 1/99).  Additionally, Martinez claims that he "was finally advised that Ms. Krug had been the source of information denigrating lead counsel and it was the Defendant who advised lead counsel [of this information in a letter]." *Id.*  Martinez maintained that Krug was actively undermining his representation of Gobert and encouraged him to request the appointment of another trial lawyer. *Id.*  Thereafter, Martinez and Gobert reconciled and he remained his trial counsel. *Id.*

In an astonishing admission, Martinez advised that as a consequence of this rift with Krug he was forced to abandon his "originally developed" trial strategy and pursue a "different strategy" that he believe was not the "best strategy" (SHCR 1/99-100).  Martinez's motion also claimed that his decision to call Tasha Lass was also the result of Ms. Krug's "alienation efforts" (SHCR 1/101). The decision by trial counsel to call Lass to impeach the testimony of a jail information who earlier

testified at trial proved to be a disastrous trial strategy that all but guaranteed Gobert would receive the death penalty. Martinez maintained that Krug failed to disclose to the defense team that Lass had previously sought her legal counsel and that she, Lass, told Krug of her inappropriate sexual relationship with Gobert while he was in custody. *Id.*

On April 5, 2010, Krug filed a response to Martinez's motion requesting the appointment of new appellate counsel (SHCR 1/107-19). Krug sets out a backdrop for the trial court of "a long and wearisome road [she's travelled] with Mr. Martinez, from defending Mr. Martinez from allegations of ineffective assistance of counsel in the Rosa Estela Olvera Jimenez [case], to filing an ineffective assistance of counsel claim against Mr. Martinez in the same case" (SHCR 1/107). She claimed that "[i]t is Mr. Martinez's reaction to the latter that resulted in his attempts to have the undersigned counsel removed as appellate counsel in this unrelated case." *Id.*

Krug also advised the trial court that:

> Mr. Martinez told this Court and all counsel that he planned to file a motion for new trial in this case. He lied. The undersigned counsel found out at the close of business on Friday, April 2, 2010, that Mr. Martinez had filed a motion to withdraw wherein he stated for the first time that he did not intend to file a motion for new trial. This gives the undersigned counsel less than five business days in which to investigate, draft and file a motion for new trial in a death penalty case. Mr. Martinez's conduct in this regard is completely inexcusable.

*Id.*

Ms. Krug then continues with a chronology of what she describes as "fabrictions or delusions" by Martinez that "conflated the personal, the political, and the professional to justify his actions and accusations in the present case. *Id.*  Rather than retread this history of resentment and animosity, it suffices to simply say that Mr. Martinez and Ms. Krug have an unworkable professional and personal relationship.

As a consequence of all this back and forth bickering by counsel, Gobert was denied the effective assistance of trial counsel at the very critical stage surrounding his possible motion for new trial.  Krug urged in her motion that:

> Martinez made a point of telling the undersigned counsel and the Court on March 24 and even before that he was going to filed the motion for new trial in this case. Exhibit S. The undersigned counsel was informed at the close of business on April 2, Good Friday, that Mr. Martinez had filed a motion to withdraw in which he stated he would not file the motion for new trial. The undersigned counsel could not even start on the motion until Monday, April 5, because it was too late to pull the Clerk's file on Friday. That gives the undersigned counsel exactly five business days, or less, to investigate and file a motion for new trial in a death penalty case. As the Court is aware, the Court of Criminal Appeals held that the motion for new trial period is a critical stage of a criminal proceeding in which a defendant is entitled to the effective assistance of counsel. Mr. Martinez, by refusing to withdraw [after sentencing], insisting he was going to do the motion for new trial, then withdrawing without filing the motion or informing the undersigned that he was doing so, has effectively denied the Defendant any representation at all during the

25 of the 30 days in which to file a motion for new trial.[16]

State habeas counsel failed to raise this viable ineffectiveness claim. Thus, under the principles established in *Trevino,* this claim, at least as it applies to the ineffectiveness of trial counsel, is not barred from this court's review. However, the principles established in *Trevino* and *Martinez* are also applicable to this claim as a whole, including the Due Process arguments. *Trevino* pointed out that generally, "if a convicted state criminal defendant can show a federal habeas court that his conviction rests upon a violation of the Federal Constitution, he may well obtain a writ of habeas corpus that requires a new trial, a new sentence, or release." *Trevino,* 133 S. Ct. at 1911. Of course, there are many traps for the unwary defendant, one being the general requirement that claims first be presented to the state courts, this is referred to as procedural default. *Id.* However, the Supreme Court has pointed out that "the doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Id.* (internal quotations omitted).

To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, Mr. Gobert must show that (1) his

---

16 Texas Rule of Appellate Procedure 25.2(b) requires that in every death penalty case, the clerk of the trial court shall filed a notice of conviction with the Court of Criminal Appeals within 30 days after the defendant is sentenced to death, thereby divesting the trial court of jurisdiction to consider a motion for new trial filed after 30 days of sentencing].

underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit," *Martinez*, 132 S.Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.; Trevino*, 133 S.Ct. at 1921. *See Preyor v. Stephens*, 12-70024, 2013 WL 3830160 (5th Cir. July 25, 2013).

State habeas counsel's failure to raise trial counsel's last-minute abandonment of his commitment to investigate and file a motion for new trial in this case prejudiced the outcome of Gobert's case. As stated supra in Claim 1, Jason Gibson offered evidence establishing that Gobert and Cotton were romantically involved and that he therefore did not murder her in the course of committing a robbery. This evidence, could have and should have been investigated by Mr. Martinez and presented in Gobert's motion for new trial. If presented, this evidence would have no doubt prompted a hearing in the trial court that would have had a significant impact on the ultimate outcome of this case. This is just one example of what could have been raised in a motion for new trial had Martinez not abandoned Gobert at this critical stage.

To demonstrate prejudice, Mr. Gobert must also show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter,* 562 U.S. 86 (2013).   In the present case, Gobert meets this very high burden of prejudice. State habeas counsel further compounds this inequity by failing to raise this issue in Gobert's State writ.

Accordingly, Gobert has established that the cause for the default of his ineffective assistance of trial counsel was the result of his State habeas counsel's ineffectiveness.  He is therefore entitled to consideration by this Court of the merits of this otherwise procedurally defaulted claim.  *Martinez,* 132 S.Ct. at 1320.

**CLAIM VII:** GOBERT'S DEATH SENTENCE WAS ARBITRARILY AND CAPRICIOUSLY ASSIGNED BASED ON THE JURY'S ANSWER TO THE UNCONSTITUTIONALLY VAGUE FUTURE DANGEROUSNESS ISSUE

**EXHAUSTION:**

This claim was presented as Claim Six at pages 110-111 of Gobert's state writ, and as Claim 8 at pages 118-119.

The FFCL rejected this claim at page 12.

Texas employs a unique sentencing scheme which requires the jury to predict "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  TEX. CODE

CRIM. PROC. art. 37.071 § 2(b)(1).[17]  The ABA has long recognized the problems

with this future dangerousness special issue.  *See Barefoot v. Estelle*, 463 U.S. 880,

930 (1983) (Blackmun, J., dissenting) (citing the ABA amicus brief for the claim

that jurors are not well-suited to predict future dangerousness).  Most recently, the

ABA released The Texas Capital Punishment Assessment Report which called on

Texas to "abandon altogether the use of the 'future dangerousness' special issue"

as it and other aspects of the Texas sentencing scheme "place limits on a juror's

ability to give full consideration to any evidence that might serve as a basis for a

sentence less than death."  ABA, THE TEXAS CAPITAL PUNISHMENT ASSESSMENT

REPORT, at viii, xxxix .

Among the ABA's concerns with the Texas scheme is that the key terms of

the future dangerousness issue are undefined.  *See* ABA Texas Assessment Report

at 308.  Additionally, the ABA notes that juries must unanimously find a

probability of future dangerousness before reaching the question of mitigation, thus

placing future dangerousness "at the center of the jury's punishment decision."

ABA, THE TEXAS CAPITAL PUNISHMENT ASSESSMENT REPORT, at 307.

The concerns raised by the ABA are consistent with violations of Gobert's

Eighth and Fourteenth Amendment rights as articulated in Supreme Court doctrine.

---

[17] If jurors answer this question, referred to as Special Issue One, with a "Yes," jurors are asked to answer another Special Issue.  If the jurors answer "No" to this question, the defendant is automatically sentenced to a term of life without the possibility of parole.

The future dangerousness special issue is unconstitutionally vague, fails to narrow the class of death-eligible defendants, leads to the arbitrary and capricious imposition of the death penalty, and limits the jury's ability to give full consideration to evidence that may serve as a basis for a sentence less than death. As such, Gobert's death sentence was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights and United States Supreme Court and state case law, and must therefore be reversed.

Article 37.071, section 2(b)(1) of the Texas Code of Criminal Procedure is unconstitutionally vague in that it fails to define any of the key terms in the future dangerousness special issue.  As a result, "[j]urors are left to comprehend [these terms] so broadly that a death sentence would be deemed warranted in virtually every capital murder case."  ABA, THE TEXAS CAPITAL PUNISHMENT ASSESSMENT REPORT, at viii.

The Supreme Court has long held that juror discretion must be channeled in capital cases.  *Gregg*, 428 U.S. at 189 (citing *Furman*, 408 U.S. at 238 ("Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.").  In *Godfrey v. Georgia*, the Court held that a state's aggravating factors must not be defined in such a way that people of ordinary sensibilities could find

that nearly every murder met the stated criteria.  446 U.S. at 428-29.  In order to avoid the arbitrary and capricious imposition of the death penalty struck down in *Furman*, states must narrow the class of death-eligible defendants "by providing specific and detailed guidance to the sentencer."  *McCleskey*, 481 U.S. at 303 (internal citations and quotation omitted); *see also Maynard v. Cartwright*, 486 U.S. 356, 362 (1988) ("Since *Furman*, our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action.").

While the Texas future dangerousness issue is not presented to the jury until the punishment phase of trial, it must be found beyond a reasonable doubt before mitigating evidence may be considered.  TEX. CODE CRIM. PROC. art. 37.071 § 2(b)–(e).  Accordingly, it acts as a de facto determinant of death eligibility and therefore must meaningfully narrow the class of death-eligible defendants.

Texas does not statutorily define the key terms in the future dangerousness special issue.  Rather, the terms are left to be interpreted according to their ordinary meaning.  *See Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007).  Absent a statutory definition to the contrary, the term "probability" is reasonably understood to mean some "likelihood of the occurrence of any particular form of an event."  *Granviel v. State*, 552 S.W.2d 107, 117 n. 6 (Tex.

Crim. App. 1976); *see also Jurek*, 522 S.W.2d at 945 (Odom, J., dissenting) ("The statute does not require a particular degree of probability but only directs that some probability need be found.").  The degree of violence is not specified and could realistically range from capital murder down to simple assault.  *See* Christopher Slobogin, *Capital Punishment and Dangerousness*, *in* MENTAL DISORDER AND CRIMINAL LAW: RESPONSIBILITY AND COMPETENCE 119, 121, 125 (Robert F. Schopp et al. eds., 2009) (questioning what qualifies as "dangerousness" and "criminal acts of violence").  Essentially, the jury is asked to determine whether there is any likelihood that Gobert might commit any act of violence in the future that poses a continuing threat to society.  Psychiatrists, however, are unable to completely rule out the possibility of *any* person committing future acts of violence, much less a person that was just convicted of a violent crime.  *See* Michael L. Radelet & James W. Marquart, *Assessing Nondangerousness During Penalty Phases of Capital Trials*, 54 ALB. L. REV. 845, 849 (1989-1990) ("Predictions of violent behavior are difficult because the probabilities considered in the prediction are conditional.  That is, each of us, given certain circumstances, might engage in violent behavior in the future; thus, each of us has a non-zero probability of killing another.").  Even when predictions are based on actuarial data, which are now considered to be slightly more accurate than clinical determinations, a defendant's risk of future dangerousness is phrased in terms of

non-zero probabilities.  *See, e.g.*, Laura S. Guy, et al., *Assessing Risk of Violence Using Structured Professional Judgment Guidelines*, J. FORENSIC PSYCHOL. PRAC., May 2012, at 272 ("[Mental health professionals] are encouraged to communicate level of risk using categorical levels of low, moderate, and high.").

The fact that every person has a non-zero probability of committing future acts of violence shows that the future dangerousness special issue does nothing to narrow the class of death-eligible defendants.  Moreover, the fact that any capital defendant is found *not* to be a future danger is evidence that the determination is based on caprice rather than reason.  In Gobert's case, the fact that this dubious determination had to be made beyond a reasonable doubt before the jury was presented with the mitigation special issue limited the jury's ability to give full consideration to evidence that might serve as a basis for a sentence less than death. *See Tennard*, 542 U.S. at 278 ("It is not enough simply to allow the defendant to present mitigating evidence to the sentencer.  The sentencer must also be able to consider and give effect to that evidence in imposing the sentence.").

As a result, Gobert's sentence was unlawfully and unconstitutionally imposed in violation of his applicable state and federal Constitutional rights, and therefore must be reversed.

### CLAIM VIII: GOBERT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHTS WERE VIOLATED UNDER *APPRENDI* BECAUSE IT PUT THE BURDEN OF PROVING THE MITIGATION SPECIAL ISSUE ON

**GOBERT RATHER THAN REQUIRING THE STATE TO MAKE THE FINDING BEYOND A REASONABLE DOUBT**

**Exhaustion:**

This claim was raised as Claim Seven of the state writ at pages 112-117.

The FFCL rejected this claim at pages 13.

### A.    Baseline Principle: The Texas Mitigation Special Issue Includes Consideration of Aggravating Factors

### 1.    Special Issues Under Article 37.071

Before a defendant may be sentenced to death in Texas, the jury must answer statutory special issues in a certain way. *See* TEX. CODE CRIM. PRO. art. 37.071 (Art. 37.071).  After a Texas defendant is convicted of capital murder, a series of questions known as "special issues" are submitted to the jury. *Id*. Based on the jury's answer to the special issues the defendant will be sentenced to life in prison or death. *Id*. In Gobert's case, pursuant to Art. 37.071, sec. 2(b), the jury was first asked the following question: "Do you find beyond a reasonable doubt that there is a probability that the defendant, Milton Gobert, would commit criminal acts of violence that would constitute a continuing threat to society?" The state was required to prove this special issue beyond a reasonable doubt, and the jury was instructed that they could not answer this special issue "yes" unless they agreed unanimously. See Art. 37.071(d)(2). This claim does not involve the first special issue because

the jury was required to find this "aggravating factor" beyond a reasonable doubt.

If the jury finds the answer to special issue no. 1 to be "yes," they are instructed to move onto the second special issue, which asks: "Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Milton Gobert, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentenced be imposed?" *See* Art. 37.071(e)(1). This is known as the mitigation special issue and was adopted to meet the Eighth Amendment requirement that jurors in death penalty cases be allowed to consider all mitigation evidence when considering the death penalty. *See Penry v. Lynaugh*, 492 U.S. 302 (1989).

### 2.   Aggravating Circumstances Can Be Considered in Connection With The Mitigation Special Issue

The cynosure of this sentencing rubric is Texas Court of Criminal Appeals doctrine interpreting the mitigation special issue to encompass aggravating evidence which is only relevant to the mitigating issue. In *Jackson v. State*, the Court explained that "we have recently recognized that aggravating circumstances can be considered in connection with the mitigation special

issue." 992 S.W.2d 469, 478 (Tex. Crim. App. 1989) (citing *Mosley v. State*, 983 S.W.2d 249, 264-272 (Tex. Crim. App. 1998)). "In *Mosley*, we explained that aggravating circumstances may be relevant to determine whether a particular mitigating circumstance or set of circumstances is sufficient to warrant a life sentence." *Id*.

### 3.   Conclusion

As the Texas mitigation special issue encompasses aggravating circumstances, the jury should be instructed that it must find those aggravating circumstances beyond a reasonable doubt before they can consider those factors in answering the mitigation special issue.

### B.   At A Minimum, No Reasonable Jurist Could Countenance The State's Court's Misapplication of Federal Constitutional Law

No Fifth Circuit case has held that reasonable doubt can **never** control the selection phase. While this is true of one type of case (not imposing this standard concerning an absence of mitigating circumstances) it is an entirely different matter when aggravating evidence is blended with mitigation evidence at the selection phase.   *Penry* is based upon the core principle that the Eighth Amendment requires individualized sentencing in which the capital jury can consider and give effect to any mitigating evidence that is relevant to the defendant's moral culpability and may persuade the jury that a life sentence is warranted rather than death. *Penry v. Lynaugh*, 492 U.S. at 319.   These

"fundamental principles" are applied to all mitigation evidence, regardless of type or category. *Abdul-Kabir*, 127 U.S.at 1670-71. The State must not be allowed to accomplish in two moves what it cannot do in one: prohibit a jury's full consideration of relevant mitigation evidence by relaxing the Constitutional requirements imposed on aggravating evidence.


### C.    The Conclusion That *Apprendi* is Not Applicable to This Claim is Contrary to Clearly Established Federal Law

Notwithstanding the self-professed "novelty" of this claim, the conclusion that *Apprendi* is not applicable to this claim is contrary to clearly established law. The State must prove aggravating factors considered by the jury in answering the mitigation special issue beyond a reasonable doubt.

*Ring* decided the exact same issue raised here: does *Apprendi* apply to the Arizona capital sentencing scheme even though the statutory maximum for that crime was the death penalty? *Id.* at 591. "In Arizona, following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determines the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty." *Id. Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Thus, since

123

*Apprendi* applies to the finding of aggravating factors in *Ring,* this same finding must also apply to aggravating factors in Texas' death penalty jurisprudence.

*Ring* recognized that "[u]nder Arizona law, Ring could not be sentenced to death, the statutory maximum penalty for first-degree murder, unless further findings were made." 536 U.S., at 592. It necessarily follows that a Texas capital defendant could not be sentenced to death (the statutory maximum) unless the first special issue was answered "yes" and the second special issue answered "no".  TEX. CODE CRIM. PROC. ART. 37.071 2(d)(2).

The *Ring* Court then explained that,  "[i]f a State makes an  increase  in  a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." 536 U.S., at 602. This applies to  the issue  at  hand  because  the State increased  the  defendant's sentence to death, based  on  the  jury's  finding  that mitigating evidence did not overcome aggravating evidence so as to warrant a life sentence. "The required finding [of an aggravated circumstance] expose[d] [Ring] to a greater punishment than that authorized by the jury's guilty verdict."  *Id*. at 602 (internal citation omitted).

It necessarily follows that *Apprendi* applied to *Ring* despite the fact that the judge's finding did not increase the statutory maximum for the crime *Ring* was

convicted of. "Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." *Id*. at 609 (citing *Apprendi* at 494, n.19). Likewise, the finding that mitigating evidence does not call for sentence of life is the equivalent of an element of a greater offense, especially where the jury is permitted to consider aggravating factors in deciding on the mitigation special issue.

> **CLAIM IX:** GOBERT'S FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS AND EIGHT AMENDMENT RIGHT TO BE FREE FROM ARBITRARY AND CAPRICIOUS PUNISHMENTS WERE VIOLATED BECAUSE THE TEXAS DEATH PENALTY STATUTE LACKS MINIMAL STANDARDS FOR A JURY TO DETERMINE WHO SHOULD LIVE AND WHO SHOULD DIE

> **CLAIM X:** GOBERT'S FOURTEENTH AMENDMENT/DUE PROCESS RIGHTS AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED UNDER *PENRY V. JOHNSON* BECAUSE THE MITIGATION SPECIAL ISSUE SENDS MIXED SIGNALS

## EXHAUSTION:

Claim 9 was raised in the state writ on pages 120-22.

Claim 10 claim was raised in the state writ on pages 123-126.

The FFCL denied relief on Claim 9 at page 13 and Claim 10 on page 14.

### A.    Baseline Legal Principles

"Mitigating evidence concerning a particular defendant's character or background plays a constitutionally important role in producing an individualized

sentencing determination that the death penalty is appropriate in any given case." *Moore v. Johnson*, 194 F.3d 586, 612 (5th Cir. 1999). Capital juries must be afforded the opportunity to consider and give effect to all evidence in mitigation of a death sentence. *See, e.g., Skipper v. South Carolina*, 476 U.S. 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978) (plurality opinion). Jury instructions that may reasonably be construed to limit the jury's consideration of relevant mitigating evidence accordingly violate the Eighth Amendment.[18] *See, e.g., Tennard v. Dretke*, 524 U.S. 274, 284-85 (2004); *Penry v. 127 Johnson,* 532 U.S. 782, 797 (2001); *Hitchcock v. Dugger,* 481 U.S. 393 (1987). This is so because "it is only when the jury is given a 'vehicle for expressing its "reasoned moral response" to that evidence in rendering its sentencing decision,'... that we can be sure that the jury 'has treated the defendant as a "uniquely individual human being" and has made a reliable determination that death is the appropriate sentence ....' " *Penry*, 532 U.S., at 797 (citations omitted).

## B.    Issue Overviewed

"[T]he relevant inquiry [is] whether there was a reasonable likelihood that the jury would interpret [the jury instructions and verdict forms] in a manner that

---

[18] In capital cases, the Supreme Court has "addressed the relevance standard applicable to mitigating evidence... in the most expansive terms.... 'Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard*, 524 U.S. 274, 284 (2004) (citations omitted). "[V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Id*. at 285 (citations omitted). *See, e.g., Coble v. Quarterman*, 496 F.3d 430, 444-45 (5th Cir. 2007).

precluded it from fully considering and giving full effect to all of the defendant's mitigating evidence." *Nelson v. Quarterman*, All F.3d 287, 293 (5th Cir. 2006) (en banc) (citing *Tennard*, 542 U.S., at 288-89, and *Smith v. Texas*, 543 U.S. 37, 38 (2004) (per curiam)). Here, there is an unacceptable risk that one or more jurors was unable "to express his reasoned moral response to evidence that has mitigating relevance," *id*., because he or she reasonably construed the jury instructions and verdict forms to require that he find that each and every prong of the court's composite mitigating factors was both true and worthy of weight in order to consider any aspect of those factors in deciding Gobert's sentence. *Cf. McCoy v. North Carolina*, 494 U.S. 433, 440 (1990) ("it would be the 'height of arbitrariness to allow or require the  imposition of the death penalty" where 1 juror was able to prevent the other 11 from giving effect to mitigating evidence" because of instructions that could reasonably be construed to require jury unanimity regarding mitigating factors) (quoting *Mills v. Maryland*, 486 U.S. 367, 374 (1988)). Here, it would be the "height of arbitrariness" to permit or require Gobert's jurors to ignore mitigating evidence they found to exist because it had been inextricably linked by the instructions and verdict forms to evidence they concluded had not been proved by a preponderance of the evidence.[19]

---

[19] Gobert does not contend that the Constitution or FDPA require a district court to instruct the jury on the specific mitigating factors alleged in any given case. The Supreme Court has held that such instructions are not generally required under the Eighth Amendment, *Buchanan v. Angelone*, 522 U.S. 269 (1998).

### C.      The Texas Statute and Gobert's Jury Instructions

Article 37.071 of the Texas Code of Criminal Procedure governs the instructions given to Texas capital juries.   The statute requires a trial court to submit at least two issues to the jury: (1) whether there is a probability that the defendant constitutes a continuing threat to society; and (2) whether, considering all the evidence, there are sufficient mitigating circumstances to warrant a sentence of life imprisonment without parole.   TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1), (e)(1).   With respect to the mitigating circumstances special issue, the court must instruct the jury that, if it answers that a circumstance warrants a sentence of life imprisonment without parole rather than a sentence of death, the defendant will receive a life sentence and will not be ineligible for parole.   *Id.* at § 2(e)(2)(A)-(B).   Furthermore, the court must instruct the jury to answer this special issue "Yes" or "No," that it may not answer "No" unless by unanimous agreement, that it may not answer "Yes" unless ten or more jurors agree,[20] and that the jurors need not agree on which evidence in particular is mitigating.   *Id.* at § 2(f)(1)-(3).

In addition to these procedural instructions, Texas law requires the court to instruct the jury that it "shall consider mitigating evidence to be evidence that a juror might regard *as reducing the defendant's moral blameworthiness*."   TEX. CODE CRIM. PROC. art. 37.071, § 2(f)(4) (emphasis added).   No definition of

---

20 This instruction is itself unconstitutional.  *See* Claim Fifteen, *ante*.

"moral blameworthiness" is provided, nor are additional instructions given as to the relationship between this instruction and the demands of the special issue itself.

As directed by the statute, the trial court in Gobert's case gave the statutorily required instructions during the punishment phase of trial and before the jury retired to deliberate. In particular, the court's charge included the following:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

Further tracking Article 37.071, the charge included the following paragraph: "In deliberating on Special Issue Number 3, you shall consider mitigating evidence to be evidence that a juror might regard *as reducing the defendant's moral blameworthiness*." (*Id.* at 2127 (emphasis added).

### D. Texas's Statute Unconstitutionally Limits the Categories of Evidence a Capital Jury May Find Mitigating and to Warrant a Life Sentence

The Supreme Court requires that a jury "be permitted to 'consider fully' [] mitigating evidence" that provides a basis for a sentence of life rather than death." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 260 (2007). "[S]uch consideration," the Court has explained, "would be meaningless unless the jury not only [has] such evidence available to it, but also [is] permitted to give that evidence meaningful,

mitigating effect in imposing the ultimate sentence."  *Id*. (internal quotations omitted).  Each juror is entitled to broad discretion in assessing the import of that mitigating evidence which the defense proffers; at the same time, the State may not limit this evidence to those categories which the State deems as mitigating.  As said the Court in *Tennard v. Dretke*:

> [A] State cannot bar the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.

542 U.S. 274, 285 (2004) (internal quotations omitted).

*See also McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) ("[T]he Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence.").

Consistent with this jurisprudence, the avenues of mitigation open to a capital jury cannot be limited to evidence that relates solely to the defendant's culpability, the nature of his crime, or what the crime says about that individual defendant.  *See Abdul-Kabir*, 550 U.S. at 246 (establishing a low threshold for what constitutes "mitigating evidence," viz., that which "might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future").  For example, evidence that a defendant has adjusted well in prison prior to his trial qualifies as mitigating evidence because "there is no question but that [inferences

drawn from the evidence] would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (quoting Lockett, 438 U.S. at 604).

Importantly, the *Skipper* Court observed that the proffered evidence—the testimony of two guards and a prison visitor—"would not relate specifically to petitioner's culpability for the crime he committed." *Id*. at 4.  Even still, it could "hardly be disputed" that the evidence's exclusion "deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment." *Id*. at 4.  *See also Abdul-Kabir*, 550 U.S. at 259 ("Like *Penry*'s evidence, Cole's evidence of childhood deprivation and lack of self-control did not rebut either deliberateness or future dangerousness but was intended to provide the jury with an entirely different reason for not imposing a death sentence.").

Like the defendant in *Skipper*, Gobert presented evidence to the jury regarding his background and character as mitigating evidence.  Some of this evidence related to the conceptualization of mitigation—affirmed in *Penry v. Lynaugh*—that "defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse."  492 U.S. 302 (1989) (*Penry I*) (internal quotations omitted), overruled on other grounds by *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).  This evidence bolstered the argument that, although legally and morally to blame for the

crime, Gobert nevertheless was a worthwhile person undeserving of a death sentence.  The evidence that Gobert's background contributed to his committing the crime held meaningful potential for jurors to decide against a sentence of death. *See Penry I*, 492 U.S. at 327 ("[S]o long as the class of murderers subject to capital punishment is narrowed, there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant.").

Texas's statutorily-mandated instruction fatally undermines the jury's capacity to give effect to this broader type of mitigating evidence by calling upon jurors to "consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness."  TEX. CODE CRIM. PROC. art. 37.071, § 2(f)(4) (emphasis added). Put differently, this instruction precluded jurors from considering mitigating evidence unrelated to Gobert's "moral blameworthiness," a limitation wholly at odds with three decades of U.S. Supreme Court precedent.  Were any of Gobert's jurors to credit such evidence—that is, evidence they found to warrant a life sentence but that did not reduce Gobert's moral blameworthiness for the crime—that juror necessarily and untenably would violate the court's instructions.  *Penry II*, 532 U.S. at 800.  Because "[w]e generally presume that jurors follow their instructions," there exists a reasonable

probability that the result of Gobert's trial would have been different had a constitutionally adequate instruction been given.  *Id*. at 799.

### D.    Conclusion

"[W]hen the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence—because it is forbidden from doing so by statute or a judicial interpretation of a statute—the sentencing process is fatally flawed."  *Abdul-Kabir*, 550 U.S. at 264.  At Gobert's trial, the jury was prohibited from giving effect—meaningful or otherwise—to mitigating evidence falling outside the boundaries specified in its instructions, and this prohibition thereby unconstitutionally limited the jury's ability to give its "reasoned moral response."  *See also Skipper*, 476 U.S. at 8 ("The exclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender.").

Although the U.S. Supreme Court has upheld Texas's capital punishment statute, it did so "on the basis of assurances that the special issues would be interpreted broadly enough to enable sentencing juries to consider all of the relevant mitigating evidence a defendant might present."  *Penry I*, 492 U.S. at 318. Since then, the Court has repeatedly expressed its concerns "regarding the extent to which the jury must be allowed not only to consider such evidence, or to have such

evidence before it, but to respond to it in a reasoned, moral manner and to weigh such evidence in its calculus of deciding whether a defendant is truly deserving of death." *Brewer v. Quarterman*, 550 U.S. 286, 296 (2007). In this case, application of the Texas capital punishment statute impaired Gobert's right to have all mitigating evidence considered by the jurors as they assessed whether he deserved a life or death sentence. *Penry I*, 492 U.S. at 320 ("[T]he Texas death penalty statute was applied in an unconstitutional manner by precluding the jury from acting upon the particular mitigating evidence [the defendant] introduced."). Therefore, no reasonable jurist could countenance the state district court's conclusion that, "Because the consideration and weighing of mitigating evidence is an open-ended, subjective determination engaged by each individual juror… V.A.C.C.P. does not unconstitutionally narrow the jury's discretion to factors concerning only moral blameworthiness."

> **CLAIM XI:** TEXAS' 12-10 RULE AS AMENDED IN 1991 VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS AS CONSTRUED BY *MILLS V. MARYLAND* AND *MCKOY V. NORTH CAROLINA*

**EXHAUSTION:** This claim was presented as Claim 11 in the state writ at pages 127-139.

The FFCL denied relief on page 14.

Gobert argues that Texas's capital sentencing scheme, by affirmatively misleading jurors about their individual ability to give effect to their personal belief regarding mitigation, violates the Eighth and Fourteenth Amendments. This claim is based on *Mills v. Maryland*, where the Court ruled that the petitioner's sentence could not stand where it was *possible* that some "jurors were prevented from considering factors which may call for a less severe penalty [than death.]" 486 U.S. 367, 376 (1988). As this Court has repeatedly recognized, "[s]ubsequent to *Mills*, the Supreme Court has explained that '*Mills* requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death.'" *See, e.g., Miller v. Johnson*, 200 F.3d 274, 288 (5th Cir. 2000) (*citing McKoy v. North Carolina*, 494 U.S. 433, 442–43, 110 S.Ct. 1227, 1233 (1990)); *Jacobs v. Scott,* 31 F.3d 1319, 1328 (5th Cir. 1994).

The constitutional defect with Texas' current jury instructions is that they, by statute and as applied in Gobert's case, mislead jurors about their individual ability to give effect to mitigating circumstances. Although Texas's sentencing statute gives individual jurors the power to prevent the death penalty if they believe mitigating circumstances call for a sentence of life, that same statute also misleads jurors into believing their individual belief is immaterial unless they are able to persuade nine of their fellow jurors that their view of the evidence is correct. *See*

Tex. Code Crim. Pro. Art. 37.071.[21]   Gobert does not argue that it is necessary to instruct jurors about the consequences of a single holdout juror although that would give meaning to Texas Code of Criminal Procedure art. 37.071 Sec. 2 (g) (if the jury is unable to answer either of the special issues the court shall sentence the defendant to life in prison).[22]   Rather, Gobert argues that Texas's sentencing scheme misleads jurors about their individual ability to "give effect to mitigating evidence when deciding the ultimate question whether to vote for a death sentence." *McKoy*, 494 U.S. at 442-43.

Gonert concedes that the Fifth Circuit has "repeatedly held that Texas's 12-10 Rule does not run afoul of *Mills. Reed v. Stephens,* 739 F.3d 753,779 (5th Cir. 2014); *Parr v. Thaler,* 481 F. App'x 872, 878(5th Cir. *2012); Druery v. Thaler,* 647 F.3d 535, 542-43 (5th Cir. 2011); *Greer* v. *Thaler,* 380 F. App'x 373, 389 (5th Cir. 2010)).. However, prior decisions rejecting the *Mill's* and *McKoy* argument have never addressed whether or not the 1991 change in capital sentencing laws brought Texas's sentencing scheme within the purview of clearly established Supreme

---

21 In judging the constitutionality of the of a capital sentencing statute, a court must ask how a reasonable juror could view his or her role under the statutory scheme. *California v. Brown*, 479 U.S. 538, 541 (1985).

22 Gobert understands that the Eighth Amendment does not require that the jurors be instructed as to the consequences of their failure to agree. *Jones v. United States*, 527 U.S. 373, 381 (1999). However, a jury cannot be "affirmatively misled regarding its role in the sentencing process." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994). The "12-10" rule produces this type of misleading effect. In fact, it misleads and diminishes the individual role of each juror in the assessment of punishment by suggesting that a life sentence cannot be assessed unless ten jurors believe a life sentence is appropriate.

Court Precedent.23 Gobert argues that the 1991 change to Texas's sentencing law brought *Mills* into play, and requests this Court to grant a certificate of appealability so that this issue can be fully briefed.

### A.   Texas's Enigmatic 12-10 Rule

Before a defendant may be sentenced to death in Texas, the jury must answer statutory special issues in a certain way. *See* TEX. CODE CRIM. PRO. art. 37.071 (Art. 37.071). This was true during Gobert's trial and remains so today. In Gobert's case two special issues were submitted to the Jury. *See* C.R. at p 567-576. Pursuant to Art. 37.071, sec. 2(b), the jury was first asked the following question: "Do you find beyond a reasonable doubt that there is a probability that the defendant, Milton Gobert, would commit criminal acts of violence that would constitute a continuing threat to society?" *Id.* at 574. The state was required to prove this special issue beyond a reasonable doubt, and the jury was instructed that they could not answer this special issue "yes" unless they agreed unanimously. *Id.* at 568; *See* Art. 37.071(d)(2); Further, the jurors were instructed that they could not answer this special issue "no" unless ten or more jurors agreed. *Id.*

More relevant to this issue is the second special issue submitted in Gobert's case. The jury was instructed that they could answer special issue no. 2 only if they

---

23 This idea is based on the research conducted by undersigned counsel, which has not uncovered a case discussing the effect of the 1991 law change on the *Mills* argument. Gobert does recognize this Court addressed the law change in *Blue v. Thaler*, 665 F.3d 647, 662 (5th Cir. 2011), however, *Blue* involved a challenge to the 12-10 brought pursuant to *Romano v. Oklahoma*, not *Mills* and *McCoy*.

answered special issue no. 1 "yes." Because the jury answered special issue no. 1 in the affirmative they moved on to special issue no. 2 which asked: "Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Milton Gobert, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentenced be imposed?" *see also* Art. 37.071(e)(1). However, the jury was also instructed that they may not answer special issue no. 2 "no" unless they agreed unanimously, and that they may not answer special issue no. 2 "yes" unless ten or more of them agreed to do so.

The verdict form used in the petitioner's case gave the jury two options in answering each special issue. They could only answer yes or no. *Id.* Further, the jury was instructed that "should you return an affirmative finding on Special Issue No. 1 and a negative finding on Special Issue No. 2 the court will sentence the defendant to death." The Jury was never told what would happen if the requisite number of jurors failed to agree on either issue, or if it was possible to return a verdict without reaching an agreement on one of the special issues.

Strangely, Texas jurors are never informed that the Code of Criminal Procedure specifically states that "[i]f the jury returns a negative finding on any issue submitted under Subsection (b) of this article [future dangerousness] or an

138

affirmative finding on an issue submitted under Subsection (e) [mitigation] of this article *or is unable to answer any issue submitted under Subsection (b) or (e)* of this article, the court shall sentence the defendant to confinement in the institutional division of the Texas Department of Criminal Justice for life." Art. 37.071 sec. 2(g). This is because "[t]he court, the attorney representing the state, the defendant, or the defendant's counsel may not inform a juror or a prospective juror of the effect of a failure of a jury to agree on issues submitted under Subsection (c) or (e) of this article." *Id.*at sec. 2(a)(1). Thus, the Texas 12-10 rule hides from jurors the fact that one or more jurors who believe that a life sentence is proper have the power to follow their belief, and that the end result will be a life sentence.

### B.    Clearly Established Supreme Court Precedent

The Supreme Court's ruling in *Mills v. Maryland* has been described by that court as follows:

> [In *Mills v. Maryland*] we reversed a death sentence imposed under Maryland's capital punishment scheme because the jury instructions and verdict form created "a substantial probability that reasonable jurors ... well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." We reasoned that allowing a "holdout" juror to prevent the other jurors from considering mitigating evidence violated the principle established in *Lockett v. Ohio,* 438 U.S. 586 (1978), that a sentencer may not be precluded from giving effect to all mitigating evidence.

*McKoy v. North Carolina,* 494 U.S. 433, 439-440 (1990).

The *Mills* court ruled that the petitioner's sentence could not stand where it was *possible* that some "jurors were prevented from considering factors which may call for a less severe penalty [than death.]" *Mills v. Maryland,* 486 U.S. 367, 376 (1988) (internal quotations removed). Petitioner Mill's death sentence was overturned because of the possibility that individual jurors were prevented from giving effect to mitigating evidence on the ground that the jury as a whole did not agree on the existence of particular mitigating evidence. The principle established from this ruling is that all jurors in capital cases must be able to give weight to any mitigating evidence presented, and that requiring unanimous agreement that certain evidence mitigates in favor of a life sentence violates the Eighth and Fourteenth Amendments.

This principle is applicable to Texas' 12-10 rule. While Texas' scheme does not require unanimous agreement by the jurors before a life sentence can be imposed, it does affirmatively mislead jurors into believing that their independent belief that a life sentence is proper is irrelevant unless nine other jurors agree with them. Texas capital jurors, and the jurors in the Gobert's case, are explicitly told that they cannot return a "yes" verdict on special issue no. 2 unless ten or more of them agree to do so. Further, by statute, Texas capital jurors are precluded from being told that a single juror's refusal to answer "no" on special issue no. 2 will result in a life sentence. Thus, ***individual*** jurors in Texas are denied the ability to

140

give weight to mitigating evidence they believe calls for a life sentence unless they can convince nine other jurors to agree with them.

The statutory mandate that jurors must be affirmatively misled about their individual ability to give effect to mitigating evidence only exasperates the problem. *See* Art. 37.071 Sec. 2(a). The Supreme Court in *Mills* pointed out that "common sense and what little extrinsic evidence we possess suggest that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation unless they are expressly instructed to do so." *Mills v. Maryland,* 486 U.S. 367, 383 (1988). As Texas' jurors are not instructed to do so, and indeed are instructed that death will be imposed unless 10 or more jurors disagree with that decision, a single hold out juror will clearly be pressured to set aside his conscience and vote with his remaining jurors. After all, the verdict form provided to jurors only allows one of two answers to the special issues, yes or no. The pressure this rule puts on a single holdout juror is obvious.

That *Mills* requires each individual juror be able to give effect to any mitigating evidence they personally deem relevant was made clear in *McKoy v. North Carolina*, 494 U.S. 433, 442-443 (1990) (emphasis added). Once again, the Texas Statute at issue violates this clearly established federal principle by instructing jurors that they cannot give effect to mitigating evidence which calls for life in prison unless nine of their counterparts agree with them.

141

The District Court's decision is diametrically opposed to the Seventh Circuit's decision in *Kubat v. Thieret*.24 In *Kubat*, the trial court erroneously instructed the jury in a capital case that it must "*unanimously* conclude that there is a sufficiently mitigating factor or factors to preclude imposition of the death sentence" before a life sentence would be imposed. *Kubat v. Thieret,* 867 F.2d 351, 369 (7th Cir. 1989). The *Kubat* Court, relying on *Mills*, held that the death sentence imposed in that case must be overturned "on the grounds that one or more of the jurors might have been precluded from considering mitigating factors." *Id.* at 373. The court explained as follows:

> The same analysis applies in Kubat's case. Kubat's jurors were never expressly informed in plain and simple language that if even one juror believed that the death penalty should not be imposed, Robert Kubat would not be sentenced to death. On the contrary, the instructions emphasized unanimity. As discussed in part III, A., 2., above, there is a substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

*Id.* at 372.

While the jurors in Gobert's case were not instructed that they had to be unanimous in their decision that mitigating circumstances called for life in prison, they were instructed that at least ten jurors must agree before a life sentence would

---

24 Gobert understands *Kubat* "does not supercede intervening Fifth Circuit precedent regarding challenges to Texas' 12–10 rule." *Druery v. Thaler*, 647 F.3d 535, 543 (5th Cir. 2011). However, as explained below, *Druery* is distinguishable from Gobert's case because it relied on cases discussing the pre-1991 formulation of capital punishment in Texas.

be imposed. For this reason, Texas's 12-10 rule creates a substantial possibility that one or more of the petitioner's jurors might have been precluded from granting mercy because of their mistaken belief that sufficient mitigating factors had to be found by ten or more jurors.

In *Davis v. Mitchell*, the Sixth Circuit granted relief to a habeas petitioner on similar grounds, reversing the ruling of the district court. *Davis v. Mitchell,* 318 F.3d 682 (6th Cir. 2003). In that case, "[i]mmediately following the trial court's instruction regarding mitigating circumstances, the trial judge . . . gave the jury a unanimity instruction, stating, '[n]ow, as you know, since this is a criminal case, the law requires that in order for you to reach a decision all 12 of you must be in agreement.'" *Id.* at 684. In addition, the "judge gave the jury a so-called 'acquittal-first' instruction stating that it must first analyze whether the elements allowing the death penalty were present, and only if they were not present, should the jury move on to consider life imprisonment." *Id.* In reaching their decision the Sixth Circuit noted that "[i]nstructions that leave a jury with the impression that juror unanimity was required to mitigate the punishment from death to life imprisonment clearly violate the Eighth Amendment, and therefore the writ of habeas corpus must issue setting aside the death sentence."

In analyzing the issue in *Davis* the Sixth Circuit reviewed the Federal Death Penalty Act enacted in 1994. The court noted that under this act "[a]ny one or more

jurors may find the existence of a mitigating factor and may then consider that factor in weighing the aggravating and mitigating factors even though other jurors may not agree that the particular mitigating factor has been established. This weighing decision must be made by *each juror giving individual consideration to the aggravating factors unanimously found by all of the jurors and such mitigating factors as may be found by each juror.*" *Id.* at 686-687 (emphasis added). The court then went onto note that the reason for adopting this language in the Federal Death Penalty Act was to "bring us into conformity with Tuesday's Supreme Court decision in Maryland versus Mills" which held that "even if one juror says there was mitigating circumstances of any sort, the death penalty cannot be imposed." *Id.* The Sixth Circuit then agreed with congress that the Eight Amendment and "*Mills* require[] that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *Id.* (internal citation omitted).

These cases show that clearly established federal law requires that capital jurors be made aware of their individual "power to prevent the death penalty by giving effect to mitigating circumstances absent an agreement of the other jurors regarding the presence of those mitigating circumstances." *Id.* at 690. Texas capital jurors are given this power by statute, but they are also affirmatively misled about this power, as required by the same statute. Art. 37.071, sec. 2(a), (g). Finally, it is

because reasonable jurors, upon receiving instructions identical to those provided to the jury in Gobert's case may have believed they did not individually have the power to stop the infliction of the death penalty that the Texas 12-10 rule violates the 8th and 14th Amendment's as interpreted by *Mills* and *McKoy.*

### C.    The1991 Change Affects the *Mills* and *McKoy* Arguments

The state argued, and the FFCL accepted, that this claim has been consistently rejected by the appeals courts. However, the Fifth Circuit in rejecting similar claims has repeatedly relied upon cases decided before Texas Code of Criminal Procedure 37.071 was drastically changed in September of 1991, even when denying similar claims for post-1991 cases. In so doing this Court has not specifically addressed the fact that the Texas Sentencing Scheme has changed, or how this change affects the *Mills* and *McCoy* analysis.

Before 1991, Texas's death penalty sentencing scheme consisted of asking jurors a series of three questions:

"(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

"(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

"(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased."

145

Art. 37.071(b) (Supp.1975-1976). If the jurors unanimously agreed that each of these questions had been proven beyond a reasonable doubt a sentence of death would result. *Id.* If the jury answered any of these questions 'no,' then life imprisonment would result. *Id.* Much like today, a yes answer had to be unanimous and a no answer had to be supported by ten of the jurors. *Id.*

Although the pre-1991 sentencing statute failed to specifically allow consideration of mitigation evidence, the Supreme Court upheld the statute because the Texas Court of Criminal Appeals "indicated that it will interpret this second question so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show." *Jurek v. Texas*, 428 U.S. 262, 272 (1976). Thus, juries in Texas were allowed to consider mitigation evidence, although they were never told so. Of course the infirmities of the pre-1991 sentencing scheme were brought to light when the Supreme Court held that Johnny Paul Penry had been sentenced to death in violation of the Eighth Amendment because his jury had not been adequately instructed with respect to mitigating evidence. *See Penry v. Lynaugh*, 492 U.S. 302 (1989) (Penry I); *Penry v. Johnson*, 532 U.S. 782 (2001). As a result, the Texas death penalty sentencing scheme was changed to expressly allow juries to consider mitigation evidence.

In 1991 the Texas legislature amended Code of Criminal Procedure art. Tex. Code Crim. Pro. Art. 37.071 to include a true "mitigation special issue." *See* 1991

146

Tex. Sess. Law Service Ch. 838 (S.B. 880). Related to Gobert's case, the two

special issues in question became the following:

> 1) Whether there is a probability that the defendant would commit criminal
> acts of violence that would constitute a continuing threat to society;
>
> 2) Whether, taking into consideration all of the evidence, including the
> circumstances of the offense, the defendant's character and background, and
> the personal moral culpability of the defendant, there is a sufficient
> mitigating circumstance or circumstances to warrant that a sentence of life
> imprisonment rather than a death sentenced be imposed.

*Id.*; *See* TEX. CODE CRIM. PRO. art. 37.071 (Vernon Supp. 1993-present). The jury

could not answer special issue no. 2 "no" unless they agreed unanimously, and

they could not answer special issue no. 2 "yes" unless ten or more of them agreed

that mitigation called for a life sentence. *Id.*

   This Court has repeatedly held that *Mills* did not apply to the pre-1991

sentencing scheme because "*Mills* involve[d] statutory schemes different from the

Texas sentencing statute and different legal standards." *See, e.g., Webb v. Collins*,

2 F.3d 93, 96 (5th Cir. 1993). This was true, as the pre-1991 sentencing scheme did

not actually involve a mitigation special issue. However, the post-1991 sentencing

scheme does include a mitigation special issue and is therefore much closer to the

sentencing scheme discussed in *Mills*. The problem is that this Court, in its

decisions related to the post-1991 sentencing scheme, has relied on decisions based

on pre-1991 sentencing schemes.

For example, in *Druery v. Thaler*, it was held that *Teague* bars review of this claim and that *Mills* does not apply to Texas's sentencing scheme. 647 F.3d 535, 543 (5th Cir. 2011) cert. denied, 132 S. Ct. 1550 (U.S. 2012)). *Druery* cites *Miller v. Johnson* for the idea that "*Mills* is not applicable to the capital sentencing scheme in Texas." *Id.* (*citing Miller v. Johnson*, 200 F.3d 274, 288 (5th Cir.2000)). *Miller* however is not applicable to the issue currently before this Court for many reasons. First, "the jury at [Miller's] trial was instructed what to do if they did not reach agreement as set forth in the charge. The jury instructions provided that if there was any special issue on which the vote of the jurors was not unanimously 'yes' or not at least ten in favor of an answer of 'no,' there should be no answer for that special issue and the presiding juror should not sign his or her name to any answer form for that special issue." *Miller*, 200 F.3d at 288. Further, the *Miller* case concerned the pre-1991 jury capital sentencing scheme which was not used in Gobert's case. *Id.* However, it is important that the *Miller* Court did recognize that, "*Mills* requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *Id.* Gobert argues that the post-1991 sentencing scheme does not allow each juror to consider and give effect to mitigating evidence.

*Druery* also cited *Hughes v. Dretke,* 412 F.3d 582, 593–94 (5th Cir.2005) for the idea that the instant claim is *Teague* barred. *Druery*, 647 F.3d at 543. Although

*Hughes* involved a crime committed after 1991 this Court's decision only discusses the application of the "future dangerousness" special issue. *Hughes,* 412 F.3d at 594. No mention was made of the mitigation special issue. *Id.* Further, this Court in *Hughes* ruled only that the claim was *Teague*-barred, relying on *Miller* (discussed above) and *Jacobs v. Scott*, 31 F.3d 1319, 1328–29 (5th Cir.1994). *Jacobs* was decided based on the pre-1991 sentencing scheme. *Jacobs,* 31 F.3d at 1328-29. Although *Jacobs* ruled that the 12-10 claim in that case was procedurally defaulted, The Court went on to explain that the substantive argument was meritless because "[t]he [pre-1991] law in Texas is completely different from that in *Mills*." *Id.* at 1328. This is true, because the pre-1991 law in Texas did not involve a mitigation special issue. Also, much like the *Miller* case, the jurors in *Jacobs* were "instructed that each juror was to make his or her decision independently." *Id.* at 1329. No such instruction was given in Gobert's case. Finally, this Court once again pointed out that *Mills* has been interpreted to mean "'each juror [must] be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death.'" *Id.* (*citing McKoy v. North Carolina*, 494 U.S. 433, 442–43 (1990)).

Gobert asserts that Texas's post-1991 capital sentencing scheme, as applied in his case, violates the Eighth and Fourteenth Amendments. The distinction between the pre-1991 and post-1991 sentencing schemes, as related to *Mills*, has

apparently not been addressed by this Court, and therefore Fifth Circuit precedent does not dictate the outcome of this claim.

As applied to the post-1991 sentencing statute, this claim is not *Teague*-barred. Under Teague, new rules of constitutional criminal procedure will not be announced on federal habeas review unless an exception applies. *Webb v. Collins*, 2 F.3d 93, 95 (5th Cir. 1993) (*citing Teague v. Lane*, 489 U.S. 288, 316 (1989). However, Gobert asserts that applying *Mills* as interpreted by *McKoy* to Texas's post-1991 sentencing scheme does not create a new rule. "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government.... To put it differently, a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301.

That jury instructions which mislead individual jurors about their ability to give effect to mitigating evidence are in violation of the Eight and Fourteenth Amendments does not break new ground. The Supreme Court has long held that "*Mills* requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *McKoy*, 442–43. This well-recognized Supreme Court rule dictates that the current Texas sentencing scheme is unconstitutional because it requires jury instructions which mislead individual jurors to believe that their

individual vote for life is meaningless unless at least nine more of their follow jurors agree.

> **CLAIM XII:** GOBERT's 4[TH], 5[TH], 6[TH], 8TH AND 14TH AMENDMENT RIGHTS WERE VIOLATED WHEN THE TRIAL COURT ERRED IN ADMITTING FUTURE DANGEROUSNESS TESTIMONY BY A.P. MERILLAT DURING THE PUNISHMENT TRIAL.

**EXHAUSTION:**

This claim was properly preserved for federal review, having been presented at pages 3-14 of the Gobert's direct appeal brief as Claim One. *See Gobet v. State*, 2011 WL 1505343, *2-14 (April 11, 2011). The CCA denied relief on direct appeal as to this claim. *See Gobert v. State*, 2011 WL 5881601, *6 (Tex. Crim. App. 2011).

**ISSUE RESTATED:** The CCA's holding that Merillat's testimony concerning specific acts of violence by Gobert while incarcerated did not violate Gobert's 8th Amendment right to an individualized assessment of his future dangerousness was the product of an unreasonable analysis of the facts of this cause and how those facts apply against the backdrop of well settled Supreme Court precedent.

**A.    Facts Supporting Gobert's Claim**

Trial counsel filed a motion in limine with regard to the testimony of Mr. A.P. Merillat (34 RR 105) (III CR 464). Trial counsel argued that the Eighth Amendment required a greater degree of accuracy of fact-finding in a capital case than in a non-capital case, citing *Woodson v. North Carolina*. 428 U.S. 280, 305 (1976), and *Gilmore v. Taylor*. 508 U.S. 333 (1993). Trial counsel's specific

concern was that the State would offer evidence of the potential for violence in the Texas prison system, including specific instances of violence, prison conditions generally, and classification issues which he deemed irrelevant to Appellant's case. He also objected that the Court of Criminal Appeals had never reached the issue of whether this type of testimony violated the right to individualized sentencing under *Jurek v. Texas*. 428 U.S. 262 (1976), and *Lockett v. Ohio*. 438 U.S. 586, 604-05 (1978).

According to appellant counsel's brief, "the trial judge was sufficiently concerned about this motion to plaster it with notes (III CR 464)." Gobert, 2011 WL 1505343 at 2 (the trial court noted that "he was overruling the objection/motion insofar as it complained about constitutional rights, because jurors need to know that prison society is not peaceful"). *Id.*

Trial counsel objected to both anecdotal and alleged "statistical" evidence coming in through Merillat. The trial judge overruled all but the part about the anecdotal evidence. When that testimony was nevertheless admitted, as to specific prosecutions, the defense asked for and was granted a running objection to Merillat's testimony (34 RR 119-20). In response to a question about whether he had ever been subpoenaed, Merillat said in front of the jury:

Yes, sir. I have been subpoenaed by defense attorneys all over the

state in many, many capital cases, and I've always cooperated, never refused to do so. I think that's wrong to do that if I refuse to cooperate. ***But after I get through talking to them or they learn what I'm going to say, they don't put me on the stand.*** Well, that's not my call. I'm available. I will -1 will respond. I will do whatever it takes. But when they hear what I'm going to say - and usually when I talk to defense lawyers, I say, here's my testimony. I'll tell them the whole thing. There's no secrets or anything. I'll even tell them how to keep me off the stand if they want to know that, and it's their choice - it had been their choice not to put me on. I don't have any say in the matter.

*Id.* (Emphasis added).

Merillat then offered that he recently compiled "statistics," at which point the defense asked for a *Daubert* hearing outside the presence of the jury, since this was the first they had heard of statistics, "to determine what he's an expert in and what the basis of that expertise is" (34 RR 126).

Merillat's area of expertise is this:

Historically speaking is all I can go by, what I've done in the past; and that's opportunities to be violent within the Texas prison system, no matter a person's conviction or their classification, and whether or not the prison is able to prevent any inmate of any stripe from taking advantage of those opportunities. I will never say that your particular client will do anything one way or the other. I've never testified to that, and I never would. I can't do that. That's primarily just from what's happened in the past, is opportunities and /or prevention.

(34 RR 128).  When further queried about his "expertise," he stated it this way:

If I had to label it, I would say prison society. I'm talking about Texas prison society. I can't speak to any other state. The violence in the Texas prison system and the general prison inmate life and classification and the daily life of prison inmates in Texas.

(34 RR 129).

Merillat also stated, on March 4, 2010, "I know the Court of Criminal Appeals has held up my testimony in capital cases across the State" (34 RR 130). Fellow practitioners of this discipline included only "my partner, Roy Smith," another former investigator for his particular inmate prosecution unit in Huntsville (34 RR 131). Merillat called his "peer review" the prosecutors across the state who have read his book, put out by TDCAA (34 RR 133). He agreed that he was basically "a law enforcement officer that uses law enforcement techniques to investigate specific crimes committed within" prison society (34 RR 135).

The Court ultimately decided that Merillat was a Rule 702 expert and the defenses *Daubert/Kelly* objections were overruled (34RR145).

The statistics offered by Merrillat related to the number of violent crimes committed in TDCJ (34 RR 152-53). When the jury returned, Merillat was allowed to testify that between 2000 and 2008, there were 111 homicides and 6262 assaults in TDCJ (34 RR 149). The Court also overruled Appellant's Rule 703 objection, made because Merillat's testimony had no relationship whatsoever to the issue of individualized sentencing (34 RR 151).

Merillat was also permitted to broadcast a documentary to the jury that he created about the lives of inmates (34 RR 167-68). He testified that "many female

guards have been victimized horribly by convicts" (34 RR 172). Mr. Martinez's objection to the anecdotal nature of that statement was sustained and his request for an instruction given, but his motion for mistrial was overruled (34 RR 172). Merillat testified that there were many potential victims in TDCJ besides guards (34 RR 173). He described weapons that were made or smuggled in and how a "zip gun" was made (34 RR 176). He said inmates had 24 hours a day, seven days a week in which to make weapons out of anything they could get their hands on (34 RR 177). He testified that inmates would have "many opportunities" to commit criminal acts of violence while in prison (34 RR 180).

When asked on cross-examination how many people with life sentences had committed murder, Merillat offered one name: Kenneth McDuff; even though he had to know Kenneth McDuff had been released from prison when he committed murder and was, therefore, no longer a part of the prison society he was testifying about (34 RR 204).

The book Merillat wrote, *Future Danger*, is put out by the Texas District and County Attorneys Association, or TDCAA (34 RR 207). Merillat persisted in testifying to specific anecdotes even though instructed not to (34 RR 211). Even the prosecutor objected to the anecdotal nature of Merillat's testimony (34 RR 214). While he testified on the one hand about an inmate who has improved his

life, he immediately followed that testimony with this statement: "Education had done very little from what I have seen to change a man's way of thinking" (34 RR 216-17). The changes he saw were "spiritual" (3 RR 217).

## B.  Arguments and Authorities: *Daubert/Kelly* Objection

A trial court's responsibility under Texas Rule of Criminal Evidence 702 is to determine whether proffered scientific evidence is sufficiently reliable and relevant to assist the jury. See, e.g., *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Kelly v. State*, 824 S.W.2d 568, 572-73 (Tex.Cr.App. 1992); *Jordan v. State*, 928 S.W.2d 550, 554-55 (Tex.Cr.App. 1996). The proponent of the scientific evidence bears the burden of demonstrating by clear and convincing evidence that the evidence is reliable. This is accomplished by showing: (1) the validity of the underlying scientific theory; (2) the validity of the technique applying the theory; and (3) proper application of the technique on the occasion in question. Kelly, 824 S.W.2d at 573. Before scientific evidence may be admitted, the trial court must conduct a hearing outside the presence of the jury to determine whether the proponent has established all three criteria. *Id.*; *Massey v. State*, 933 S.W.2d 141, 152 (Tex. Cr. App. 1996); *Campbell v. State*, 910 S.W.2d 475, 478-79 (Tex. Cr. App. 1995), *cert. denied*, 517 U.S. 1140 (1996). This pre-admission determination is required whether the science at issue is novel or well established.

*Hartman v. State*, 946 S.W.2d 60, 63 (Tex.Cr.App. 1997); *cf. Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) (holding that trial court's "gatekeeping" function under Federal Rule of Evidence 702 applies to all expert testimony - not just scientific testimony).

In evaluating such scientific evidence, the CCA must look at four general observations as a guide into scientific reliability: (1) falsifiability; (2) peer review and publication; (3) the existence of methodological standards, including the error rate; and (4) general acceptance within the relevant scientific field. *Daubert*, 509 U.S. at 593-94. The goal of these "flexible" guidelines is to evaluate the admissibility of expert testimony by the standards that comparable experts within the same scientific field use in evaluating each other's professional work. *See id.*

Expert testimony is unreliable if it is not grounded "in the methods and procedures of science" and is no more than "subjective belief or unsupported speculation." *Robinson*, 923 S.W.2d at 557 (quoting *Daubert*, Inc., 509 U.S. at 579). In evaluating expert testimony, the trial court must "assess whether the expert made an adequate effort to tie the relevant facts of the case to the scientific principles about which he testified." *Morales v. State*, 32 S.W.3d 862, 866 (Tex. Crim. App. 2000). If the expert does not tie the facts to his expert testimony, the testimony is neither helpful nor admissible. See *Griffith v. State*, 983 S.W.2d 282,

287-88 (Tex. Crim. App. 1998); see also *Rousseau v. State*, 855 S.W.2d 666, 686 (Tex. Crim. App. 1993).

Merillat's testimony in the present case had no particular relevance to Gobert's punishment trial.  As noted in Gobert's direct appeal brief "Merillat's prides himself on the irrelevance of his testimony, mistaking it for a badge of neutrality, clearly knowing that his testimony can only militate in favor of death." *Gobert*, 2011 WL 1505343 at *13.

Merillat's alleged "area of expertise" is neither a hard science nor a soft science.  The CCA understood this principle as evidenced in its opinion in *Coble v. State*, 330 S.W.3d 253, 287 (Tex. Crim. App. 2010) ( "'Soft' science does not mean soft standards. When 'soft' sciences are at issue, the trial court must inquire "(1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field'").

There are no tangible and testable principles in Merillat's field of expertise. As noted in the direct appeal brief, "[h]is testimony is that TDCJ is so grossly incompetent and so dangerous that the safety of all who enter there is in jeopardy." Gobert, 2011 WL 1505343 at *13.  Such "expert" testimony has no relevance to

this the ultimate issue of Gobert's future dangerousness and a a consequence fails to meet the reliability standard of Rule 702 and *Daubert*. The CCA's failure to apply the facts of Gobert in accordance with *Daubert* and its progeny is therefore at total odds with well-settled federal law. *See Gobert v. State*, 2011 WL 5881601, *6 (Tex. Crim. App. 2011) (holding the trial court did not err in admitting Merillat's testimony over Gobet's Rule 702 objections).

### C.    Arguments and Authorities: 8th Amendment Objection

The CCA's holding that Merillat's testimony was not a clear violation of the Eighth Amendment is the result of a misapplication of the facts of this case to well-settled federal precedent. There can be no disputing that Merillat's testimony was harmful. Merillat's relentless message to the jury was that TDCJ is a death trap, and the only way to make sure that Appellant does not add to it is to kill him, since TDCJ is totally ineffectual in safeguarding any of the many, many potential victims who work and enter there. This argument is unconstitutional and irrelevant because it has nothing to do with the individualized sentencing of Gobert.

As Mr. Merillat slyly noted at the beginning of his testimony, no defense attorney would ever call him as a witness, because his testimony would be bad from the standpoint of any defense attorney, despite the occasional anecdote about that one fellow who turned his life around after undergoing a "spiritual" change.

Regardless, Merillat clearly knows, and anybody who reads his testimony knows, that his testimony militates in favor of killing anybody facing the death penalty. Once Mr. Merillat has testified about the Texas Seven, it is clear that his expert opinion includes injecting as many specific horror stories as possible despite any instruction or objection.

As Mr. Anschutz stated in his motion, this Court has yet to decide whether this kind of testimony meets the heightened standard of reliability required by the Eighth Amendment in death penalty cases. A quick review of Mr. Merillat's "many" (as he put it) cases shows that Mr. Anschutz is correct.

In *Estrada v. State*. 313 S.W.3d 274, 286 (Tex.Crim.App. 2010), the State confessed error based upon Merillat's erroneous testimony, and this Court sustained that point of error. Merillat was again a rebuttal witness. When he volunteered in Gobert's trial that the Court of Criminal Appeals had upheld his testimony many times, he failed to mention his error or the confession of error in this trial. Surely he was made aware of his "inadvertent" error because he testified correctly about G3 status and capital life inmates in Gobert's trial.

As noted by the United States Supreme Court in *Jurek v. Texas,* 428 U.S. 262 (1976), "[w]hat is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Id.* at

276. "[I]n capital cases the fundamental respect for humanity underlying the Eight Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson,* 428 U.S. at 304, 96 S.Ct. at 2991 (citations omitted); *see also Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983); *Lockett,* 438 U.S. at 608, 98 S.Ct. at 2966–67 (Burger, J., joined by Stewart, Powell, Stevens, JJ.); *Bradley,* 880 F.Supp. at 285 (*citing Jurek,* 428 U.S. at 276, 96 S.Ct. at 2958). The anecdotal testimony offered by Merillat to the jury in this case offends both the 8th Amendment and the Court's holding and *Jurek.* "Given a jury's role during the sentencing phase of a capital case, 'the matter pending before the jury' is to determine whether or not the defendant ought to receive the death penalty." *Id.* at 249 (citing *Caldwell v. Mississippi,* 472 U.S. at 320, 329 (1985)). The Eight Amendment "requires consideration of aspects of the character of the individual offender ... as a constitutionally indispensable part of the process of imposing the ultimate punishment of death." *Woodson v. N. Carolina,* 428 U.S. 280, 281 (1976). The CCA's application to the facts of this case therefore runs contrary to well-settled federal precedent. *See Gobert v. State*, 2011 WL 5881601, *6 (Tex. Crim. App.

2011) (holding that Merillat's "background testimony" did not violate the 8th Amendment requirement of individualized sentencing).

> **CLAIM XIII:** GOBERT's 4[TH], 5[TH], 6[TH], 8TH AND 14TH AMENDMENT RIGHTS WERE VIOLATED WHEN THE TRIAL COURT ERRED IN ADMITTING FUTURE DANGEROUSNESS TESTIMONY BY DR. RICHARD COONS DURING THE PUNISHMENT TRIAL.

### EXHAUSTION:

This claim was properly preserved for federal review, having been presented in Gobert's direct appeal brief as Claim Two. *See Gobet v. State*, 2011 WL 1505343, *14-16 (April 11, 2011). The CCA denied relief on direct appeal as to this claim. *See Gobert v. State*, 2011 WL 5881601, *6 (Tex. Crim. App. 2011).

**ISSUE RESTATED:** The CCA's holding that Dr. Coon's testimony rendering an opinion as the issue of future dangerousness based totally on hypothetical scenarios violates well settled federal precedent under *Daubert,* offends Gobert's 8th Amendment right to an individualized assessment of his future dangerousness and was the product of an unreasonable analysis of the facts of this cause and how those facts apply against the backdrop of well settled Supreme Court precedent.

### A.    Facts Supporting Gobert's Claim

Gobert's defense counsel objected to the testimony of Dr. Richard Coons on the issue of future dangerousness ("doctor will be rendering an opinion as to future dangerousness based on a hypothetical given to him by the State"). *See Gobet*, 2011 WL 1505343, *14. Trial counsel argued that under *Kelly* and *Daubert*. et cetera, that Dr. Coons lacked specialized knowledge that would assist the jury in understanding the evidence or determine a fact in issue in the Gobert's punishment

162

trial ("It will cause the jury to abandon their proper role and merely accede to his professional opinion") *Gobet*, 2011 WL 1505343, *14. Trial counsel also argued that Dr. Coons was not sufficiently qualified by knowledge, skill, experience, training, or education to render a reliable opinion about future danger. *Id.* ("in fact, he does not have and has not propounded a sufficiently valid scientific technique or theory that has been accepted as valid by the scientific community").  Gobert's counsel maintained that "psychiatry is not the study of the prediction of future danger; it is, as he [Coons] has acknowledged, the study of mental disease and mental disorders. Future dangerousness is not one of those. Basically his qualifications do not relate to making such predictions." *Id.* Defense counsel added that Dr. Coons failed to identify any scientific literature or documentation to support his purported technique. *Id.* ("He has not identified any potential rate of error so that we know whether or not the opinion is reliable or useful. There really are only a couple of folks that he had mentioned as experts in this areas to potentially even evaluate his technique and is not certain of their - these other people's techniques").  Gobert's counsel added that:

> "[b]asically the scientific theory that he propounds is not a subject to adequate understanding by this Court. The opinion would be based merely upon speculation. The field of expertise that he claims to be relying on is not a legitimate one, and to the extent that he is a psychiatrist, the subject matter of this testimony is not within the scope of that field. Basically his testimony does not rely upon principles that are involved in the field of psychiatry. The information

- he has an inadequate factual basis to make such an opinion. Basically in balancing the probative value of his opinion with the prejudicial effect, it is clear that whatever probative value would be substantially outweighed by prejudice - the risk of prejudice, and that the jury will improperly use this opinion. The admission of this opinion before the jury would deny the defendant the right to due process, due course of law, ineffective *(sic)* assistance of counsel, imposition of cruel and unusual punishment as protected in the U.S. Constitution Amendments Five, Six, Eight, Fourteen, and Texas Constitution, Article I, sections 10 [and] 13, and also violate the requirement of heightened reliability imposed upon the Court by the Supreme Court in death penalty cases. As a result we would basically argue that this type of testimony fails the test under *Kelly* and *Daubert* and would ask that it be excluded.

(36 RR 252-54) (I CR 121-50).

The trial court overruled Gobert's objections and permitted Dr. Coons to testify based upon imaginary scenarios (36 RR 255-56). Under cross-examination, Dr. Coons was unable to point to any research or studies that supported as any of his predictions as reliable and legitimate.  To compound the illegitimacy of his findings, Dr. Coons could not point to a single prior prediction that ultimately was proven accurate (36 RR 279-80). Despite the hugely speculative nature of his predictions, however, Dr. Coons testified that Gobert would be a future danger to society unless the jury killed him. *Id.*

## B.   Arguments and Authorities: Dr. Coon's Opinion

The Texas Court of Criminal Appeals held in this case that the trial court

abused its discretion in admitting Dr. Coons's opinion on future dangerousness, but noted that the admission of said testimony amounted to harmless error. *See Gobert*, 2011 WL 5881601 at *7 (citing *State v. Coble*, 330 S.W.3d at 279-80). The CCA concluded that:

> Given the overwhelming evidence of appellant's life-long penchant for violence, the circumstances of the capital murder, the evidence of his conspiracy to commit capital murder to effectuate his escape from jail, his own testimony concerning his prior violence in prison and toward anyone—including his own mother—who angers him, we are confident that this error did not affect appellant's substantial rights to a fair sentencing trial.
>
> …
>
> In this trial, unlike that in *Coble,* the jury was not considering the future dangerousness of a model prisoner. The evidence in this case showed that, during prior periods of incarceration, appellant had
>
> • attacked a fellow prison inmate with a hoe, gashing him in the back;
>
> • threatened to hit a prison guard with a hoe;
>
> • threatened to fight other prison guards;
>
> • gotten into "five or six" fights with fellow prison inmates;
>
> • gotten into "four or five" fights with fellow jail inmates;
>
> • developed inappropriate relationships with at least two female jail guards and manipulated them into providing him with contraband or special privileges;
>
> • plotted to murder a jailer and steal his car keys and car to effectuate appellant's escape;
>
> • plotted to kill any other inmates or jailers who might witness that planned escape; and

• manipulated his leg brace so that it could not lock and impede his mobility in the courtroom during his capital-murder trial.

…

Furthermore, the State did not emphasize or rely upon Dr. Coons's opinion in closing argument.

*Id*.

The CCA's holding that Dr. Coons's testimony was harmless in this case is the result of an unreasonable application of well-settled federal law to the facts of this case. *See Gobert v. State*, 2011 WL 5881601, *7-8 (Tex. Crim. App. 2011).

As noted by the United States Supreme Court in *Jurek v. Texas,* 428 U.S. 262 (1976), "[w]hat is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Id.* at 276. "[I]n capital cases the fundamental respect for humanity underlying the Eight Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson,* 428 U.S. at 304, 96 S.Ct. at 2991 (citations omitted); *see also Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983); *Lockett,* 438 U.S. at 608, 98 S.Ct. at 2966–67 (Burger, J., joined by Stewart, Powell, Stevens, JJ.); *Bradley,* 880 F.Supp. at 285 (*citing Jurek,* 428 U.S. at 276, 96 S.Ct. at 2958). Although the CCA regarded Dr. Coons's testimony as harmless in this case, the Texas court failed to

consider how such testimony offended both the 8th Amendment and the Court's holding and *Jurek*. "Given a jury's role during the sentencing phase of a capital case, 'the matter pending before the jury' is to determine whether or not the defendant ought to receive the death penalty." *Id.* at 249 (citing *Caldwell v. Mississippi,* 472 U.S. at 320, 329 (1985)). The Eight Amendment "requires consideration of aspects of the character of the individual offender ... as a constitutionally indispensable part of the process of imposing the ultimate punishment of death." *Woodson v. N. Carolina,* 428 U.S. 280, 281 (1976).  The CCA's application to the facts of this case therefore runs contrary to well-settled federal precedent.

**CLAIM XIV:** GOBERT's 5TH, 6TH, 8TH AND 14TH AMENDMENT RIGHTS WERE VIOLATED TRIAL COURT OVERRULED HIS OBJECTIONS CHALLENGING THE CONSTITUTIONALITY OF TEXAS ARTICLE OF CRIMINAL PROCEDURE 37.071.

**EXHAUSTION:**

This claim was properly preserved for federal review, having been presented at pages of the Gobert's direct appeal brief as Claim Three. *See Gobet v. State*, 2011 WL 1505343, *15-29 (April 11, 2011). The CCA denied relief on direct appeal as to this claim. *See Gobert v. State*, 2011 WL 5881601, *8 (Tex. Crim. App. 2011).

**ISSUE RESTATED:** The CCA's holding that Article 37.071 is: 1) not "too broad" to guarantee fair application of the death penalty; 2) an inadequate and unconstitutional because the future dangerousness issue is submitted to the jury for determination, but not set forth in the indictment; and 3) unconstitutional because it permits unreliable evidence to suffice as the basis for a death verdict is all the product of an unreasonable analysis of the facts of this cause and how those facts apply against the backdrop of well settled Supreme Court precedent.

### A. Facts Supporting Gobert's Claim

In a pretrial hearing, the defense litigated what the defense referred to as "several non-evidentiary motions" regarding the constitutionality of 37.071. After the presentation of evidence, the judge overruled the motions after the defense informed the Court he stood on those motions for argument, even though the trial judge had read none of them and said as much (3 RR 4-6). At the commencement of hearings the defense attorney stated, "This is on a *Gore v. Bush* motion, Your Honor, the protection *(sic)* issue on 37.071 and its application on a statewide basis." (2 RR 5).

The issues raised in one of the pretrial motions, as the State reiterated, focused on whether future dangerousness should be considered by the grand jury and included in the indictment as a element of the offense under *Ring v. Arizona* and *Apprendi v. New Jersey* (3 RR 5-8). The trial court denied these motions (3 RR 8).

Prior to that ruling, evidence was adduced as to whether the decision to seek

the death penalty was arbitrary and capricious, due to such factors as the political whims of the individual district attorney, or the financial ability of the county to seek the death penalty, or the status of the victim as say, a sheriff's captain (2 RR 9). The witnesses testified that there was no uniformity across the 254 counties of Texas when it came to whether to seek the death penalty. One suggestion was to give that authority to the grand jury rather than the district attorney.

Texas attorney and board-certified specialist Gary Taylor testified as an expert on capital litigation (3 RR 6). He testified that on a statewide perspective, there is no "discernible standard applicable in the decision between who gets the death penalty, and who doesn't" (2 RR 7). He testified that letting the grand jury determine when to seek the death penalty would be one method of taking the arbitrariness out of the decision to seek the death penalty (2 RR 8). In some counties there is a committee that makes the decision to seek the death penalty; in other counties it is left to the discretion of the individual district attorney (2 RR 10). Another suggestion Taylor made was to allow the AG to make the determination pursuant to a certified policy as to whether to seek the death penalty (2 RR 11).

Texas Defender Service Director John Niland testified that there was no set standard across the State when determining whether to seek the death penalty (2

RR 16). He testified that the presence or absence of money and personnel was one factor district attorneys use when deciding whether to seek the death penalty (2 RR 17). He stated that the Court of Criminal Appeals has declined to determine this issue because they said they did not have enough information (2 RR 18). Mr. Niland offered the opinion that future dangerousness as an element of the offense should be determined by the grand jury under the *Ring* and *Apprendi*. as well as *Jones v. United States* (2 RR 19). Another method, suggested by the Governor's council in Illinois, the national Constitution Project, and the Massachusetts's Governor's Council on Capital Punishment, was to set up committees in each county, composed of individuals from diverse backgrounds, to make those determinations (2 RR 19-20). Mr. Niland also expressed his concern that this was a due process issue, and that capital defendants should be afforded the same due process as non-capital defendants under the Eighth Amendment (2 RR 22).

A third witness, Gerald Byington, a mitigation expert, testified that there is no uniform standard or policy or principle by which it is determined, from county to county, whether to seek the death penalty or not (2 RR 26). He cited factors such as politics, money, court time and scheduling that go into determining whether to seek the death penalty or not (2 RR 26).

John Stickels25, board certified criminal lawyer and Assistant Professor of Criminology at UT Arlington, testified as well (2 RR 32-33). He testified that in his studies he had determined that there are three main ways prosecutors prove future dangerousness: (1) the facts of the crime; (2) psychiatric testimony; and (3) the testimony of the "two guys from the special prosecution units in Huntsville, Mr. Merillat (who testified in this case) and Mr. Smith, who come and testify about future dangerousness" (2 RR 34).

> With regard to the psychological and psychiatric testimony, I have done extensive research of all of the academic - the published academic articles in psychiatry, psychology, criminology, criminal justice, sociology, and have not found a single peer reviewed article that supports the proposition that a psychologist or psychiatrist can accurately make a prediction of future dangerousness; in fact, I have found articles to the contrary - peer reviewed articles to the contrary that stand for the opposite proposition, that an opinion by a psychologist or a psychiatrist with regard to future dangerousness is not a valid or predictable opinion.... With regard to Mr. Merillat and Mr. Smith's testimony, there is no, again, published or accepted academic standards that apply to their testimony. Their testimony has not been subject to peer review. Their opinions have not been subject to peer review. Their methods to collect whatever data they have has not been subjected to peer review. There is nothing - no academic opinions that support their opinion about future dangerousness also.... the American Psychiatric Association has long held that psychiatrists are not qualified to give opinions as to future dangerousness.... In my opinion, testimony by a psychiatrist or psychologist or by Mr. Merillat or Mr. Smith that a particular defendant will constitute a future danger to society is not based on any recognized scientific method, is not based on research and is, therefore - has not been subjected to peer review and is, therefore, unreliable.

---

25 The same Mr. Stickles who acted as Mr. Gobert's state capital habeas counsel in this case.

(2 RR 35-37).

Stickels testified that under *Manson v. Brathwaite*. 432 U.S. 98, 114 (1977), the Supreme Court did not approve of juries making future dangerousness determination based upon unreliable evidence (2 RR 38). It is Mr. Stickel's opinion that future dangerousness predictions are always unreliable and inappropriate (2 RR 40). His suggestion was to remove future dangerousness from the equation entirely and have juries, like in the federal system, find aggravating factors beyond a reasonable doubt (2 RR 41).

The defense filed numerous motions in support of its proposition that the Texas death penalty statute is unconstitutional.26   In these collective motions, defense counsel maintained that:

> 1. Section 19.02-19.03 of the Texas Penal Code was unconstitutional (I CR 167);
>
> 2. Sections 19.02-19.03 of the Texas Penal Code violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the Federal Constitution and Article I, Sections 3,10, 13, 19 and 29 of the Texas Constitution because there is no ability by the jury to

---

26 "Motion to Declare Section 19.02-19.03 of the Texas Penal Code Unconstitutional" (I CR 167); Motion to Preclude the Death Penalty Due to the Grand Jury's Failure to Allege in the Indictment All Elements to Make the Defendant Death Eligible"(I CR 176); "Defendant's Objection to Penalty Phase Instructions to the Jury" (I CR 182); Motion (*sic*) Preclude Offer of Evidence of Extraneous Offenses (*Ring v. Arizona*) (I CR 189); "Motion to Declare Texas Death Penalty Statute to Be Unconstitutional" (III CR 480); "Motion to Preclude the Death Penalty as a Sentencing Option" (III CR 493); "Memorandum in Support of Motion to Preclude Death Penalty as a Sentencing Option" (III RR 498); "Motion to Declare Texas Death Penalty Statute to Be Unconstitutional" (III CR 542); "Motion (*sic*) Preclude Death Penalty as a Sentencing Option and Declare Article 37.071 Unconstitutional" (IV CR 800); "Motion to Preclude Death Penalty as a Sentencing Option" (IV CR 823); "Motion to Declare Texas Death Penalty Statute to Be Unconstitutional" (IV CR 836).

give effect to a sudden passion instruction in a case of self-defense, which was the defense in this case, absent jury nullification;

3. The death penalty should be precluded in this case because the grand jury failed to make a finding in the Indictment as to all elements that made Gobert eligible for death (I CR 176); 4) Mr. Gobert's Due process and Article I Section 10 of the Texas Constitution rights were violated because the grand jury failed to make a determination of those elements the jury must find to impose a death sentence.

4.  Mr. Gobert objected to the penalty phase instructions under *Apprendi v. New Jersey*. 530 U.S. 466 (2000) and *Ring v. Arizona*. 536 U.S. 584 (2002) to the jury because the charge requires the jury to return a verdict for conduct not charged by the grand jury, in particular future dangerousness (I CR 182);

5.  Mr. Gobert objectdd to the admissibility of evidence of extraneous offenses under *Ring v. Arizona* (I CR 189) (arguing that under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Federal Constitution, and under Articles 3, 10, 13, and 19 of the Texas Constitution, as well as *Ring*, an indictment must allege all elements of a crime with which a defendant is charged, including the punishment special issues and extraneous offenses, even though Texas courts have rejected these arguments in the past);

6. Mr. Gobert argued that the Texas death penalty statute is unconstitutional on the basis that is impossible to reliably predict future dangerousness (III CR 480);

7. Mr. Gobert moved to peclude the death penalty as a sentencing option under Article 29 of the Texas Constitution, and Article 1.05, 1.06 and 1.09 of the Texas Code of Criminal Procedure because Article 37.071 fails to provide a mechanism as to who will determine against whom the death penalty is sought. Under *Bush v. Gore*'s requirement of equal protection, the same method should be used in all 254 Texas counties. 531 U.S. 98 (2000) (III CR 493);

8. Mr. Gobert objected to imposition of the death penalty under *Furman v. Georgia*. 408 U.S. 238, 359 (1972) (III RR 498);

Gobert's appellate counsel argued on direct appeal that "However many motions were filed, the trial judge failed to read them between the time of the original indictment in 2003 and the time of the hearing on them in January 2005." *See Gobet*, 2011 WL 1505343 at *23. Appellate counsel added that:

> This is an unusual case in that the trial judge declined to read the motions he was ruling on, and said so. The prosecutor only argued the *Ring. Apprendi* argument, which is one of several raised in this multitude of "non-evidentiary pretrial motions," upon which defense counsel relied in lieu of argument.

> Since the trial judge shirked his duty to read the motions presented to him, this Court is not bound by his decision on these motions. Furthermore, unlike past cases, this case presents this Court with an abundance of evidence with which to determine that Article 37.071 causes the death penalty to be arbitrarily, capriciously, wantonly and freakishly applied.

*Id.*

As a consequence, the state trial court failed to consider and apply well-settled Supreme Court precedent to the facts of this case.

## B. Argument and Authorities: Inadequacy and unconstitutionality of prosecutorial discretion in determining whether to seek the death penalty:

As was noted supra by the defenses expert witnesses, prosecutorial discretion, and the factors that go into it, is simply too broad to guarantee that the death penalty will be fairly and evenly applied in all 254 Texas counties. As Mr.

Niland pointed out in his Memorandum in support of trial counsel's "*Bush*" motion, on a per capita basis as well as a racial basis, there are wide discrepancies between which county most often seeks the death penalty, if at all, as well as who gets the death penalty based upon race (III CR 517-19). The other witnesses talked about discrepancies based upon politics, budget, staffing, whether the determination is made by an office holder or a group - all factors that have nothing to do with the individual culpability of the accused. It should be noted that CCA has rejected similar arguments in the past citing *Bush v. Gore*. 531 U.S. 98 (2000). Appellate counsel conclude argument as to this claim by noting that the CCA has repeatedly rejected this argument in prior opinions. *See  Gobert*, 2011 WL 1505343 at *28 (citing *Busby v. State*. 253 S.W.3d 661, 667 (Tex. Crim. App.), *cert, denied*, 129 S.Ct. 625 (2008); *Rayford v. State*. 125 S.W.3d 521, 533-534 (Tex. Crim. App. 2003)). The CCA reaffirmed its prior position by again denying relief on this ground in this case. *See Gobert*, 2011 WL 5881601 at *8. The CCA's holding as to this issue is the result of a misapplication of the facts of this case to well-settled federal law.

### C.    Arguments and Authorities: Inadequacy and unconstitutionality of submitting the future dangerousness issue to the jury:

Mr. Gobert's appellate counsel argued that the grand jury forum would be the best venue to submit the issue of future dangerousness so that that it would be

175

an element of the indictment and subject to the reasonable doubt standard under *Ring* and *Apprendi*. Appellate counsel conceded, however, that the CCA has previously rejected any argument that these cases have application to 37.071. *See Gobert*, 2011 WL 1505343 at *28 (citing *Rayford v. State*. 125 S.W.3d 521, 534 (Tex. Crim. App. 2003). The CCA reaffirmed its prior position by again denying relief on this ground in this case. *See Gobert*, 2011 WL 5881601 at *8. The CCA's holding as to this issue is the result of a misapplication of the facts of this case to well-settled federal law.

**D.     Argument and Authority: Unreliability and unconstitutionality of the types of evidence currently used by prosecutors to prove death-worthiness:**

Mr. Gobert's appellate counsel also raised a claim concerning the quality of evidence the State may rely upon in proving a "death-worthiness" case.

> As was discussed, particularly by defense expert Dr. Stickel, evidence currently being used to obtain the death penalty once that decision is made is wholly unreliable, including psychiatric, and most particularly, in this case, the testimony of Mr. Merillat and Dr. Coons. Mr. Merillat's testimony is largely anecdotal and has nothing to do with the defendant's individual moral culpability, which was discussed in more detail in Point of Error Number One, *supra*. Mr. Merillat's testimony is basically that TCDJ is a violence-filled and dangerous place, and could therefore never militate in favor of doing anything other than killing the defendant. As he chuckled at the time of his testimony, defense lawyers never use him once they hear what he had to say. This Court has previously approved the use of psychiatric testimony based upon hypotheticals, as well as the testimony of Mr. Merillat. Mr. Merillat's testimony was previously approved as "expert-

educator" rebuttal testimony under Rule 702, where a defense expert had argued that opportunities for violence in TDCJ are low, and where the trial court ordered that specific instances of misconduct be excluded, in *Coble v. State*, 330 S.W.3d 253, 287-290 (Tex.Crim.App. 2010). Here, the witness persisted in interjecting specific instances of misconduct and egregious facts, over the objections of both the prosecution and the defense.

Dr. Coons' testimony was previously rejected by this Court as not even rising to the level of reliable TRE 702 expert evidence.

While these attacks on Article 37.071 individually have been rejected, together they form a powerful basis from which to see that Article 37.071 invites nothing but unfairness in determining who gets the death penalty, how that issue is determined, and the type of evidence typically relief on to make that determination.

*See Gobert*, 2011 WL 1505343 at *28.

The CCA rejected this claim on appeal, holding in part that "the fact that some prosecutors, in some cases, have offered some evidence that might be improper does not render the statute unconstitutional in all its applications." *See Gobert*, 2011 WL 5881601 at *8.

And appellant has failed to show that Article 37 .071 was unconstitutional as applied to him as we have already held that (1) the trial judge did not abuse his discretion in admitting Mr. Merillat's testimony, and (2) the erroneous admission of Dr. Coons's opinion testimony in this case was harmless. Appellant's third point of error is overruled.

*Id.*

As restated supra, the CCA's holding as to this issue is the result of a misapplication of the facts of this case to well-settled federal law.

177

**CLAIM XV:** GOBERT's 5TH, 6TH AND 14TH AMENDMENT RIGHTS WERE VIOLATED WHEN HE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL UNDER *STRICKLAND* AS A RESULT HIS TRIAL COUNSEL TELLING THE JURY THAT HE ADVISED HIS CLIENT NOT TO TESTIFY ON HIS OWN BEHALF, THEREBY UNDERMINING HIS RIGHT TO TESTIFY.

### EXHAUSTION:

This claim was properly preserved for federal review, having been presented in Gobert's direct appeal brief as Claim Six. *See Gobet* , 2011 WL 1505343 at *32.

The CCA denied relief on direct appeal as to this claim. *See Gobert*, 2011 WL 5881601 at *11.

**ISSUE RESTATED:** The CCA's holding that trial counsel's introductory questions expressing concern about Gobert's decision to testify and subject himself to cross-examination was not constitutionally deficient performance under *Strickland* is the product of an unreasonable application of the facts of this case to settled Supreme Court precedent.

### A. Facts Supporting Gobert's Claim

Mr. Martinez:   At the end of the punishment phase, appellant's counsel informed the trial judge, outside the presence of the jury, that appellant insisted on exercising his right to testify (38 RR 38). All three defense counsel were concerned and registered their opposition, on the record, to appellant's decision. Mr. Martinez: He is wanting to testify on the grounds that he be able to plead fro his life without having to be cross-examined. I already told him that he is going to be cross-examined, and because of the rules in Teas he will be allowed—they will be allowed to go into everything, reopen everything, question him about every issue on this case, and it is not going to be a good thing. I am recommending that he not do it, and he would be violating my advice, he would be violating the advice of co-counsel, both co-counsels. I just think it is not—if I had the legal authority to say he cannot, if I had the authority, I would exercise that authority to

stop him.

The Court:  I don't think you do. I think he has a constitutional right to testify if he wants to.

Mr. Martinez:  Right. Even though I think it is undermining his—also his right under the Sixth Amendment to have an effective lawyer.

The Court:  It is his call, I mean so ...

Mr. Martinez:  Your call, sir.

…

Mr. Anschutz:  Judge, just for the record, I will add my word to Mr. Martinez's. I have strenuously advised the defendant against taking the stand.

*Id.*

There can be no doubt that defense counsel made a clear and sufficient record, outside the presence of the jury, as to their opposition to Gobert taking the stand. It was therefore totally unnecessary and reckless of counsel to engage Gobert in the same line of questioning in front of the jury. It served no purpose other than to alienate Gobert from his defense counsel team in the eyes of the jury.

When lead counsel began his direct examination of Gobert before the jury, he acknowledged his disagreement with appellant's decision to testify and characterized appellant's decision to plead for his life as one that would subject him to "dehumanization" by the prosecutor (38 RR 40).

179

Once examination commenced, Mr. Martinez said, "Let me just go through some ground rules with you, okay, because you and I don't necessarily agree with this, correct? Is that right?" Appellant responded, "Yes, sir, we don't agree" (38 RR 41). No sound strategy can be raised that would justify such comments by counsel.

During direct examination, Mr. Martinez focused on Gobert's childhood and certain mitigating factors related to childhood abuse 38 RR 41-114).  Mr. Gobert was thereafter subjected to a vigorous cross-examination by the district attorney (38 RR 115-208).

## B.  Argument and Authorities

Certain constitutional rights are so fundamental that they are deemed personal to a defendant, and he alone may decide whether these rights will be exercised or waived. *United States v. Curtis*, 742 F.2d 1070, 1076 (7th Cir. 1984). In *Wright v. Estelle,* 572 F.2d 1071, 1077–80 (5th Cir.1977) (*en banc* ), Judge Godbold, dissenting from the majority decision, which assumed the existence of a personal constitutional right to testify for the purpose of applying a harmless error analysis to the denial of that right, concluded that the right to testify in one's own behalf also is of constitutional dimension, is personal to the defendant, and may not be waived by counsel under the rubric of trial strategy.

Although the exercise of certain constitutional rights, such as a defendant's Sixth Amendment right to present evidence and witnesses on his behalf, are subject to control and direction by defense counsel, the decision whether the defendant will testify falls within this category. *See Wainwright v. Sykes,* 433 U.S. 72, 93 n. 1, (1977) (Burger, J., concurring) ("Only such basic decisions as whether to plead guilty, waive a jury, or testify in one's own behalf are ultimately for the accused to make."). *See also* ABA Standards for Criminal Justice, The Defense Function § 4–5.2 (1980).

A defendant's personal right to forego the assistance of counsel and conduct his own defense, recognized in *Faretta,* also encompasses his personal right to testify in his own behalf as a part of that defense. *See Faretta v. California*. 422 U.S. 806 (1975). That a defendant's decision to do so may be unwise from a tactical standpoint also may be said of a defendant's personal decision to proceed to trial or to invoke his right to a trial by jury. But, as Judge Godbold put it, "[t]he wisdom or unwisdom of the defendant's choice does not diminish his right to make it." *Estelle,* 572 F.2d at 1079.

When a defendant, such as Gobert, asserts that he desires to exercise his constitutional right to testify truthfully, counsel's duty is to inform the defendant why he believes this course will be unwise or dangerous. *Curtis*, 742 F.2d at 1076. "If a defendant insists on testifying, however, irrational that insistence might be

from a tactical viewpoint, counsel must accede." *Id.* That is the extent, however, of counsel's obligation in this respect. To go to the length, as Mr. Martinez did in the represent case, of essentially making Gobert look like a fool in front of the jury for exercising that right served no purpose.  As a consequence, trial counsel violated Gobert's 5th, 6th and 14th Amendment rights and rendered ineffective assistance of counsel.

If counsel would have limited his comments regarding Gobert's decision to testify to confines of the trial judge and the State, his conduct would most certainly by justified as sound action. But to interject such self-serving comments about Gobert's decision to testify in the presence of the jury was an inexcusable act by counsel that did nothing to help his client's case. This behavior by trial counsel falls below prevailing norms established for trial counsel, particularly in a death penalty case. Moreover, there can be doubt that counsel's conduct had an adverse effect on the outcome of the punishment trial. As a consequence, Gobert has satisfied both the cause and prejudice prongs of *Strickland*.

On appeal, the CCA attempted to offer cover for Mr. Martinez's lapse in judgment by suggesting that his "introductory colloquy … set the stage for the beginning of counsel's impassioned closing argument at punishment: 'Milton Dwayne Gobert wanted his opportunity to come up here and basically ask each one

of you, don't take my life.'" *See Gobert*, 2011 WL 5881601 at *11 ("the record in this case reflects that counsel's apparent strategy was a reasonable one: he was framing appellant's decision to testify and plead for his life as something he felt so strongly about that he was willing to risk the consequences of a merciless cross-examination").   The CCA also added that this strategy was in keeping with the Eight Circuit's holding in *Noel v. Norris*, 322 F.3d 500 (8th Cir. 2003) (finding that counsel's statement during direct examination that his client—a capital-murder defendant—was testifying against counsel's advice "was designed to impress the jury with [the defendant's] sincerity").

The CCA's holding, however, runs contrary to well established federal law in this respect and was the product of a misapplication of the facts of this case to said law.

> **CLAIM XVI:** GOBERT's 4TH AND 14TH AMENDMENT RIGHTS WERE VIOLATED BECAUSE THE SEARCH WARRANT USED TO SEARCH HIS HOME AND OBTAIN HIS DNA, ABSENT THE ILLEGALLY OBTAINED MATERIAL FROM HIS PREVIOUSLY SUPPRESSED CONFESSION, LACKED SUFFICIENT PROBABLE CAUSE.

**EXHAUSTION:**

This claim was properly preserved for federal review, having been presented in Gobert's direct appeal brief as Claim Seven. *See Gobert* , 2011 WL 1505343 at

*34. The CCA denied relief on direct appeal as to this claim. *See Gobert*, 2011 WL 5881601 at *12.

**ISSUE RESTATED:** The CCA's holding that after excising the Gobert's confession, there was still sufficient probable cause in the search warrant affidavits to support the second search of his apartment and the search to obtain his DNA, is the product of an unreasonable application of the facts of this case to settled Supreme Court precedent.

### A. Facts Supporting Gobert's Claim

On direct appeal, Gobert argued that the trial judge erred in failing to grant his motion to suppress evidence of his DNA and items taken from his apartment and car under four separate search warrants. *See Gobert*, 2011 WL 5881601 at *12. He argued that the first two affidavits did not establish probable cause to search and the second two affidavits were based, in part, on his illegally obtained confession. *Id.* He claimed that, without the inclusion of those statements, the magistrate lacked a substantial basis for concluding that there was probable cause to search appellant's apartment or obtain his DNA. We conclude that all four affidavits contain sufficient, lawfully obtained, information to support a finding of probable cause to search.

State's Exhibits ("SX") 5 and 6 are the search warrants originally obtained to search Appellant's apartment and obtain his DNA on October 7, 2003, the day after the murder. After the Appellant was illegally questioned, second search warrants were obtained on October 15, 2003, using the illegally obtained material, in

addition to the original allegations, to establish probable cause. SX 7 and 8.

The defense objected to the search warrants as lacking probable cause (11 RR 4). SX 5 and 6 are for Appellant's car and home. SX 7 and 8 are for Appellant's home and his DNA. Affidavits executed on October 15, in paragraphs 4 and 5, contain information from the confession suppressed by the trial judge (11 RR 31). The trial court denied the motion to suppress, finding that SX 5 and 6 had sufficient information to support probable cause (12 RR 4-7).

Objects obtained in with these search warrants includes bloody shoes and gloves with the complainant's DNA on them. All items collected with the search warrants are specified in the lists attached to those exhibits and include the defendant's DNA.

At a pretrial hearing, the trial judge granted Gobert's motion to suppress his confession. *See Gobert*, 2011 WL 5881601 at *12.  The judge found that, at the beginning of the interview, appellant had invoked his Fifth Amendment right to counsel, thus the detectives violated his *Miranda* rights in continuing to question him after that Invocation. *See State v. Gobert*, 275 S.W.3d 888, 889 (Tex. Crim. App. 2009) (upholding the trial court's decision on interlocutory appeal from the State). Gobert then filed a motion to suppress evidence obtained from four separate search warrants.

At the suppression hearing, Officer Fuentes testified that he prepared affidavits on October 7, 2003, to search appellant's apartment and car. He drafted those affidavits and search warrants—State's Exhibit 5 & 6—at the time that appellant was being interviewed by others, and he did not rely upon any information from that ongoing interview. *See Gobert*, 2011 WL 5881601 at *12. In his affidavit, Officer Fuentes relied upon information

> • from Demetrius that the murderer was "a male, not white, with a shaved head and mustache wearing a striped shirt and silver shorts," and Demetrius's statement that the murderer put his mother's purse inside a black bag that the man brought with him;
>
> • from Christina Pocharansang that she suspected appellant was the murderer and her report that appellant had assaulted her the previous month, so she called Ms. Cotton to help her secretly move out of appellant's apartment, that Ms. Cotton had several friends help her move out, but in the process "they stole some of Gobert's property";
>
> • that appellant had open arrest warrants for parole violations and assault;
>
> • that when officers went to arrest appellant at his apartment, the manager showed them appellant's blue Taurus car;
>
> • that when officers arrested appellant, they saw what appeared to be blood in several places on the living room carpet;
>
> • that, after arresting appellant, one of the officers looked into appellant's blue Taurus and saw "what appeared to be blood on the steering column and on the driver's door lock";
>
> • that, after arresting appellant, the officers saw knife cuts on appellant's hands;
>
> • from appellant's brother's girlfriend that appellant arrived at their

apartment shortly after the murders to take a shower and when he arrived he was carrying a black duffel bag.

See Gobert, 2011 WL 5881601 at *12-13.

The CCA reasoned that Officer Fuentes went through all of this information and verified that none of it came from Gobert. *Id.* at 13. The magistrate found probable cause to search both appellant's apartment and car based on this information and officers conducted those searches, under warrant, the next day. *Id.* They seized numerous items of evidentiary value.

Detective Burgh then compiled a second search warrant for appellant's apartment on October 15, 2003. *Id.* This affidavit included the same information as that in the first two affidavits, but added some information from Gobert's confession as well. The only evidence seized under this third warrant was a black and blue bag with toiletries in it. *Id.* Det. Burgh also compiled a November 5, 2003, search warrant and affidavit to collect appellant's DNA. *Id.* That affidavit included the same information that was in the October 7th affidavits as well as information from Gobert's confession. *Id.*

The trial judge overruled the motion to suppress evidence and entered findings that the first two search warrant affidavits contained sufficient facts to establish probable cause and the second two affidavits contained sufficient facts to

establish probable cause, even after appellant's illegally obtained statements were excluded. *Id.* The CCA affirmed the trial court's finding on direct appeal. *Id.*

### B. Argument and Authorities

The cornerstone of the Fourth Amendment is that a magistrate may not issue a search warrant without first finding "probable cause" that a particular item will be found at a particular location. Probable cause for a search warrant exists if, under the totality of the circumstances presented to the magistrate, there is at least a "fair probability" or "substantial chance" that contraband or evidence of a crime will be found at the specified location. *Illinois v. Gates*. 462 U.S. 213, 238, 243 n. 13 (1983). Probable cause for a search warrant does not require that, more likely than not, the item or items in question will be found at the specified location. *Texas v. Brown*, 460 U.S. 730, 742 (1983). In his determination of whether probable cause exists, the magistrate may interpret the probable cause affidavit in a non-technical, common-sense manner and he may draw reasonable inferences from it. *Illinois v. Gates*. 462 U.S. at 235-38; *Hankins v. State*. 132 S.W.3d 380, 388 (Tex. Crim. App. 2004).

The duty of a reviewing court, including a reviewing trial court, is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *Illinois v. Gates*. 462 U.S. at 238. This "substantial basis" standard

of review "does not mean the reviewing court should be a rubber stamp but does mean that the magistrate's decision should carry the day in doubtful or marginal cases, even if the reviewing court might reach a different result upon de novo review." W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.7(C)) at 452 (4th ed. 2004 & Supp. 2009-2010) (internal punctuation omitted) (citing cases); *Flores v. State*. 319 S.W.3d 697 (Tex. Crim. App. 2010).

At the time the original search warrants, SX 5 and 6 were drawn up, there was a lot of circumstantial evidence included, but the crux of the affidavits was that Gobert's former girlfriend, Christina, thought he might be the killer. It was just a guess. There was no other evidence specifically tying Gobert to the murder. It was in affidavits 7 and 8 that the evidence tying Gobert to the murder was included, but that evidence was illegally obtained and suppressed, first by the trial court and then in *State v. Gobert* 275 S.W.3d 888 (Tex. Crim. App 2009). Therefore, the fruits of all the search warrants in this case were fruits of the poisonous tree which should be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).   The CCA's holding to the contrary is the result of a misapplication of the facts of this case to well-settled federal law.

### Conclusion

As this petition demonstrates, Petitioner Gobert's rights under the federal constitution were violated, unremedied by the Texas courts.

### RELIEF REQUESTED

Prayer for Relief

WHEREFORE, Petitioner respectfully prays this Court:

1.    Order that Petitioner be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases and permit Gobert to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his petition, and any defenses thereto raised by the Respondents' Answer;

2.    Order that upon completion of discovery, Gobert be granted leave to amend his petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery and that Devoe be granted to leave to expand the record pursuant to Rule 7 of the

Rules Governing § 2254 Cases to include additional materials related to the petition;

3.    Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing § 2254 Cases at which proof may be offered concerning the allegations of this petition;

4.    Issue a writ of habeas corpus to have Gobert brought before it to the end that he may be discharged from his unconstitutional confinement and restraint;

5. Grant such other relief as may be appropriate and to dispose of the matter as law and justice require.

WHEREFORE, PREMISES CONSIDERED, Petitioner Gobert asks this Court to hold hearings, make its findings of fact and conclusions of law, and find that he was denied rights.  He requests the Court to vacate his conviction and issue a writ to the Respondent, or the warden of the Polunsky Unit, ordering release of Gobert from custody, or alternatively, to reverse Gobert's conviction and order a new trial, or alternatively, to vacate his sentence of death and order a new trial on sentencing.

Respectfully submitted,

*Seth    Kretzer*

LAW OFFICE OF SETH KRETZER
The Lyric Center
440 Louisiana Street
Suite 200
Houston, TX 77002
(713) 775-3050 (work)
(713) 224-2815 (FAX)

seth@kretzerfirm.com


/s/ Carlo D'Angelo
_____

Carlo D'Angelo
ATTORNEY AT LAW
100 E. Ferguson St.; Suite 1210
Tyler, TX 75702
[Tel.] (903) 595-6776
[Fax] (903) 407-411

COURT APPOINTED LAWYERS FOR
PETITIONER GOBERT

### CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Petition for Writ of

Habeas Corpus was served on all counsel of record by filing on the ECF System on

this 8th day of March 2016.

_____
Seth Kretzer

193

## VERIFICATION

As a representative for the petitioner, I verify that the foregoing is true and correct to the best of my knowledge.

Respectfully submitted,

LAW OFFICE OF SETH KRETZER
The Lyric Center
440 Louisiana Street
Suite 200
Houston, TX 77002
(713) 775-3050 (work)
(713) 224-2815 (FAX)

seth@kretzerfirm.com

/s/ Carlo D'Angelo
_____
Carlo D'Angelo
ATTORNEY AT LAW
100 E. Ferguson St.; Suite 1210
Tyler, TX 75702
[Tel.] (903) 595-6776
[Fax] (903) 407-411

194