**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **MILTON DWAYNE GOBERT,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | **Civil No. 1:15-CV-42-RP** |
| **v.** | § | |
| | § | **\* DEATH PENALTY CASE \*** |
| **BOBBY LUMPKIN, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Milton Dwayne Gobert initiated this federal habeas corpus action pursuant to 28 U.S.C. § 2254 to challenge the constitutionality of his 2010 state capital murder conviction and sentence of death.  Currently before the Court is Petitioner's Amended Petition for Writ of Habeas Corpus (ECF No. 22), as well as Respondent Bobby Lumpkin's Answer (ECF No. 32) and Petitioner's Reply thereto (ECF No. 42).  Having carefully considered the record and pleadings submitted by both parties, the Court concludes Petitioner is not entitled to federal habeas corpus relief or a certificate of appealability.

## I. <u>Background</u>

**A.**    <u>The Offense</u>

In February 2006, Petitioner was indicted in Travis County for the 2003 stabbing death of Mel Cotton committed during the course of a robbery or kidnapping.  1 CR 3-6.[1]  Following protracted litigation concerning the suppression of a statement Petitioner gave to authorities,

---

[1]  Throughout this opinion, "CR" refers to the Clerk's Record of Petitioner's trial while "RR" refers to the Reporter's Record.  Both are preceded by volume number and followed by the relevant page numbers, and can be found on this Court's docket sheet at ECF Nos. 17-2 to 17-19.

Petitioner's trial commenced in February 2010.  After hearing testimony and arguments for seven days, a jury found Petitioner guilty of capital murder as charged in the indictment.  3 CR 565-67; 32 RR 131-32.  The Texas Court of Criminal Appeals (TCCA) accurately summarized the evidence presented at Petitioner's trial:

> In the early hours of October 6, 2003, five-year-old Dem[i]trius Cotton was awakened by the sound of his mother, Mel Cotton, screaming from her bedroom. He went into her room and saw a strange man there—"kind of tall, bald, and buff." He had a mustache and was wearing boots and boxers.  He had gloves on his hands. Dem[i]trius saw his mom sitting on the edge of the bed with duct tape on her mouth; the man was standing in front of her, stabbing her in the arms with a sharp knife. She was trying to get away from him.  She stood up, but then lost her balance and fell.  The man kept stabbing, so Dem[i]trius "ran over and tried to pull him down by his leg."  He said, "Stop," but the man pushed him off, turned on the bedside light and continued stabbing at his mom.  The man told Dem[i]trius, "sit down and shut up," so Dem[i]trius sat down.  He was scared.

> Then the man put duct tape on Dem[i]trius's ankles and mouth.  He told Dem[i]trius to get out of the room, so the child hopped out into the hallway.  The man locked the door when Dem[i]trius tried to get back inside the bedroom.  He heard his mom scream, "Leave me alone," but the man said, "Give me the money" and "Where is it at in your purse?"  Dem[i]trius hopped into his room and sat on a pallet of blankets beside his bed.  He heard the man take his mom's phone and "stomp on it" in the bathroom.  The man also cut the telephone cord.

> Dem[i]trius fell asleep, but he woke up when he heard the man come into his room.  The man "choked" Dem[i]trius with both hands.  Dem[i]trius tried to scream, but he couldn't.  He blacked out.  When he woke up later, he had a hole in his chest with blood coming out.  He went to his mom's room.  She was laying on the floor on her side.  Dem[i]trius felt her neck.  It was cold.  "[S]he was gone."  He touched her hand and talked to her for a while.  Then he went to the bathroom for a washcloth to stop his chest from bleeding.  He looked to see if anyone else was there in the apartment.  The man was gone.  Dem[i]trius ate a popsicle, then went back to his room, got his stuffed caterpillar, and waited for a long time for someone to come.  He fell asleep again, but woke up early that Monday morning when he heard knocking on the door.  He took his stool to the door to see out of the peephole, and when he saw his "Aunt Tweety," he opened the door.

> Monica Salinas, who lived in the same Austin apartment complex as Mel Cotton and Dem[i]trius, heard a hysterical woman crying, "My sister is dead, my sister is dead, please help me."  She ran up the stairs, saw Dem[i]trius with duct tape still around his neck and Mel Cotton's body in the master bedroom, so she called 911.  She saw "blood everywhere and handprints of blood all over the room."

Paramedics rushed Dem[i]trius to the hospital.  He had four stab wounds in his chest.  They were so deep that a paramedic saw Dem[i]trius's lung inflating and deflating.  Dem[i]trius said that he could hear the air coming out of the hole in his chest; it sounded like "a farting noise."  Dem[i]trius lost twenty to thirty percent of his blood volume and had a pneumothorax (collapsed lung) and a pulmonary contusion.  Doctors also determined that Dem[i]trius had been strangled.  Although his wounds were life-threatening, Dem[i]trius recovered.

The medical examiner testified that Mel Cotton had a total of 107 stab wounds that were inflicted during a drawn-out attack.  Thirty-eight of the wounds were centered around Ms. Cotton's left breast, indicating "some degree of [the victim's] incapacitation or lack of movement."  Another group of wounds were in her back.  She had approximately thirteen defensive wounds to her hands and arms.  Twenty of the wounds reached her internal organs.  She, like Dem[i]trius, had been strangled.  The medical examiner said that Ms. Cotton had probably been conscious for about ten to twenty minutes after her jugular vein had been cut.

Christina Pocharasang, [Petitioner]'s former girlfriend, learned of Ms. Cotton's murder later that day.  She immediately suspected [Petitioner].  She testified that Ms. Cotton had helped her move out of [Petitioner]'s apartment two weeks earlier by arranging for a man named Kenneth to haul her heavy furniture.  [Petitioner] had been furious and accused Ms. Cotton and Kenneth of stealing his things, including his vacuum cleaner.[2]  Christina called [Petitioner] to ask him about the murder.  When he answered the phone, [Petitioner] was breathing heavily and said that he had been in a fight with Kenneth, who had stabbed him in the stomach, causing an injury that required sixteen stitches.  Christina then called the Austin police to report her suspicions.

Austin police discovered that [Petitioner] had an outstanding parole-violation warrant and went to his apartment to arrest him.  After peeking through his blinds, [Petitioner] refused to open the door, so the officers made a forced entry.  [Petitioner] did not have a stab wound in his stomach, but he did have cuts on his right hand that looked like those made when an attacker loses his grip on a knife shaft and cuts his own hand.

Officers obtained a search warrant for [Petitioner]'s apartment and car.  They found stain remover, bleach, and vinegar containers; a glove on top of the washing machine; and a glove, tennis shoes, and a striped shirt inside the washing machine.  DNA consistent with that of Ms. Cotton's DNA was found on the left tennis shoe, and DNA consistent with that of [Petitioner], Ms. Cotton, and an

---

[2]        [Petitioner] left numerous threatening voicemails for Christina, saying such things as "Yeah, ho, you go on and do what you like. I don't give a f—— no more.  But I bet you this one thing.  You still got my shit, you keep that. That's yours.  Since you distributed my shit to all this different mother f—— and shit.  And gave my shit to these niggers.  You gave my shit to these niggers.  But bitch, one day you're going to look up, and you're going to see me. Bet that."

unknown male[3] was found on the glove on top of the washing machine. A latent fingerprint, matching [Petitioner]'s fingerprint, was found on Ms. Cotton's bedroom window blind.

While in jail, [Petitioner] bragged to his cellmate about stabbing Ms. Cotton and Dem[i]trius. He recounted details of the crime, including wrapping Ms. Cotton in an extension cord, washing his bloody clothes, and throwing the knife that he used in a lake.[4]

[Petitioner] called a jail guard, Deputy Tasha Lass, to testify that the inmates did not have much privacy in their jail cells, thus suggesting that perhaps the cellmate could have learned details about the murder from reading [Petitioner]'s case files in his jail cell.

[Petitioner] also made numerous phone calls from the jail to family members, suggesting to one brother that he might remember that [Petitioner] and Mel Cotton had a sexual relationship. [Petitioner]'s older brother told [Petitioner] to stop asking him, his brother, and their mother to lie for him. These calls were recorded and played at trial.[5] In them, [Petitioner] told various versions of the events.

One of [Petitioner]'s brothers testified at trial to the version of events that [Petitioner] told him. According to [Petitioner], he and Mel Cotton had had sex that night, and then he went to sleep in her bed. She later woke him up, and they began arguing. She came at him with a knife, saying that she was going to shoot him with a gun. They struggled over the knife. He got the knife, but when he tried to get dressed and leave, she attacked him again. Dem[i]trius came into the room and "fell" on the knife that his mother was holding. [Petitioner] told his brother that he had stayed with the little boy, giving him pain pills, until Dem[i]trius's aunt arrived the next morning. [Petitioner] told his family members that "wasn't nothing wrong with [Demitrius], he was—he's alive and he wasn't seriously hurt . . . He wasn't hurt bad at all. He went to school the next day."

The jury found [Petitioner] guilty of capital murder.

*Gobert v. State*, No. 76,345, 2011 WL 5881601, at *1-3 (Tex. Crim. App. Nov. 23, 2011).

---

[3]       When the DNA analysis was made, the technician did not have Dem[i]trius's DNA.

[4]       During his punishment-stage testimony, [Petitioner] confirmed that he threw the knife into the lake.

[5]       In one of them, [Petitioner] told his brother that a jury would surely sentence him to death if they heard that he had attacked and stabbed his mother when he was nineteen, so he wanted his mother to lie about that event. "I can't have her up there. That's, that's suicide . . . What am I going to look like in these folks' eyes? . . . I mean it's not about telling the truth, get up there and tell the truth, that's suicide, man . . . How can you say if you love somebody that you're gonna sit up there and, and, and get up there and, and help go to the death chamber? That's suicide for me, man."

**B.**     **The Punishment Phase**

The punishment phase of Petitioner's trial began March 3, 2010. 33 RR 4. The State gave a brief opening statement summarizing the evidence it intended to present, while defense counsel reserved their opening statement for later. Over the course of the next week, the jury heard testimony from twenty-six witnesses presented by the prosecution and seven witnesses presented on behalf of the defense, including Petitioner himself.

1.     Evidence Presented by the State

At punishment, the State presented several witnesses to testify about Petitioner's history of violence. The jury heard Petitioner had previously been convicted of several offenses, including burglary of a habitation, robbery, false imprisonment, and two counts of assault. 33 RR 82-92. The jury also heard from three of Petitioner's victims. Christina Pocharasang, Petitioner's former girlfriend who testified at the guilt-innocence phase, testified again and described three different violent episodes in which Petitioner repeatedly punched her, bit her, strangled her, and threatened to kill her. *Id*. at 32-63. Another of Petitioner's former girlfriends, Marinda Davis, testified that she ended the relationship because Petitioner was often jealous and began hitting her. On one occasion, she was forced to jump out of a moving car to get away from Petitioner, who then came after her and started hitting her in the face. 34 RR 218-227. Kresa Rogers, Petitioner's on-and-off girlfriend from high school, also recounted several incidents where Petitioner punched, strangled, and threatened to kill her. On at least three different occasions, Petitioner kidnapped Davis and would not let her leave. *Id*. at 230-58.

The State also presented extensive evidence regarding Petitioner's behavior while he has been incarcerated. Petitioner had numerous disciplinary incidents during the seven years he was incarcerated at the Travis County Jail, including assaulting his new cellmate, Thomas Swarmes,

within hours of Swarmes being placed in his cell.  33 RR 94-104; 34 RR 19-25, 70-74, 91-95.

During the instant trial, Petitioner had wedged a piece of plastic into the security leg brace he was

required to wear during the trial that prevented the brace from locking.  35 RR 76-98.  Testimony

was also heard regarding Petitioner's "fraternizing" with two female jail guards, including Deputy

Tasha Lass, who testified briefly for the defense at the guilt/innocence phase.  34 RR 46-68.  Lass

admitted she had been in an inappropriate relationship with Petitioner while he was incarcerated

and had given him a cell phone so they could talk without being recorded.  Lass also admitted

Petitioner still had the cell phone and that she talked to him every day during the trial.

Following her testimony and the discovery of the cell phone in Petitioner's cell, Lass was

arrested and charged with the felony of bringing a prohibited item into a correctional facility.  35

RR 35-65.  She was later recalled by the State after revealing to authorities Petitioner's plan to

escape custody.  36 RR 145-94; 37 RR 10-36.  Lass testified she first met Petitioner in December

2009 and soon became interested in Petitioner and his upcoming trial.  Petitioner made her feel

"needed," and the two began talking daily after she brought him the cell phone and charger.  In

early February 2010—after voir dire had already commenced in Petitioner's trial—Petitioner

began asking Lass to bring him a .45 pistol with a silencer and four magazines so that he "could

shoot people and locks to get out."  Petitioner also asked Lass to buy a storage shed and stock it

with food so that he could hide out until he escaped to Dubai, where he believed he would be safe

from extradition.

According to Lass, Petitioner's detailed plan would allow him to avoid being observed by

the jail's security cameras and involved targeting a particular corrections officer, Martin

Fernandes.  The TCCA accurately described Petitioner's escape plan:

> [Petitioner] told Deputy Lass that he planned to call Deputy Fernandes over
> to his cell at 2:30 a.m., shoot him, drag the deputy's body into the cell, change into

his clothes, grab his car keys,[6] shoot any other inmates who saw him, kill the control-room operator,[7] take the keys to the fire closet, grab the bag inside that closet that contained a rope, then go to the top floor fire closet for another rope, go out the roof door, tie the two ropes together and attach one end to the building, toss the rope over the edge and climb down, run over to the parking garage and drive off in Deputy Fernandes's car.  [Petitioner] would "knock out" Deputy Lass and put her in the fire closet, but she did not believe that he would leave her alive.  She said that she did not want to aid in this escape plan but [Petitioner] kept asking her every day.

*Gobert*, 2011 WL 5881601, at *5.

Finally, the State presented expert testimony concerning the probability that Petitioner would commit future acts of violence.  A. P. Merillat, an investigator with the Special Prosecution Unit of the Texas Department of Criminal Justice (TDCJ), testified generally regarding the opportunity inmates have to commit violent crimes while in prison.  Dr. Richard Coons, a forensic psychologist, rebutted certain claims blaming Petitioner's violent behavior on a childhood head injury and testified that, in his opinion, a hypothetical person with Petitioner's history, conduct, and character would likely pose a danger of violence in the future.

2.    Evidence Presented by the Defense

The first witness presented by the defense was Larry Fitzgerald, a former public information officer with TDCJ.  35 RR 147-207.  Fitzgerald discussed the procedures in place to ensure the safety of the inmates and employees of a maximum-security facility, although he acknowledged that, with over 158,000 inmates in Texas, someone could act violently if they wanted.  Nevertheless, Fitzgerald testified that the probability of violence is extremely low—in 2009, there were only 1,262 serious assaults reported, 1 homicide, and only 4 escape attempts.

---

[6]    [Petitioner] told Ms. Lass that he had seen [from his cell window] Deputy Fernandes drive in and out of the parking garage so he knew which car was his and where it was parked.

[7]    [Petitioner] wanted Ms. Lass to be in the control room so she could give him the keys.

Talecia Gobert, Petitioner's niece, testified that she was six or seven years old when she started to visit Petitioner in prison with her grandmother.  35 RR 230-40.  They would also write each other weekly, and Petitioner always encouraged her to do her best and pursue her faith.

The defense then presented the testimony of Petitioner's older sister, older brother, and cousin to discuss an incident that happened during Petitioner's childhood.  35 RR 207-29; 36 RR 5-70.  When Petitioner was five years old, he rode his big wheel into the street and was struck by a passing car.  Petitioner was hospitalized for several months and eventually came home in a full body cast.  Following this incident, each noticed a startling change in Petitioner's disposition, as he developed a quick temper and became easily agitated.  Petitioner's brother, Michael Gobert, further testified that Petitioner had trouble controlling his temper but is only aggressive when he feels physically threatened.  He admitted that Petitioner once hit him over the head with a trophy that required stitches.

Petitioner's mother, Alice Gobert, testified that Petitioner's father was abusive but was no longer in her life when Petitioner was born.  36 RR 70-135.  She often would tell Petitioner he needed discipline so that he would not end up like his father.  Even before the accident, Petitioner was hyperactive and wasn't allowed to stay in nurseries because of his tantrums.  After the accident, she thought demons had possessed her child because of the ugly things he would say to her.  Petitioner's inability to control his anger got worse with age, and by the third grade his teachers believed he should be in alternative school.  Ms. Gobert eventually became afraid of Petitioner, and he was sent to a juvenile facility on several occasions for being aggressive with her.  On one occasion, Petitioner hit his mother with a broomstick, requiring stitches.  On another

occasion, he cut her with a knife following a physical altercation.[8]  She believes her son has calmed down while in prison and that it was better for him to be incarcerated.

Petitioner was the last witness to testify at the punishment phase.  38 RR 41-209.  Although his defense counsel disagreed with this decision, Petitioner wanted to address the jury and make a plea to save his life.  Petitioner stated that he never knew his father growing up, and that he was treated differently than his siblings because they had a different father.  He hated his mother until he taught himself how to love while in prison.  Before that, he looked to "pimps and players on the street" regarding how to deal with women because he wasn't taught how to love.  Since he has been incarcerated, he has attempted to better himself by attending college courses, including 1,800 hours of computer, maintenance, and plumbing training.  He has also taken literature courses and attempted to get anger counseling.

According to Petitioner, he never started trouble, but his anger sometimes built up to where he could not control it.  He admitted to previously behaving violently while incarcerated—striking a man with a garden hoe, threatening guards, and participating in close to ten altercations—but stated those actions were in self-defense and that he is no longer a violent person.  Although prison is still a violent place, he believes he can do some good by talking and sharing his experiences with younger people.

During direct examination and again on cross-examination, Petitioner admitted to assaulting Kresa Miller, Marinda Davis, and Christina Pocharasang, but blamed his actions on anger issues and the fact these women all reminded him of his mother.  Petitioner also claimed that each woman lied about the extent of the assaults and the injuries they sustained.  Similarly, Petitioner accused Thomas Swarmes and Deputy Lass of lying during their testimony, and stated

---

[8]  Petitioner's mother and brother both testified that Petitioner called them prior to trial and asked them not to testify about these incidents.

his belief that Demitrius Cotton's testimony was "coached" because he neither stabbed nor choked Demitrius.  To the contrary, Demitrius would have died if Petitioner hadn't helped him.

While Petitioner admitted to murdering Mel Cotton and acknowledged the crime was horrible, he stood by his assertion that it was self-defense.  Petitioner stated he was attacked by Ms. Cotton as he got out of the shower and that he tied her up only to prevent her from reaching a .357 revolver in her closet.  One was never found.  Although he had remorse for killing Ms. Cotton, he is not the "deranged killer" the prosecution makes him out to be.  If he were, Petitioner argued, he would have just cut both Mel and Demitrius Cotton's throats while they slept.  Nevertheless, Petitioner admitted to taking Ms. Cotton's purse and some other items and also to disposing of the murder weapon, his shirt, and a bloody comforter.  He claimed to have had a long-standing affair with Ms. Cotton, but that he lied to police because they didn't respect his request for counsel.

Petitioner asked the jury to spare his life after impartially considering his upbringing and his eventual redemption while in prison.

### 3.    Closing and Allocution

Following this testimony, on March 10, 2010, the jury was instructed on the punishment special issues and heard closing argument by counsel.   After closing arguments, the jury deliberated and returned its verdict, finding unanimously (1) beyond a reasonable doubt there was a probability Petitioner would commit criminal acts of violence that would constitute a continuing threat to society, and (2) taking into consideration all of the evidence, including the circumstances of the offense, the Petitioner's character, background, and personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment rather than a death sentence.  38 RR 280-81.  The trial court accordingly sentenced Petitioner to death.  *Id*.

Once the verdict was read, the victim's family was given the opportunity to make an allocution statement.   After hearing a statement from Mel Cotton's sister, Ethel McPherson, Petitioner shouted: "That bitch wasn't no angel.  That was a bitch, a motherfucking bitch.  Fuck all y'all.  That was a bitch, a ho bitch."  When the trial court attempted to intervene, Petitioner replied, "No, fuck you.  Fuck your allocution.  Fuck all you motherfuckers."

## C.   Post-conviction Proceedings

Petitioner appealed his conviction and sentence, raising seven points of error in his direct appeal brief.  In an opinion issued November 23, 2011, the TCCA affirmed Petitioner's conviction and sentence.   *Gobert*, 2011 WL 5881601.   The United States Supreme Court later denied Petitioner's petition for writ of certiorari.  *Gobert v. Texas*, 568 U.S. 827 (2012).

While his direct appeal was still pending, Petitioner was appointed counsel—attorney John Stickels—to represent him in pursuing state habeas corpus relief.  Mr. Stickels filed a lengthy state habeas application on Petitioner's behalf in the state trial court raising a total of twelve multi-faceted claims for relief.  2 SHCR at 261-476.[9]  Following a response in opposition from the State, the trial court issued findings of fact and conclusions of law recommending that state habeas corpus relief be denied.  Supp. SHCR at 155-69.  In an order dated January 14, 2015, the TCCA adopted the trial court's findings of fact and conclusions of law and denied Petitioner state habeas corpus relief. *Ex parte Gobert*, No. 77,090-01 (Tex. Crim. App. 2015).

One year following the denial of state habeas relief, Petitioner filed his initial federal habeas corpus petition in this Court (ECF No. 21) and amended the petition two months later (ECF No. 22).  Thereafter, Respondent filed an answer to the amended petition (ECF No. 32) to which Petitioner responded (ECF No. 42).  The case is now ripe for adjudication.

---

[9]      "SHCR" refers to the State Habeas Clerk's Record while "Supp. SHCR" refers to the Supplemental State Habeas Clerk's Record.  Both are preceded by volume number and followed by the relevant page numbers.

## II.  Claims for Relief

As raised in his amended federal petition (ECF No. 22), the following sixteen allegations are now before the Court:

1.  Petitioner received ineffective assistance of trial counsel by counsels' failure to investigate and present Jason Gibson as a witness to establish the existence of a prior relationship between the victim and Petitioner;

2.  Gibson's affidavit establishes that Petitioner is actually innocent of capital murder;

3.  Trial counsel were ineffective for failing to investigate, develop, and present compelling mitigation evidence at the punishment phase;

4.  Petitioner received ineffective assistance of appellate counsel by counsel's failure to raise viable claims on direct appeal;

5.  Trial counsel were ineffective for failing to thoroughly investigate the testimony of Tasha Lass prior to calling her as a witness during the guilt/innocence phase of trial;

6.  Trial counsel were ineffective for failing to timely pursue an investigation and file a motion for new trial alleging they rendered ineffective assistance;

7.  Special Issue Number One, the future dangerousness special issue, is unconstitutionally vague, fails to narrow the class of defendants sentenced to death, and limits the jury's ability to consider mitigating evidence;

8.  Special Issue Number Two, the mitigation special issue, is unconstitutional because it places the burden of proof on the defendant rather than the State;

9.  The mitigation special issue violates the Eighth Amendment because it lacks minimal standards for a jury to make its determination;

10.  The mitigation special issue is unconstitutional because it sends "mixed signals" to the jury and restricts their consideration of evidence;

11.  Texas's "12-10" rule is unconstitutional because it misleads jurors about their individual ability to give effect to their beliefs regarding mitigation;

12.  The trial court erred in admitting the testimony of A.P. Merillat at the punishment phase because it violated Petitioner's right to an individualized assessment of his future dangerousness;

13.  The trial court erred in admitting the future-dangerousness prediction of Dr. Richard Coons at the punishment phase;

14. The Texas capital sentencing process is unconstitutional because it allows unfettered prosecutorial discretion, does not require future dangerousness factors to be set forth in the indictment, and permits the use of unreliable evidence;

15. Trial counsel rendered ineffective assistance by revealing to the jury their disagreement with Petitioner's decision to testify; and

16. The search and seizure of evidence from his car, home, and person violated his Fourth Amendment rights.

### III.  Standard of Review

Petitions for federal habeas corpus relief are governed by the heightened standard of review provided by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  *See* 28 U.S.C. § 2254.  But the standard of review a federal court applies to such petitions will differ depending on the state court's treatment of the federal claims.  If the claims raised in the federal petition were adjudicated on the merits in state court, federal courts should apply the deferential standard of review provided by § 2254(d).  With respect to claims that have not been adjudicated on the merits by the state courts, however, a federal court does not conduct review pursuant to § 2254(d).  Instead, the court applies a *de novo* standard of review.  *See Hoffman v. Cain*, 752 F.3d 430, 437 (5th Cir. 2014).

### A.      Claims Adjudicated in State Court

The AEDPA "imposes a highly deferential standard of review for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt."  *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam).  Under the heightened standard of § 2254(d), a petitioner may not obtain federal habeas corpus relief on any claim that was adjudicated on the merits in a state court proceeding unless the state court's adjudication either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005). This intentionally difficult standard stops just short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)).

A federal habeas court's inquiry into unreasonableness should always be objective rather than subjective, with a focus on whether the state court's application of clearly established federal law was "objectively unreasonable" and not whether it was incorrect or erroneous. *McDaniel v. Brown*, 558 U.S. 120 (2010); *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable, regardless of whether the federal habeas court would have reached a different conclusion itself. *Richter*, 562 U.S. at 102. Instead, a petitioner must show that the decision was objectively unreasonable, which is a "substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003).

So long as "fairminded jurists could disagree" on the correctness of the state court's decision, a state court's determination that a claim lacks merit precludes federal habeas relief. *Richter*, 562 U.S. at 101 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In other words, to obtain federal habeas relief on a claim previously adjudicated on the merits in state court, Petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103; *see also Bobby v. Dixon*, 565 U.S. 23, 24 (2011).

**B.**     **Claims Not Adjudicated in State Court**

For claims that have not been adjudicated on the merits in state court, the deferential scheme laid out in § 2254(d) will not apply and a reviewing court must instead "apply a *de novo* standard of review." *Ward v. Stephens*, 777 F.3d 250, 256 (5th Cir. 2015); *Hoffman*, 752 F.3d at 437. But a petitioner may not escape § 2254(d)'s deferential review simply by "using evidence that is introduced for the first time" in federal court. *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011). To the contrary, except for the narrow exceptions contained in § 2254(e)(2), a habeas petitioner is precluded from further factual development in federal court and must rely on the evidence presented to the state court when challenging a state court finding. *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011) (explaining that § 2254(d)(1) "requires an examination of the state-court decision at the time it was made" and that review "is limited to the record that was before the state court.").

Similarly, § 2254(e)(2) also restricts the discretion of a district court to consider new evidence when deciding claims entirely without a state court merits adjudication. *Pinholster*, 563 U.S. at 185-86. As such, a petitioner must be diligent to develop the record in state court first and present, if possible, all claims of constitutional error. *(Michael) Williams v. Taylor,* 529 U.S. 420, 430 (2000). "If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met." *Id*. at 437. Even if the petitioner exercised diligence in state court, a district court nevertheless retains discretion to deny a hearing and may do so if the federal record is sufficiently developed to make an informed decision. *Schriro*, 550 U.S. at 468; *McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998).

# IV. **Analysis**

## A.   **Actual Innocence** **(Claim 2)**

Petitioner first contends he is "actually innocent" of capital murder because he did not "commit or attempt to commit a robbery." According to Petitioner, the affidavit of Jason Gibson—presented for the first time during Petitioner's state habeas proceedings—establishes a prior relationship between Petitioner and Mel Cotton that proves she was not killed during the course of a robbery. In response, Respondent argues that Petitioner's assertion of actual innocence fails to state a claim upon which federal habeas relief may be granted and is alternatively without merit. Because the Court agrees that Petitioner's claim of actual innocence is not a cognizable federal habeas claim, the merits of the allegation need not be reached.

"Freestanding" claims of actual innocence, such as the allegation now before the Court, do not provide a valid basis for federal habeas relief. *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000) (citing *Herrera v. Collins*, 506 U.S. 390, 400 (1993)). "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Herrera*, 506 U.S. at 399. Although the *Herrera* court left open the question of whether, in a capital case, "a truly persuasive demonstration of 'actual innocence' made after trial would . . . warrant habeas relief if there were no state avenue open to process such a claim," 506 U.S. at 417, the Fifth Circuit has consistently rejected this theory.[10] *See Cantu v. Thaler*, 632 F.3d 157, 167 (5th Cir. 2011); *In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009); *Graves v. Cockrell,* 351 F.3d 143, 151 (5th Cir. 2003) (collecting cases). Because the Fifth Circuit does not recognize freestanding claims of actual innocence on federal

---

[10]      In later revisiting the issue of actual innocence, the Supreme Court declined to resolve the question of whether freestanding actual-innocence claims are to be recognized in federal habeas proceedings. *House v. Bell*, 547 U.S. 518, 555 (2006).

habeas review, Petitioner's allegation must be rejected.[11]

Even assuming Petitioner's actual-innocence claim could be the basis for federal relief, it would only be cognizable if there were no state procedure available for making the claim.  *Herrera*, 506 U.S. at 417; *Graves*, 351 F.3d at 151.  Such is not the situation in Texas, where state procedures are available to raise actual-innocence claims in clemency proceedings or a state habeas petition.  *See* Tex. Crim. Proc. Code art. 48.01 (West 2019); *Lucas v. Johnson*, 132 F.3d 1069, 1075 (5th Cir. 1998).  Indeed, Petitioner unsuccessfully raised this actual-innocence allegation during his state habeas corpus proceedings.  Supp. SHCR at 158-59.  Thus, Petitioner's freestanding claim of actual innocence must be denied.

## B.   <u>Trial Counsel</u> (Claims 1, 3, 5, 6, and 15)

Petitioner next raises several claims alleging he received ineffective assistance of trial counsel (IATC) at both the guilt/innocence and punishment phases of trial.  Specifically, Petitioner faults counsel for: failing to investigate and present Jason Gibson as a witness to establish the existence of a prior relationship (Claim 1); failing to investigate and present compelling mitigation evidence (Claim 3); failing to thoroughly investigate Tasha Lass prior to calling her as a witness (Claim 5); failing to investigate and file a timely motion for new trial (Claim 6); and revealing to the jury that counsel advised Petitioner not to testify (Claim 15).

---

[11]     Perhaps for this reason, Petitioner suggests that the Court consider this claim a "*Schlup*-type claim."  In *Schlup v. Delo*, the Supreme Court distinguished freestanding, substantive innocence claims—in which a petitioner asserts that his innocence entitles him to habeas relief—from procedural innocence claims in which a petitioner seeks to "have his otherwise barred constitutional claim considered on the merits."  *Schlup v. Delo*, 513 U.S. 298, 315 (1995) (quoting *Herrera*, 506 U.S. at 404).  This distinction makes it clear that the instant claim is substantive rather than procedural.  Although Petitioner's actual-innocence claim is similar to his first ineffective-assistance claim (in that it relies on the Gibson affidavit), he is not using it to obtain review of that ineffective-assistance claim.  Indeed, he has no reason to do so—in the following section, the Court can and will consider the merits of the ineffective-assistance claim, which is not subject to a procedural bar.  The Court thus declines Petitioner's invitation to consider this claim under *Schlup*.  *See Coleman v. Thaler*, 716 F.3d 895, 908-09 (5th Cir. 2013).

Four of these five allegations—Claims 1, 3, 5, and 15—were raised and rejected in state court during either Petitioner's direct appeal or state habeas proceedings. As discussed below, Petitioner fails to demonstrate the state court's rejection of the claims was contrary to, or an unreasonable application of, Supreme Court precedent. The remaining IATC claim concerning counsels' failure to file a motion for new trial (Claim 6) was not exhausted in state court and is therefore procedurally barred from federal habeas review. The claim also lacks merit even when reviewed under a *de novo* standard. Thus, relief is denied on each of Petitioner's IATC claims.

1.    The *Strickland* Standard of Review

In the habeas context, IATC allegations are reviewed under the familiar two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, Petitioner must demonstrate (1) counsels' performance was deficient, and (2) this deficiency prejudiced his defense. *Id*. at 687-88, 690. According to the Supreme Court, "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

*Strickland*'s first prong "sets a high bar." *Buck v. Davis*, 137 S. Ct. 759, 775 (2017). "To demonstrate deficient performance, the defendant must show that, in light of the circumstances as they appeared at the time of the conduct, 'counsel's representation fell below an objective standard of reasonableness' as measured by 'prevailing professional norms.'" *Rhoades v. Davis*, 852 F.3d 422, 431-32 (5th Cir. 2017) (quoting *Strickland*, 466 U.S. at 687-88). This requires the Court to "affirmatively entertain the range of possible 'reasons . . . counsel may have had for proceeding as they did.'" *Cullen v. Pinholster*, 563 U.S. at 196. "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003). As such, counsel is "strongly presumed to have rendered

adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Burt v. Titlow*, 571 U.S. 12, 17 (2013) (quoting *Strickland*, 466 U.S. at 690).

To satisfy *Strickland*'s second prong, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  In conducting a *Strickland*'s prejudice analysis, a court must "consider all the relevant evidence that the jury would have had before it if [trial counsel] had pursued the different path." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (per curiam).  However, the question "is *not* whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel [had] acted differently." *Harrington v. Richter*, 562 U.S. at 111-12 (emphasis added) (citing *Wong*, 558 U.S. at 27).  Rather, the "likelihood of a different result must be substantial, not just conceivable." *Id*.

Finally, where the IATC claims raised by Petitioner were adjudicated on the merits by the state court, this Court must review these claims under the "doubly deferential" standards of both *Strickland* and 28 U.S.C. § 2254(d). *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (citing *Pinholster*, 563 U.S. at 190); *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009) (same).  Such claims are considered mixed questions of law and fact and are analyzed under the "unreasonable application" standard of § 2254(d)(1). *Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010).  In reviewing these claims, the "pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standards, but whether "the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S at 101.  That is to say, the question to be asked in this case is not whether counsels' actions were reasonable, but whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. at 105.

2.    <u>Jason Gibson</u> (Claim 1)

Petitioner's first IATC claim alleges counsel were ineffective for failing to interview and present Jason Gibson as a witness at the guilt/innocence phase of trial.  During Petitioner's state habeas proceedings, Gibson provided an affidavit claiming to have seen Petitioner with the victim, Mel Cotton, on more than one occasion around 2002-2003.  While he did not actually meet Petitioner until they were both incarcerated at the Travis County Jail in 2003 or 2004, Gibson stated that he had seen both Petitioner and the victim, separately and together, at an apartment complex he frequently visited in north Austin.  Petitioner argues Gibson's testimony, had counsel discovered and presented it, would have established a prior relationship between the victim and Petitioner and rebutted the assertion that Petitioner murdered the victim during the course of a robbery.  This argument is unconvincing for several reasons.

To start, despite Petitioner's claims to the contrary, counsel did conduct a reasonable investigation into the existence of an ongoing relationship between Petitioner and the victim. *Strickland*, 466 U.S. at 690-91 (requiring counsel to undertake a reasonable investigation).    To be reasonable, counsel must, at minimum, interview potential witnesses and make an independent investigation of the facts and circumstances of the case.  *Kately v. Cain*, 704 F.3d 356, 361 (5th Cir. 2013).  But in assessing the reasonableness of counsel's investigation, a heavy measure of deference is applied to counsel's judgments, and is weighed in light of the defendant's own statements and actions.  *Strickland*, 466 U.S. at 691.

During Petitioner's state habeas proceedings, counsel submitted affidavits addressing, in part, Petitioner's allegation regarding Jason Gibson.  Lead counsel for the defense, Leonard Martinez, refuted the notion that counsel did not adequately investigate the robbery angle.  Supp. SHCR at 6.  According to Martinez, the defense team—which included himself, two other "very

able lawyers," a mitigation specialist, and an investigator—"investigated every fact that made up the elements of robbery and kidnaping" but had never heard of Gibson before. *Id.* Martinez's co-counsel, Kent Anschutz, elaborated by stating Petitioner never mentioned Gibson despite specifically being asked "for names of witnesses that could substantiate the existence of an ongoing relationship between [Petitioner] and the victim." II SCHR at 534.

Because Petitioner failed to mention Gibson throughout the pendency of his case, trial counsel can hardly be deemed deficient for failing to interview Gibson about his alleged knowledge of Petitioner's prior relationship with the victim. *See Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir. 1997) (holding whether counsel's investigation is reasonable may critically depend on the information provided by the defendant). Indeed, the state habeas trial court explicitly credited counsels' statements and concluded counsels' performance was not deficient. Supp. SHCR at 155-57. This determination, including the trial court's credibility findings, is entitled to a presumption of correctness which Petitioner has not overcome. *Richards v. Quarterman*, 566 F.3d 553, 563-64 (5th Cir. 2009).

Furthermore, even assuming counsel was deficient, Petitioner fails to demonstrate that the results of his trial would have been different had counsel discovered and investigated Gibson as a witness. *Strickland*, 466 U.S. at 694. Petitioner claims Gibson would have provided the jury with evidence of Petitioner's existing relationship with the victim that would, in turn, negate the robbery charge. But the alleged existence of any relationship between the two would not necessarily have impacted the jury's decision regarding whether Petitioner murdered Ms. Cotton during the course

of a robbery because it is possible to commit a robbery against someone known by the perpetrator. *See* Tex. Penal Code § 29.02.[12]

Indeed, the jury heard argument from counsel and testimony from several witnesses suggesting there may have been a previous relationship between the two. 26 RR 22 (opening argument by counsel suggesting an ongoing relationship); 29 RR 28-29 (testimony from Petitioner's former cellmate that Petitioner admitted to stabbing his girlfriend), 47-49 (cross-examination of Petitioner's brother regarding whether he knew of a relationship between Petitioner and Ms. Cotton); 30 RR 47-48 (testimony from Petitioner's brother suggesting on ongoing relationship); 32 RR 63 (closing argument suggesting ongoing relationship). Thus, any testimony Gibson could provide on the subject would have been cumulative of evidence already presented at trial. *See Trottie v. Stephens*, 720 F.3d 231, 246-47 (5th Cir. 2013) (finding IATC claim for failing to call a witness fails if the proposed testimony was cumulative of evidence already in the record); *Skinner v. Quarterman*, 528 F.3d 336, 345 n. 11 (5th Cir. 2008) (same).

Finally, it is unlikely that counsels's alleged error was prejudicial because the evidence that Petitioner committed a robbery in addition to murdering Ms. Cotton was substantial. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (noting the weight of the evidence of guilt in finding alleged deficient performance of counsel not prejudicial); *Pondexter v. Quarterman*, 537 F.3d 511, 525 (5th Cir. 2008) (same). In assessing prejudice, this Court must consider "the totality of the evidence before the judge or jury." *Mejia v. Davis*, 906 F.3d 307, 315 (5th Cir. 2018) (quoting *Strickland*, 466 U.S. at 696) (internal quotation marks omitted). In this case, the evidence established that Petitioner committed robbery in addition to murder. 26 RR 157 (testimony from

---

[12]     Under § 29.02, a person commits robbery if, "in the course of committing theft . . . and with intent to obtain or maintain control of the property, he: (1) intentionally, knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death."

Detective De Los Santos that, when speaking to Demitrius Cotton at the hospital, Demitrius told him Petitioner "took my mama's purse and money"); 28 RR 202, 222-25 (testimony from Demitrius that Petitioner demanded money from his mother and that her purse was missing from the apartment); 38 RR 180 (testimony from Petitioner during the punishment phase admitting to taking Ms. Cotton's purse and cell phone).

Consequently, Petitioner has demonstrated neither deficient performance nor prejudice, much less that the state court's denial of this claim was an unreasonable application of *Strickland*. As such, under the "doubly" deferential review encompassed by *Strickland* and the AEDPA, Petitioner's claim fails. *Richter*, 562 U.S. at 105.

3.     The Mitigation Investigation (Claim 3)

Petitioner next claims his trial counsel were ineffective for failing to adequately investigate and present mitigating evidence to the jury at the punishment phase.  Specifically, Petitioner faults counsel for not interviewing or presenting testimony from three of his former teachers to help support the defense's mitigation theory that Petitioner lacked impulse control due to being hit by a car as a child.  Petitioner also contends counsel, had they conducted an adequate investigation, could have better utilized the testimonies of his mother and brother to include readily available mitigating evidence concerning Petitioner's background and upbringing.  This allegation was raised and rejected during Petitioner's state habeas corpus proceedings.  Petitioner fails to demonstrate that this adjudication was contrary to, or an unreasonable application of, clearly established federal law.

In preparing for the penalty phase of a death penalty trial, "counsel must either (1) undertake a reasonable investigation or (2) make an informed strategic decision that investigation is unnecessary." *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013).  However,

lawyers generally need not go "looking for a needle in a haystack," especially when they have "reason to doubt there is any needle there." *Maryland v. Kulbicki*, 136 S. Ct. 2, 4-5 (2015) (per curiam) (quoting *Rompilla v. Beard*, 545 U.S. 374, 389 (2005)).  Instead, counsel's decision not to investigate a particular matter "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins v. Smith*, 539 U.S. 510, 522 (2003).  When the omission alleged is failing to investigate something in particular, a court must look at "the known evidence" and whether it "would lead a reasonable attorney to investigate further." *Id*. at 527.  There is always a strong presumption that an alleged deficiency "falls within the wide range of reasonable professional assistance." *Feldman v. Thaler*, 695 F.3d 372, 378 (5th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689)).

The record in this case supports the state court's conclusion that Petitioner's trial counsel "were well-informed about [Petitioner's] background and made reasonable decisions based on trial strategy." Supp. SHCR at 160.  Petitioner's defense team consisted of three experienced attorneys, a mitigation specialist, and an investigator.  *Id*. at 6.  The defense team obtained and reviewed a significant amount of records as part of their investigation and conducted interviews, either by phone or in person, with Petitioner, his family, and former schoolteachers.  II SHCR at 487-91.  Counsel also obtained the services of Larry Fitzgerald, an expert on prison society within TDCJ, to rebut the anticipated testimony of A. P. Merillat at trial.

As a result of their investigation, counsel presented a substantial mitigating case during the punishment phase of Petitioner's trial, including testimony from Petitioner's mother, sister, brother, and cousin concerning the following:  (1) Petitioner's temper and lack of impulse control following his being hit by an automobile at age five, (2) Petitioner was disciplined physically by his mother and fought often with his siblings and neighborhood kids, (3) Petitioner's biological

father, who was gone by the time Petitioner was born, was an alcoholic and physically abused Petitioner's mother well into her eighth month of pregnancy with Petitioner, (4) Petitioner was born a month early, and his mother attempted an abortion in her third month of pregnancy, (5) Petitioner had emotional problems at school and teachers thought he should go to alternative school by the third grade, and (6) Petitioner's mother thought demons had possessed her child after his accident, could not control him, and eventually became scared of him. All this evidence supported counsels' stated intention to demonstrate Petitioner's lack of impulse control was the product of his father's legacy of violence, prenatal abuse, and the injuries he sustained when hit by a car at age five.

Petitioner does not contend this strategy was deficient; rather, he argues counsel were deficient in implementing it by conducting an unreasonably limited investigation. According to Petitioner, at least three of Petitioner's former schoolteachers could have testified about Petitioner's emotional problems and lack of impulse control in a school setting. Petitioner also contends his mother and brother could have been better utilized to provide further details about Petitioner's background and upbringing.[13] However, complaints of uncalled witnesses are disfavored as means of establishing an IATC claim, in part because allegations of what a witness would have testified are largely speculative. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). To prevail on an IATC claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate the witness was available to testify, delineate the content of the witness's proposed testimony, and show the testimony would have been favorable to the defense. *Gregory v. Thaler,* 601 F.3d 347, 352 (5th Cir. 2010); *Day*, 566 F.3d at 538.

---

[13]   This evidence included: (1) Petitioner's mental and emotional instability, substance abuse, and suicide attempt, (2) Petitioner's lifelong fear that demons were after him, (3) Petitioner's academic problems and lack of impulse control at school, (4) a family history of substance abuse, (5) physical abuse meted out as discipline by his mother, brother, and uncles, and (6) abuse suffered by Petitioner's mother before Petitioner was born.

Assuming the first three requirements are satisfied by the affidavits submitted by Petitioner's family and former schoolteachers during his state habeas proceedings, Petitioner still fails to demonstrate the fourth—that the proposed testimony would be favorable.  In fact, much of what is contained in these affidavits is not even new, but is of the same nature as that already presented to the jury.  For instance, evidence that Petitioner lacked impulse control, had difficulty in school and exhibited mental and emotional instability was presented at length by Petitioner's mother, brother, and sister, as well as through the testimony of Petitioner himself.  *See* Background, Section I(B)(2), *supra*.  The severe abuse Petitioner's mother suffered at the hands of Petitioner's father, his father's alcoholism, and the physical altercations Petitioner had with his family members and neighbors was also discussed extensively by Petitioner's family at trial.  While the affidavits presented by Petitioner undoubtedly provide more details in hindsight, any additional testimony regarding Petitioner's upbringing and lack of impulse control would have been largely redundant of evidence already presented at trial.  *See Trottie*, 720 F.3d at 246-47 (finding IATC claim for failing to call a witness fails if the proposed testimony was cumulative of evidence already in the record); *Skinner*, 528 F.3d at 345 n. 11) (same).

Regardless, even assuming counsel were deficient in not investigating further, Petitioner fails to demonstrate prejudice under the second prong of *Strickland*.  For mitigation-investigation claims such as these, a federal habeas court must "reweigh the evidence in aggravation against the totality of available mitigating evidence."  *Trevino v. Davis*, 861 F.3d 545, 549 (5th Cir. 2017) (citing *Wiggins*, 539 U.S. at 534).  *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that, but for counsels' deficient investigation, the result of the punishment phase of a trial would have been different.  *Wong*, 558 U.S. at 27 (citing *Strickland*, 466 U.S. at

694).  But "[t]he likelihood of a different result must be substantial, not just conceivable."  *Brown v. Thaler*, 684 F.3d 482, 491 (5th Cir. 2012) (citing *Richter*, 562 U.S. at 112).  And it is virtually impossible to establish *Strickland* prejudice in cases such as this where the evidence of future dangerousness is overwhelming.  *Busby v. Davis*, 925 F.3d 699, 726 (5th Cir. 2019) (citing *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002)).

As noted by Respondent, the punishment evidence against Petitioner was "exceedingly strong."  The jury had already heard an abundance of evidence concerning the brutality of Mel Cotton's murder, including the fact that she was stabbed 107 times, as well as the fact that her five-year-old son, Demitrius, was repeatedly stabbed but nonetheless lived to testify against Petitioner.[14]  At the punishment phase, the jury then heard evidence Petitioner had previous convictions for burglary, robbery, false imprisonment, and two counts of assault.  The jury also heard from three of Petitioner's former girlfriends who testified Petitioner repeatedly abused them by punching, biting, strangling, and threatening their lives.  Petitioner was also a less-than-model prisoner while incarcerated at the Travis County Jail, having assaulted his cellmate and committing numerous disciplinary infractions, including "fraternizing" with two female jail guards.  One of these jail guards, Tasha Lass, admitted to smuggling in a cell phone for Petitioner, who then attempted to recruit her in an elaborate escape plan that involved her smuggling a weapon into the jail so he could shoot everyone who stood in his way.  Petitioner also tampered with his security leg brace on two occasions, negating its disabling effect.  *See* Background, Section I(B)(1), *supra*.

---

[14]    While, by their nature, all capital murder cases involve terrible circumstances, Supreme Court precedent plainly anticipates that the severity of the crime is a relevant factor in *Strickland* prejudice.  *See Smith v. Spisak*, 558 U.S. 139, 154-55 (2010); *Strickland*, 466 U.S. at 699; *see also Carty v. Thaler*, 583 F.3d 244, 263 (5th Cir. 2009) ("In this re-weighing, the brutality of the crime is relevant but does not automatically trump additional mitigating evidence."); *Vasquez v. Thaler*, 389 F. App'x 419, 428 (5th Cir. 2010) (unpublished) ("Naturally, the power of the newly amplified case to mitigate a jury's selected punishment will be contingent on other factors in the case, such as the circumstances of the crime.").

Additionally, Petitioner then took the stand and admitted to assaulting his mother, brother, and each of the women who testified against him.  However, he claimed his actions were the result of anger issues or the fact the women all reminded him of his mother.  He also admitted to killing Mel Cotton, although he stood by his argument that his actions were self-defense.  And he claimed his assault on an inmate with a garden hoe, his threatening of several guards, and his participation in around ten prison fights were also the results of his acting in self-defense.  *See* Background, Section I(B)(2), *supra*.

Given Petitioner's testimony and the strength of the overwhelming evidence establishing Petitioner's future dangerousness, Petitioner fails to establish the result would have been different had counsel discovered the evidence in question.  *See Russell v. Lynaugh*, 892 F.2d 1205, 1213 (5th Cir. 1989) (finding no ineffective assistance "[g]iven the weakness of such testimony when juxtaposed with the overwhelming evidence of guilt, the horrifying nature of the crime, and the abundant impeachment material available to the State").  Petitioner was therefore not prejudiced by counsels' allegedly deficient mitigation investigation.

In summary, Petitioner contends that counsel deficiently implemented their own strategy of showing that Petitioner's lack of impulse control was not his fault but rather the result of an unstable and unfortunate upbringing.  But "[t]he defense of a criminal case is not an undertaking in which everything not prohibited is required.  Nor does it contemplate the employment of wholly unlimited time and resources."  *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992).  Although it is possible, in hindsight, to speculate that counsel could have investigated more, hired different experts, or presented more mitigating witnesses, this Court is "particularly wary of arguments that essentially come down to a matter of degrees.  Did counsel investigate enough?  Did counsel present enough mitigating evidence?  Those questions are even less susceptible to judicial second-

guessing." *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) (quoting *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000)) (internal quotation marks omitted).

Here, the objective evidence present in the record demonstrates counsel conducted a broad investigation into Petitioner's background and presented a thorough case for mitigation. Petitioner provides little persuasive evidence to the contrary, and the evidence he has presented is, for the most part, cumulative of the evidence already adduced at trial. Moreover, Petitioner's evidence does not come close to outweighing the substantial evidence presented by the State regarding the brutal murder of Mel Cotton and Petitioner's history of violence. *See Busby*, 925 F.3d at 726 (finding evidence "of the same genre as that presented to the jury at trial" could not outweigh the State's "overwhelming" evidence of future dangerousness) (citing *Newbury v. Stephens*, 756 F.3d 850, 873-74 (5th Cir. 2014)). Petitioner thus fails to demonstrate either deficient performance or prejudice as required under *Strickland*, rendering Petitioner's allegation without merit.

4.   <u>Tasha Lass</u> (Claim 5)

In his fifth claim for relief, Petitioner faults counsel for failing to thoroughly investigate Travis County Deputy Tasha Lass prior to calling her as a witness during the guilt/innocence phase. Lass testified briefly for the defense for the limited purpose of showing that inmates did not have much privacy in their jail cells, thus suggesting Petitioner's cellmate could have learned details about the murder from reading Petitioner's case files as opposed to hearing him confess. Later, Lass testified for the State at the punishment phase regarding her inappropriate relationship with Petitioner, smuggling Petitioner a cell phone, and Petitioner's attempt to involve her in an elaborate plan to escape jail by shooting his way out. Had counsel conducted a proper investigation, Petitioner argues, they could have foreseen the risk of calling Lass as a witness and apparently prevented her damaging punishment-phase testimony.

Rather unexpectedly, Petitioner urges this Court to find that the claim is "essentially" unexhausted and thus procedurally defaulted even though it was raised both on direct appeal and during Petitioner's state habeas proceeding.  Citing certain factual allegations[15] that were not included in his state court briefing, Petitioner contends the claim is now fundamentally different than the claim presented to the state courts and should not be evaluated under the AEDPA's deferential standard.  Instead, the claim should be reviewed *de novo* because of state habeas counsel's failure to fully develop the claim, which Petitioner contends should constitute cause to excuse the procedural default under *Martinez v. Ryan*, 566 U.S. 1 (2012).  After reviewing Petitioner's new allegations, however, it is clear they do not "fundamentally alter" his claim, but "merely provide[] additional evidentiary support for his claim that was already presented and adjudicated in the state court proceedings."  *Escamilla v. Stephens*, 749 F.3d 380, 395 (5th Cir. 2014).  Thus, *Martinez* is inapplicable, and Petitioner must overcome the deference afforded to state court decisions.  He fails to make this showing.[16]

For example, Petitioner has not demonstrated counsel were deficient in their performance. "[C]ounsel has a duty to make a reasonable investigation of defendant's case or to make a reasonable decision that a particular investigation is unnecessary."  *Ransom*, 126 F.3d at 723 (citing *Strickland*, 466 U.S. at 691).  But in reviewing such claims, it is important to remember that counsel's performance need not be optimal to be reasonable.  *Richter*, 562 U.S. at 104; *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam) (finding a defendant is entitled to

---

[15]    Specifically, these allegations assert that (1) Lass's testimony at guilt/innocence was unnecessary and could have been developed simply by cross-examining Petitioner's former cellmate, (2) Lass was not even a guard at the Del Valle Jail where Petitioner and his cellmate were held; and (3) counsel should have been suspicious given Petitioner's past history of inappropriate relationships with jailers.

[16]    Even assuming the claim is procedurally defaulted, Petitioner cannot establish cause to excuse the default because Petitioner's allegation is insubstantial.   See *Martinez*, 566 U.S. at 14 (finding an IATC claim must be "a substantial one" in order to excuse a procedural default).

"reasonable competence, not perfect advocacy.").  "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Richter*, 562 U.S. at 110.  For this reason, every effort must be made to eliminate the "distorting effects of hindsight." *Strickland*, 466 U.S. at 689.

Petitioner's allegation that counsel should have thoroughly investigated Deputy Lass only makes sense through the benefit of hindsight.  At the time of Lass's guilt/innocence testimony, counsel had no reason to investigate a law enforcement officer or suspect there was an illicit relationship between the two.  While Petitioner cites as "red flags" a previous affair with another jailer, in addition to the fact that Lass testified in civilian clothing without a subpoena, none of these facts—individually or taken as a whole—would indicate Petitioner was carrying on an improper relationship with Lass and trying to involve her in a potentially violent escape plan.  In fact, given that the only two people who ever knew about the affair were Petitioner and Lass, discovering evidence of this relationship was the remotest of possibilities.  This was confirmed at the punishment phase when, after being granted a short continuance to investigate these matters, counsel failed to discover anything in Lass's background as a decorated law enforcement officer that would have warranted hesitation in calling her as a witness.  II SCHR at 487-91 (affidavits of Kent Anschutz and Paul Quinzi).

Moreover, whether an investigation is reasonable depends, in part, on the information provided by the defendant.  *See Sonnier v. Quarterman*, 476 F.3d 349, 362 (5th Cir. 2007) (holding that a criminal defendant cannot block his attorney's efforts and later claim that the resulting performance was constitutionally deficient); *Ransom*, 126 F.3d at 723 (holding that whether or not counsel's investigation is reasonable may critically depend on the information provided by the

defendant and the defendant's own strategic choices concerning his representation).  Here, the only person with knowledge of the risks involved in calling Lass as a witness was Petitioner himself. Despite this fact, Petitioner not only failed to disclose his relationship with Lass to counsel, he *insisted* on calling her as a witness against counsels' advice.  Supp. SHCR at 6-7 (affidavit of Leonard Martinez); II SCHR at 487-91 (affidavits of Kent Anschutz and Paul Quinzi).

As a result, trial counsel cannot be deemed ineffective for not discovering information that Petitioner could have, but did not, disclose.  *See Blanton v. Quarterman*, 543 F.3d 230, 239 (5th Cir. 2008) (trial counsel could not have uncovered evidence where neither petitioner nor his family mentioned it); *Soria v. Johnson*, 207 F.3d 232, 250-51 (5th Cir. 2000) (no deficient performance where, despite encouragement, petitioner and family failed to reveal evidence of past behavior and family).  Indeed, it appears this Court is being asked to find counsel deficient "on the ground that his lawyer[s] did exactly what he asked [them] to do.  That argument answers itself." *United States v. Masat*, 896 F.2d 88, 92 (5th Cir. 1990).

Aside from deficient performance, Petitioner also fails to demonstrate prejudice under *Strickland*.  The record indicates that, even if counsel had pursued an investigation into Lass, Petitioner cannot show that the results of such an investigation would have been fruitful.  As counsel stated in their affidavits to the state habeas court, they were unable to find anything suspicious in Lass's background even after her punishment phase testimony admitting to a relationship with Petitioner.  II SCHR at 487-91.  Further, it was not counsels' lack of preparation or even their presentation of Lass as a witness at the guilt/innocent phase that led to the eventual discovery of a relationship—it was Lass's repeated appearance at the trial "just to see what was going on." *Id*. at 488.  As such, it was likely the State would have discovered the relationship even if Lass did not testify at guilt/innocence.

Regardless, Petitioner does not demonstrate a "reasonable probability" that the result of the punishment phase of a trial would have been different had counsel somehow prevented Lass's secrets from being discovered. *Wong*, 558 U.S. at 27. "[A] court assessing prejudice must consider the totality of the evidence before the judge or jury." *Mejia*, 906 F.3d at 315 (quoting *Strickland*, 466 U.S. at 696) (internal quotation marks omitted). While Lass's testimony concerning Petitioner's escape plan was undoubtably damaging, there was still a substantial amount of evidence presented to the jury concerning Petitioner's potential for future danger, including the murder of Mel Cotton and Petitioner's life-long tendency for violence and inability to control his anger. *See* Section IV(B)(3), *supra*. Where the evidence of future dangerousness is overwhelming, it is virtually impossible to establish *Strickland* prejudice. *Ladd*, 311 F.3d at 360. As such, Petitioner fails to establish either prong of the *Strickland* inquiry, and relief is denied.

5.     Motion for New Trial (Claim 6)

Petitioner next contends trial counsel were ineffective for failing to investigate and pursue a motion for new trial. Had lead trial counsel not abandoned him at this critical stage, Petitioner argues, he could have investigated and presented the testimony of Jason Gibson that was the subject of his first and second claims for relief. In her answer, Respondent points out that this allegation was not exhausted in state court and is therefore procedurally barred from federal habeas review.[17] Acknowledging this dilemma, Petitioner again cites *Martinez v. Ryan* and asks this Court to excuse the procedural bar due to ineffective assistance of state habeas counsel.

---

[17]     Respondent also contends the allegation is barred by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989). Under *Teague*, federal courts are generally barred from applying "new" constitutional rules of criminal procedure retroactively on collateral review. According to Respondent, Petitioner seeks to apply a new rule because there is no clearly established right to counsel at the motion-for-new-trial phase. But as Petitioner correctly points out in his Reply, "every federal circuit to consider this issue, as well as the [TCCA], has relied on settled Supreme Court precedent in determining that the motion for new trial, during the post-trial, pre-appeal period, is a critical stage" warranting the right to counsel. *See McAfee v. Thaler*, 630 F.3d 383, 393 (5th Cir. 2011) (finding the right to the assistance of counsel at the motion-for-new-trial phase in Texas). Respondent's argument is thus unpersuasive.

Petitioner fails to establish that *Martinez* should apply. Even when reviewed under a *de novo* standard, Petitioner's underlying IATC allegation lacks merit.

a.   Procedural Default

The AEDPA requires that a prisoner exhaust his available State remedies before raising a claim in a federal habeas petition. *See* 28 U.S.C. § 2254(b)(1)(A) (stating that habeas corpus relief may not be granted "unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State."). The exhaustion requirement is satisfied if the substance of the federal habeas claim was presented to the highest state court in a procedurally proper manner. *Baldwin v. Reese*, 541 U.S. 27, 29-32 (2004); *Moore v. Cain*, 298 F.3d 361, 364 (5th Cir. 2002). In Texas, the highest state court for criminal matters is the TCCA. *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998).

Petitioner readily admits he did not raise the instant claim in the TCCA. As such, the claim is unexhausted. *Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001). But if Petitioner were to return to state court to satisfy the exhaustion requirement only to have the state court procedurally bar the claim under state law, the unexhausted claim would also be considered procedurally barred from federal habeas review. *See Keeney v. Tamayo-Reyes*, 504 U.S. 1, 9-10 (1992) (holding an unexhausted claim is procedurally defaulted for federal habeas purposes if the claim would now be procedurally barred by state court); *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991) (same).

In this case, Petitioner is unable to return to state court to present his unexhausted claim because doing so would be barred by Texas' abuse of the writ doctrine codified in Article 11.071, Section 5(a) of the Texas Code of Criminal Procedure. *Fuller v. Johnson*, 158 F.3d 903, 906 (5th Cir. 1998). The Fifth Circuit has consistently held that Texas' abuse of the writ doctrine is an independent and adequate state procedural bar foreclosing federal habeas review of unexhausted

claims. *See Williams v. Thaler*, 602 F.3d 291, 305-06 (5th Cir. 2010) (holding a petitioner's claims were procedurally defaulted because if the petitioner returned to state court, the court would not consider the merits under Article 11.071, § 5(a)); *Rocha v. Thaler*, 626 F.3d 815, 832 (5th Cir. 2010); *Beazley v. Johnson*, 242 F.3d 248, 264 (5th Cir. 2001). As a result, Petitioner's unexhausted claim is procedurally defaulted in federal court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Bagwell v. Dretke*, 372 F.3d 748, 755 (5th Cir. 2004).

Federal habeas relief based on a procedurally defaulted claim is barred unless the petitioner can demonstrate cause for the default and actual prejudice arising from the default or demonstrate the failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750; *Barrientes v. Johnson,* 221 F.3d 741, 758 (5th Cir. 2000). Petitioner makes no attempt to show a "fundamental miscarriage of justice" will result from the Court's dismissal of these claims. Instead, Petitioner contends the ineffectiveness of his post-conviction counsel constitutes cause to overcome the procedural bar under *Martinez*. As discussed below, Petitioner fails to make this showing.

      b.   <u>*Martinez* Analysis</u>

Prior to *Martinez*, an attorney's negligence in a postconviction proceeding could not serve as "cause" to excuse the procedural default of claims in federal court. *Coleman*, 501 U.S. at 755. In *Martinez*, the Supreme Court carved out a "narrow" exception to the *Coleman* rule for IATC claims. *Trevino v. Thaler*, 569 U.S. 413, 422 (2013). Now, a petitioner may meet the cause element by showing (1) "that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding" and (2) "that his [IATC claim] is substantial—i.e., has some merit." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013). Neither of these prongs are satisfied in this case.

To start, Petitioner fails to establish that his state habeas counsel, John Stickels, rendered ineffective assistance during Petitioner's state habeas proceedings.  Petitioner contends Stickels's inadequacies stem from his failure to raise an IATC claim concerning trial counsel's failure to file a motion for new trial.  According to Petitioner, trial counsel should have investigated and presented the testimony of Jason Gibson in a motion for new trial but failed to do so due to bickering between trial counsel and Petitioner's counsel on direct appeal.  But while Stickels did not specifically challenge trial counsel's performance at the motion-for-new-trial phase, he did raise an actual-innocence claim and a general IATC claim based on the affidavit provided by Gibson.  Because both allegations were rejected by the state habeas court, Stickels can hardly be faulted for raising essentially the same allegation in another, slightly altered form.  *See Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995) (finding "[c]ounsel cannot be deficient for failing to press a frivolous point."); *Barbee v. Davis*, 660 F. App'x. 293, 314 (5th Cir. 2016) (unpublished) (finding no prejudice if there is no "reasonable probability that [Petitioner] would have been granted state habeas relief had the claims been presented in the first state habeas application.").

Petitioner also fails to demonstrate that his underlying IATC claim "is a substantial one." *Martinez*, 566 U.S. at 14 (citing *Miller–El v. Cockrell,* 537 U.S. 322 (2003)).  "For a claim to be 'substantial,' a petitioner 'must demonstrate that the claim has some merit.'" *Reed v. Stephens*, 739 F.3d 753, 774 (5th Cir. 2014) (quoting *Martinez*, 566 U.S. at 14).  "Conversely, an 'insubstantial' ineffective assistance claim is one that 'does not have any merit' or that is 'wholly without factual support.'" *Reed*, 739 F.3d at 774 (quoting *Martinez*, 566 U.S. at 15-16).  Again, allegations of ineffective assistance are reviewed under *Strickland*'s familiar two-prong test requiring a demonstration of deficient performance and prejudice.  466 U.S. at 687-88, 690.

In order to demonstrate a substantial claim, Petitioner must show that counsel's decision not to move for a new trial was objectively unreasonable as a matter of strategy. *McAfee*, 630 F.3d at 394. But this Court's judicial scrutiny of counsel's performance under *Strickland* must be "highly deferential," indulging in a "strong presumption" that "trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy." *Id*. (citing *West v. Johnson*, 92 F.3d 1385, 1400, 1409 (5th Cir. 1996)). Indeed, trial counsel has broad discretion when it comes to deciding how best to proceed strategically. *See Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir. 2015) (the Supreme Court has emphasized counsel has "wide latitude in deciding how best to represent a client") (quoting *Yarbrough*, 540 U.S. at 5-6).

Here, the record suggests that trial counsel did not file a motion for new trial because of his belief that the habeas process was a better forum for challenging the conviction. I SHCR at 196 (indicating counsel consulted with capital litigation experts before making this decision). This strategy is reasonable, particularly given the Supreme Court's similar position on the matter. *See Trevino*, 569 U.S. at 424 (stating the motion-for-new-trial vehicle in Texas "is often inadequate because of time constraints and because the trial record has generally not been transcribed at this point.") (citation omitted); *see also Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997) (finding that habeas proceedings, rather than a motion for new trial, are the preferred method for gathering facts necessary for an IATC challenge).

Furthermore, although no motion for new trial was filed on his behalf, Petitioner does not propose any claim that would have been successful had one been filed. In fact, the only claim Petitioner does mention is the general allegation concerning counsel's overall failure to discover Jason Gibson, a claim this Court has already found to lack merit. *See* Section IV(B)(2), *supra*. In order for Petitioner to prevail on the more specific claim that counsel should have presented

Gibson's affidavit in a motion for new trial, he must show a reasonable probability that, had counsel moved for a new trial, the trial court would have granted the motion. *McAfee*, 630 F.3d at 395. Given that the trial court later rejected Petitioner's general IATC claims concerning Gibson during Petitioner's state habeas proceeding, Petitioner cannot make this showing.

Consequently, Petitioner has neither established a substantial IATC allegation nor demonstrated that his state habeas counsel rendered ineffective assistance for failing to raise the claim during Petitioner's state habeas proceedings. For this reason, Petitioner fails to establish cause under *Martinez* that would excuse his unexhausted IATC claims from being procedurally defaulted. Petitioner is thus barred from receiving federal habeas relief on these allegations. Alternatively, even if the Court were to look past the procedural default and review the claim *de novo*, relief would be denied because the claim lacks merit.

6. <u>Petitioner's Decision to Testify</u> (Claim 15)

In his last IATC claim, Petitioner faults his lead counsel, Leonard Martinez, for expressing in front of the jury his disagreement with Petitioner's decision to testify. According to Petitioner, counsel's comment that he "doesn't necessarily agree" with Petitioner's choice served no purpose and undermined Petitioner's right to testify on his own behalf. The TCCA disagreed, finding on direct appeal that counsel's decision to inform the jury of his disagreement with Petitioner was a reasonable strategy designed to emphasize how strongly his client felt about testifying and making a sincere personal plea for mercy. *Gobert*, 2011 WL 5881601, at *11-12. This decision was not an unreasonable application of *Strickland*.

Toward the end of the punishment phase, counsel informed the trial court of Petitioner's insistence on exercising his right to testify. 38 RR 38-39. All three of Petitioner's attorneys strenuously disagreed with Petitioner's decision and registered their opposition on the record

outside the presence of the jury. *Id*. at 38-39, 113. Once Petitioner's direct examination began, Martinez reiterated to the jury his disagreement with Petitioner's decision and explained his concern about subjecting his client to a "dehumanizing" cross-examination:

| Martinez: | Mr. Gobert, you asked—you asked to address this jury, is that correct? |
|---|---|
| Petitioner: | Yes, sir. |
| Martinez: | Let me just go through some ground rules with you, okay, because you and I don't necessarily agree with this, correct? Is that right? |
| Petitioner: | Yes, sir, we don't agree. |
| Martinez: | And you know that I have concerns that because you are taking the witness stand they are going to be able to question you about everything and try to make you look bad. You saw what happens on that witness stand to witnesses. You know what happens to them, don't you? |
| Petitioner: | Yeah. It is not a concern, though, to me. |
| Martinez: | Okay. But you wanted to address this jury and make a plea for your life, didn't you? |
| Petitioner: | Yes, sir. |
| Martinez: | Even though in making that plea for your life, now they are going to put you under intense cross-examination to dehumanize you. Do you know that? |
| Petitioner: | Well, they did—done a lot of dehumanizing, yes, sir. I'm not concerned with that. |

*Id*. at 41-42.

Petitioner was the last person to testify at his trial. At closing argument, Martinez continued to emphasize Petitioner's strong desire to take the stand to plead for mercy despite facing a brutal cross-examination. He began by reiterating that Petitioner "wanted his opportunity to come up here and basically ask each one of you, don't take my life." *Id*. at 246-47. Martinez then concluded his impassioned closing argument by asking the jury to spare Petitioner's life:

I am pleading with you.  He pleaded with you.  He said, spare my life, spare my life.  I am saying, please, spare his life if for no other reason than we should value life, affirm life, because he is not escaping punishment.  He will be punished severely.  That's all I'm asking.  Just spare his life.  Thank you.

*Id*. at 264.

Petitioner contends that Martinez's comment to the jury that he disagreed with Petitioner's choice to testify served no purpose and made Petitioner "look like a fool" for exercising his constitutional right.  But counsel "has wide latitude in deciding how best to represent a client. . ." *Yarborough*, 540 U.S. at 5-6, 8 ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."). For this reason, "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness."  *Cotton*, 343 F.3d at 752-53.  This makes an attorney's choice of defense and his strategy in arguing that defense to a jury "virtually unchallengeable." *Strickland*, 466 U.S. at 690; *Trottie*, 720 F.3d at 243 (holding the failure to present a particular line of argument is presumed to be the result of strategic choice).

Here, the record clearly indicates Martinez's decision to inform the jury of his disagreement with Petitioner was strategic:  "he was framing [Petitioner]'s decision to testify and plead for his life as something [Petitioner] felt so strongly about that he was willing to risk the consequences of a merciless cross-examination."  *Gobert*, 2011 WL 5881601, at *12.  In other words, counsel was simply emphasizing his client's strong desire to face the jury and make a plea for mercy.  There is nothing objectively unreasonable with this strategy, and Petitioner fails to cite a single case where counsel, under similar facts, was found to be ineffective.  Thus, because counsel's comment on Petitioner's decision testify was strategic and imminently reasonable, Petitioner fails to establish the deficient-performance prong of an ineffective assistance claim.  *See*

*Clark v. Thaler*, 673 F.3d 410, 427 (5th Cir. 2012) (recognizing the broad deference to which counsel is entitled in making tactical decisions in closing argument).

With regard to prejudice, Petitioner makes only the single, cursory statement that there is "no doubt" counsel's conduct had an adverse effect on the outcome of Petitioner's trial. But such conclusory assertions of prejudice are insufficient to support a claim for ineffective assistance of counsel. *Woodfox v. Cain*, 609 F.3d 774, 809 n.17 (5th Cir. 2010); *Day*, 566 F.3d at 540. Moreover, given that counsel only briefly mentioned his disagreement with Petitioner at the beginning of Petitioner's testimony and never mentioned it again, this Court is highly doubtful of any prejudicial impact the statement may have had. This is particularly so given the overwhelming evidence presented against Petitioner at the punishment phase. *See* Section IV(B)(3), *supra*.

This Court therefore concludes that Petitioner failed to show that counsel's performance was deficient or prejudicial, much less that the state court's denial of this claim was unreasonable application of *Strickland*. Accordingly, viewed through the "doubly" deferential lens of the AEDPA, relief is unavailable.

## C.     Appellate Counsel (Claim 4)

In his fourth claim for relief, Petitioner alleges that his direct appeal attorney was ineffective because she failed to challenge the admission of the following evidence: (1) testimony from a paramedic, Bryan Mason, that Demitrius Cotton's wounds were consistent with someone trying to kill him; (2) testimony from Detective Eric De Los Santos that Demitrius told him the person who stabbed his mother "took all my mama's purse and money;" and (3) a video showing Demitrius's physical condition while in the hospital. These allegations concerning appellate counsel were rejected by the state court during Petitioner's state habeas proceedings. Supp. SHCR

at 162-64.   Petitioner has not shown this rejection on the merits to be contrary to, or an unreasonable application of, the relevant *Strickland* standard.

1.     The *Strickland* Standard Governs

The same two-pronged standard set out in *Strickland* to prove that counsel rendered unconstitutionally ineffective assistance applies equally to both trial and appellate attorneys.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Dorsey v. Stephens*, 720 F.3d 309, 319 (5th Cir. 2013). Thus, the standard for evaluating the performance of counsel on appeal requires inquiry into (1) whether appellate counsel's conduct was objectively unreasonable under then-current legal standards, and (2) whether there is a reasonable probability that, but for appellate counsel's deficient performance, the outcome of Petitioner's appeal would have been different.  *Robbins*, 528 U.S. at 285; *Higgins v. Cain*, 720 F.3d 255, 260-61 (5th Cir. 2015).  Appellate counsel who files a merits brief need not, and should not, raise every non-frivolous claim.  *Robbins*, 528 U.S. at 288; *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  Only solid, meritorious arguments based on directly controlling precedent should be raised on direct appeal.  *Schaetzle v. Cockrell*, 343 F.3d 440, 445 (5th Cir. 2003).  Nonetheless, appellate counsel is obligated to research relevant facts and law or to make an informed decision that certain avenues will not prove fruitful.  *See Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir. 2004); *United States v. Reinhart*, 357 F.3d 521, 525 (5th Cir. 2004).  The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy.  *Smith v. Murray*, 477 U.S. 527, 536 (1986); *Barnes*, 463 U.S. at 751–52.

2.     Bryan Mason and the Video of Demitrius

Petitioner first contends his appellate counsel was ineffective for failing to challenge a portion of the testimony given by Bryan Mason, one of the paramedics who arrived first at the

scene of Mel Cotton's murder.  After determining Ms. Cotton was deceased, Mason turned his attention to five-year old Demitrius Cotton, who had sustained several deep stab wounds to his chest.  26 RR 70-89.  Mason described Demitrius's injuries and condition to the jury and explained how he treated Demitrius before sending him to the hospital.  *Id*.  At the end of his direct testimony, Mason was asked, "[b]ased on the injuries to this child that you observed, in your opinion, did it seem to be consistent with someone who was trying to kill him?"  *Id*. at 87.  Mason responded, "Absolutely."  *Id*. at 88.

Defense counsel objected on the basis that the question calls for speculation and is outside of Mason's area of expertise, but the objection was overruled.  *Id*.  Petitioner now contends that this testimony was erroneously admitted in violation of Texas law and argues that his appellate counsel should have challenged the trial court's ruling on direct appeal.  This allegation was raised during Petitioner's state habeas proceedings where it was determined that appellate counsel was not ineffective because the challenged testimony was admissible under the Texas Rules of Evidence.  Supp. SHCR at 162.  Because the state habeas court determined that Mason's testimony was permissible under state law, this Court may not conclude otherwise. *See Charles v. Thaler*, 629 F.3d 494, 500-01 (5th Cir. 2011) (stating that "[a] federal court lacks authority to rule that a state court incorrectly interpreted its own law. When, as here, a state court's legal conclusions are affirmed by the highest court in that state, those conclusions are state law."); *Young v. Dretke*, 356 F.3d 616, 628 (5th Cir. 2004) (declining to review the state habeas court's determination of the validity of a Texas statute under the Texas constitution in the context of a *Strickland* claim). Indeed, it is not this Court's function to review a state's interpretation of its own law.  *Bradshaw v. Richey*, 546 U.S. 74 (2005) ("We have repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."); *Schaetzle*, 343 F.3d at 448-49 ("It is not

our function as a federal appellate court in a habeas proceeding to review a state's interpretation

of its own law, and we defer to the state courts' interpretation of the Texas . . . statute.") (citation

omitted).

Petitioner's allegation concerning the video of Demitrius meets the same fate.  At the

guilt/innocence phase of trial, the State introduced a silent video showing Demitrius's physical

condition when he was being interviewed at the hospital.  26 RR 159-61.  Trial counsel objected

to the video based on relevance and the potential for undue prejudice, but the objection was

overruled after counsel waived the objection upon realizing the video had no sound.  *Id.*  Petitioner

now alleges the admission of the video violated Rules 401 and 403 of the Texas Rules of Evidence

and argues appellate counsel should have challenged the trial court's ruling on direct appeal.  This

allegation was also rejected during Petitioner's state habeas proceedings after the state court found

the video admissible under Texas law as same transactional contextual evidence.  Supp. SHCR at

163.  Because the state habeas court held the video of Demitrius was admissible under Texas law,

this Court simply "cannot review the correctness of the state habeas court's interpretation of state

law."  *Amador v. Quarterman*, 458 F.3d 397, 412 (5th Cir. 2006) (citing *Young*, 356 F.3d at 628).

   3.   Detective De Los Santos

Homicide detective Eric De Los Santos was the first to interview Demitrius when he was

taken to the hospital.  Prior to Detective De Los Santos testifying about what Demitrius told him,

trial counsel objected to the testimony as violating the Confrontation Clause pursuant to *Crawford*

*v. Washington*, 541 U.S. 36 (2004).  The trial court overruled the objection after a lengthy

discussion outside the presence of the jury.  26 RR 145-56.  Following this ruling, Detective De

Los Santos testified that Demitrius told him the man who stabbed his mother "took my mama's

purse and money."  *Id.* at 157.

44

Petitioner now contends the trial court's ruling was erroneous and that his appellate counsel was ineffective for failing to challenge the ruling on direct appeal. According to Petitioner, out-of-court statements like Demitrius's are "testimonial" and thus impermissible under *Crawford* as evidence against the accused. Indeed, a witness's testimony against a defendant is inadmissible under *Crawford* "unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009) (citing *Crawford*, 541 U.S. at 54). As found by the state habeas court during Petitioner's state habeas proceedings, however, no such Confrontation Clause issue existed in this case because Demitrius was available and indeed did testify at this trial. Supp. SHCR at 163; *see* 28 RR 179-234. As such, appellate counsel cannot be faulted for raising what would have amounted to a frivolous *Crawford* allegation. *Barnes*, 463 U.S. at 751-52 ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."); *Schaetzle*, 343 F.3d at 445 (holding that only solid, meritorious arguments based on directly controlling precedent should be raised on direct appeal).

In summary, Petitioner's allegations concerning appellate counsel were rejected by the state court during his state habeas proceedings, and Petitioner has not shown this rejection on the merits to be contrary to, or an unreasonable application of, the *Strickland* standard. *See Richter*, 562 U.S. at 101. Federal habeas relief is therefore denied.

## D.   The Special Issues (Claims 7-11, 14)

Petitioner next raises several challenges to Texas's death penalty system, arguing he was sentenced to death under an unconstitutional statutory scheme. As discussed below, each of these

allegations is either procedurally barred, foreclosed by clear Supreme Court and Fifth Circuit precedent, or foreclosed by the non-retroactivity principle of *Teague v. Lane*, 489 U.S. 288 (1989).

1.     Special Issue Number One (Claim 7)

Under Texas's capital sentencing statute, the jury must answer two "special issues" before a sentence of death may be assessed.  *See* Tex. Code. Crim. Proc. art. 37.071 § 2(b).  Under the first special issue, the jury must decide "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  *Id*. Petitioner contends this first special issue—the future-dangerousness special issue—is unconstitutionally vague because it does not define such terms as "probability," "criminal acts of violence," and "continuing threat to society."  As a result, Petitioner argues, the statute neither adequately channels the jury's discretion nor narrows the class of defendants sentenced to death. This allegation fails for two reasons.

First, Petitioner did not present this claim to the TCCA for review either on direct appeal or during his state habeas proceedings.[18]  Nor does he attempt to demonstrate cause and prejudice for his failure to raise these claims in state court or argue that a denial of the claim will result in a "fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. at 750-51.  As such, Petitioner is procedurally barred from federal habeas relief on this claim.  *See* Section IV(B)(5), *supra*.

Second, Petitioner's allegation is "far from novel."  *Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir. 1998).  The Fifth Circuit has consistently upheld the future-dangerousness special issue against challenges to the phrases "probability," "criminal acts of violence," and "continuing threat

---

[18]     Although Petitioner contends the claim was presented as Claims 6 and 8 in his state habeas application, the record demonstrates that these allegations both concern the sufficiency of the evidence and not the future dangerousness special issue.  Indeed, the instant allegation is wholly unrelated to the state habeas claims cited by Petitioner.

to society." *See Sprouse v. Stephens*, 748 F.3d 609, 622 (5th Cir. 2014); *Turner v. Quarterman*, 481 F.3d 292, 299-300 (5th Cir. 2007); *Leal v. Dretke*, 428 F.3d 543, 553 (5th Cir. 2005); *Hughes v. Johnson*, 191 F.3d 607, 615 (5th Cir. 1999). The terms "have a plain meaning of sufficient content that the discretion left to the jury is no more than that inherent in the jury system itself." *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009). Because Petitioner's allegation concerning the terms used in the future-dangerousness special issue lacks merit in light of clearly established federal law, relief is denied.

    2.    <u>Special Issue Number Two</u> (Claims 8-11)

Under Texas's second special issue—the mitigation special issue—Petitioner's jury was required to determine "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment . . . rather than a death sentence be imposed." Tex. Code. Crim. Proc. art. 37.071 § 2(e). Petitioner challenges the constitutionality of this special issue for three reasons: (1) the statute fails to require the jury to make its findings beyond a reasonable doubt and places the burden of proof onto Petitioner instead of the State, (2) the statute lacks minimal standards and sends "mixed signals" to the jury, and (3) the accompanying "12-10 Rule" that instructs the jury that ten or more jurors must agree to assess a life sentence is confusing and creates an unnecessary risk of jury coercion.

    a.    <u>Procedural Default</u>

Under the procedural default doctrine, this Court is precluded from reviewing "claims that the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017); *Canales v. Stephens*, 765 F.3d 551, 562 (5th Cir. 2014) (citing

*Maples v. Thomas*, 565 U.S. 266, 280 (2012)).  The "independent" and "adequate" requirements are satisfied where the court clearly indicates that its dismissal of a particular claim rests upon a state ground that bars relief, and that bar is strictly and regularly followed by the state courts. *Roberts v. Thaler*, 681 F.3d 597, 604 (5th Cir. 2012) (citing *Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001)).  This doctrine ensures that federal courts give proper respect to state procedural rules.  *Coleman*, 501 U.S. at 750-51.  The application of an independent and adequate state procedural bar must be honored even if the state court has, in the alternative, reached the merits of the claim.  *Harris v. Reed*, 489 U.S. 264 n.10 (1989).

During Petitioner's state habeas proceedings, the state trial court rejected each of these allegations as procedurally barred because Petitioner could have raised the claims on direct appeal.[19]  Supp. SHCR at 167-68 (citing *Ex parte Nelson*, 137 S.W.3d 666, 667 (Tex. Crim. App. 2004)).  The state court cited *Nelson*, a case which in turn relies on *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1998).  The rule from *Gardner*—which bars consideration of claims that could have been but were not raised on direct appeal—is "an adequate state ground capable of barring federal habeas review."  *Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir. 2005) (citing *Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir. 2004)).  Consequently, Petitioner is precluded from federal habeas review of these claims unless he can show cause for the default and resulting prejudice, or demonstrate that the Court's failure to consider his claim will result in a "fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750-51; *Busby v. Dretke,* 359 F.3d 708, 718 (5th Cir. 2004).  Again, Petitioner fails to make this demonstration.  Thus, circuit precedent compels the denial of the claims as procedurally defaulted.

---

[19]     The trial court also reviewed the claims alternatively on the merits and denied relief.  *Id.*

b.      The Burden of Proof (Claim 8)

Regardless of the procedural bar, Petitioner's claims concerning the mitigation special issue are meritless.  Petitioner first challenges the mitigation special issue because it does not require the jury to make its finding beyond a reasonable doubt.  Citing *Ring v. Arizona*[20] and *Apprendi v. New Jersey*,[21] Petitioner contends the mitigation special issue also encompasses aggravating circumstances that must be proven beyond a reasonable doubt.   For this reason, Petitioner asserts the current statutory scheme is unconstitutional for not imposing a burden of proof on the State to prove these aggravating circumstances to the jury beyond a reasonable doubt.  Petitioner's allegation is contrary to clearly established Fifth Circuit precedent.

 The Fifth Circuit has "specifically held that the Texas death penalty scheme did not violate either *Apprendi* or *Ring* by failing to require the state to prove beyond a reasonable doubt the absence of mitigating circumstances."  *Allen v. Stephens*, 805 F.3d 617, 627-28 (5th Cir. 2015), *abrogated on other grounds by Ayestas v. Davis*, 138 S. Ct. 1080 (2018) (citing *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007)).  Indeed, "No Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005); *see also Druery v. Thaler*, 647 F.3d 535, 546-47 (5th Cir. 2011); *Blue v. Thaler*, 665 F.3d 647, 668-69 (5th Cir. 2011); *Avila v. Quarterman*, 560 F.3d 299, 315 (5th Cir. 2009).   Because the Fifth Circuit has repeatedly rejected Petitioner's contention that the Constitution requires that the State be assigned the burden of proof on the mitigation special issue, federal habeas relief is foreclosed.

---

[20]      536 U.S. 584 (2002).

[21]      530 U.S. 466 (2000).

c.      "<u>Mixed Signals</u>" (Claims 9, 10)

Petitioner's next two allegations allege that the mitigation special issue sends "mixed signals" to the jury by requiring the jury to consider all of the evidence presented while simultaneously limiting consideration to only evidence that reduces a defendant's "moral blameworthiness."  *See* Tex. Code Crim. Proc. art 37.071, § 2(f)(4).  According to Petitioner, the definition of mitigating evidence found in § 2(f)(4) is unconstitutionally restrictive because it impermissibly limits the jury's discretion to consider other types of evidence—including background and character evidence—that may be mitigating but does not reduce a defendant's "moral blameworthiness" for the crime.

The Fifth Circuit has repeatedly rejected similar arguments.  *See, e.g., Rockwell v. Davis*, 853 F.3d 758, 763 (5th Cir. 2017); *Blue*, 665 F. 3d at 665-66; *Beazley v. Johnson*, 242 F.3d 248, 259 (5th Cir. 2001).  In *Beazley*, the Court considered the exact allegation now raised by Petitioner and held that the post-1991 capital sentencing scheme as currently codified in article 37.071 "does *not* unconstitutionally 'preclude the jury from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'"  242 F.3d at 260 (citing *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)) (emphasis in the original).  Citing *Beazley* some sixteen years later, the Court bluntly stated that the statute "does not unconstitutionally restrict the mitigating evidence that Texas juries are allowed to consider."  *Rockwell*, 853 F.3d at 763.  Fifth Circuit precedent thus clearly forecloses relief on Petitioner's allegation.

d.      <u>The 12–10 Rule</u> (Claim 11)

In his next allegation, Petitioner contends that Texas's "12-10 Rule" violates the Eighth and Fourteenth Amendments by misleading jurors about their ability to give effect to mitigating

circumstances.  The "12-10 Rule" requires the jury to be instructed that: (1) the jury shall return an answer of "yes" or "no"; and (2) the jury may not answer the issue "no" unless it unanimously agrees and may not answer the issue "yes" unless ten or more jurors agree.  *See* Tex. Code. Crim. Proc. art. 37.071 § 2(f).  Citing *Mills v. Maryland*,[22] Petitioner contends that this rule confuses jurors as to the effect of a single negative vote on the special issues and creates a danger that confused jurors may think their individual beliefs are immaterial unless they can persuade nine other jurors to think similarly.

This issue has been foreclosed for some time by the Supreme Court's decision in *Jones v. United States*, 527 U.S. 373, 381-82 (1999).  In *Jones*, the Court explicitly rejected the idea that the trial court, by neglecting to inform a jury regarding the consequences of its failure to reach a verdict, "affirmatively mislead[s] [the jury] regarding its role in the sentencing process."  *Id*.  The Court reasoned that an instruction informing the jury that a life sentence would be imposed if it could not reach a unanimous verdict had no bearing on the jury's role in the sentencing process.  *Id*.  Rather, such an instruction "speaks to what happens in the event that the jury is unable to fulfill its role—when deliberations break down and the jury is unable to produce a unanimous sentence recommendation."  *Id*.

Likewise, the Fifth Circuit has also rejected this claim.  "*Mills* is not applicable to the capital sentencing scheme in Texas.  We have concluded that '[u]nder the Texas system, all jurors can take into account any mitigating circumstance.  One juror cannot preclude the entire jury from considering a mitigating circumstance.'"  *Miller v. Johnson*, 200 F.3d 274, 288–89 (5th Cir. 2000) (quoting *Jacobs v. Scott*, 31 F.3d 1319, 1329 (5th Cir. 1994)).  On that basis, the Fifth Circuit has regularly denied claims based on the 12–10 rule.  *See, e.g., Young v. Davis*, 835 F.3d 520, 528 (5th

---

[22]        486 U.S. 367 (1988).

Cir. 2016) ; *Allen*, 805 F.3d at 632; *Reed v. Stephens*, 739 F.3d 753, 779 (5th Cir. 2014); *Blue*, 665 F.3d at 669-70; *Druery*, 647 F.3d at 542-43.  Petitioner's claim is therefore foreclosed by clearly established federal law.

      3.    <u>The special issues in general</u> (Claim 14)

     In his final allegation concerning the Texas special issues, Petitioner challenges the trial court's denial of several motions regarding the constitutionality of Article 37.071 of the Texas Code of Criminal Procedure.  In part, these motions argued that Article 37.071 was inadequate and unconstitutional because: (1) prosecutorial discretion in seeking the death penalty is too broad to guarantee fair application in all 254 Texas counties, (2) the future-dangerousness special issue is submitted to the jury but not set forth in the indictment, and (3) it permits the use of unreliable evidence in obtaining a sentence of death.  Each of these allegations were raised and rejected during Petitioner's direct appeal proceedings.  *Gobert*, 2011 WL 5881601, at \*8.  As shown below, the state court's rejection was neither contrary to, nor an unreasonable application of, clearly established federal law.

      a.    <u>Prosecutorial Discretion</u>

     Petitioner first contends the unfettered discretion given to Texas prosecutors to decide whether to seek a death sentence is unconstitutional.  Citing the vote-counting standards articulated in *Bush v. Gore*,[23] Petitioner argues the decision to seek the death penalty is arbitrary and capricious because there is no uniformity in the decision-making process throughout the 254 Texas counties.  However, the Fifth Circuit has rejected similar challenges to prosecutorial discretion, specifically noting "*Bush v. Gore*'s utter lack of implication in the criminal procedure context." *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006) (citations omitted); *see also White v.*

---

[23]    531 U.S. 98 (2000).

*Thaler*, 522 F. App'x 226, 235 (5th Cir. 2013) (unpublished) (Equal protection claim based on *Bush v. Gore* "is not well taken."); *Chi v. Quarterman*, 223 F. App'x 435, 439 (5th Cir. 2007) (unpublished) (rejecting disparate-treatment claim based on *Bush v. Gore* as foreclosed by *Coleman*).

        b.    <u>Defect in the Indictment</u>

Next, Petitioner contends that the aggravating factors that were later submitted to the jury in the punishment phase of his trial should have been included in the indictment and presented to the grand jury. Although Petitioner's briefing on this issue is sparse, he appears to rely on the Fifth Amendment's right to a grand jury indictment in support of this argument. *See United States v. Robinson*, 367 F.3d 278, 284 (5th Cir. 2004) (finding the government is required to charge, by indictment, the statutory aggravating factors it intends to prove to render a defendant eligible for the death penalty).

Petitioner's allegation is meritless because the right to a grand jury indictment only extends in a *federal* death-penalty prosecution and was never imposed on the States through the Fourteenth Amendment. *Albright v. Oliver*, 510 U.S. 266, 272 (1994) (noting that the Fifth Amendment right to indictment was not among the Bill of Rights provisions incorporated into the Fourteenth Amendment); *Robinson*, 367 F.3d at 288 (addressing only the requirement of a grand jury indictment in a *federal* prosecution); *see also Kerr v. Thaler*, 384 F. App'x 400, 402-03 (5th Cir. 2010) (unpublished) (same). Because Petitioner was prosecuted in state court, the Fifth Amendment's indictment requirement is irrelevant in this case.

Moreover, Petitioner's allegation is based on a pure fallacy—that the future-dangerousness special issue is an aggravating factor that somehow increases the maximum penalty for capital murder and must therefore be presented in the indictment. In Texas, the aggravating factors that

could render a person death-eligible are found solely in Section 19.03 of the Texas Penal Code, and the eligibility determination is made at the guilt/innocence phase of trial according to the elements that are alleged in the indictment. *See Lowenfield v. Phelps*, 484 U.S. 231, 245-46 (1988) (noting that, in Texas, capital-murder aggravating factors are determined at the guilt/innocence phase of trial). The special issues addressed at the punishment phase have nothing to do with the eligibility determination, but instead are designed to narrow the jury's discretion in making the ultimate decision whether to impose a death sentence. *See Jurek v. Texas*, 428 U.S. 262, 279 (1976) (reviewing and upholding the Texas death-penalty statutory scheme). As such, the special issues are not elements of the offense that must be alleged in an indictment and proven beyond a reasonable doubt.

c.    <u>Unreliable Evidence</u>

Petitioner's last argument contends that Article 37.071 is unconstitutional because it permits the use of unreliable evidence to obtain a sentence of death. Because prosecutors offer testimony by such witnesses as A. P. Merillat and Dr. Richard Coons, Petitioner argues "Article 37.071 invites nothing but unfairness in determining who gets the death penalty, how that issue is determined, and the type of evidence typically [relied] on to make that determination." But as the state court found on direct appeal, "the fact that some prosecutors, in some cases, have offered some evidence that might be improper does not render the statute unconstitutional in all of its applications." *Gobert*, 2011 WL 5881601, at *8. This determination is entitled to deference, and Petitioner fails to cite a single case in support of his assertion. Moreover, as discussed in more detail in Section IV(E), *infra*, Petitioner has not shown constitutional error in the admission of either Merillat's or Dr. Coons's testimony. Federal relief is thus unwarranted.

4.    The *Teague* Bar

Finally, relief on each of the foregoing claims is barred by the anti-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989). Under *Teague*, federal courts are generally barred from applying "new" constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen*, 510 U.S. 383, 389-90 (1994). A new rule for *Teague* purposes is one which was not "dictated by precedent existing at the time the defendant's conviction became final." *Felder v. Johnson*, 180 F.3d 206, 210 (5th Cir. 1999) (citing *Lambrix v. Singletary*, 520 U.S. 518, 527-28 (1997)). The only two exceptions to the *Teague* non-retroactivity doctrine are reserved for (1) rules that would place certain primary conduct beyond the government's power to proscribe, and (2) bedrock rules of criminal procedure that are necessary to ensure a fundamentally fair trial. *O'Dell v. Netherland*, 521 U.S. 151, 157 (1997).

In this case, Petitioner's conviction and sentence became final for *Teague* purposes on October 1, 2012, when the Supreme Court denied his petition for certiorari after his conviction was affirmed on direct review in state court. *Gobert v. Texas*, 568 U.S. 827 (2012). Petitioner has pointed to no precedent since that time mandating the new rules he now proposes. Nor do any of these new rules fall within either of the two noted exceptions to the *Teague* doctrine. Consequently, *Teague* bars relief on Petitioner's allegations and precludes this Court from recognizing the new legal theories underlying his claims. *See Blue*, 665 F.3d at 670 (holding that any extension of *Mills v. Maryland* to Texas's penalty-phase instructions would violate *Teague*); *Rowell*, 398 F.3d at 379 (finding a violation of *Teague* would occur if the court were to accept petitioner's argument that the future-dangerousness special issue is unconstitutionally vague for failing to define the term "probability"); *see also White v. Thaler*, 522 F. App'x 226, 234 (5th Cir. 2013) (finding a petitioner's "mixed-signals" claim and *Apprendi* claim to be barred by *Teague*").

E.      **Trial Court Error** (Claims 12, 13)

Petitioner's next two allegations contend the trial court committed error at the punishment phase of trial by allowing the future-dangerousness testimony of A. P. Merillat and Dr. Richard Coons. Both claims were raised and rejected during Petitioner's direct appeal proceedings. *Gobert*, 2011 WL 5881601, at *5-8. As discussed below, Petitioner fails to demonstrate the state court's rejection of the claims was contrary to, or an unreasonable application of, Supreme Court precedent.

1.      A. P. Merillat

During the punishment phase, the State called A. P. Merillat, an investigator with TDCJ's Special Prosecution Unit, who testified generally about the prison classification system and the undeniable fact that inmates have many opportunities to commit violent acts while in prison. Petitioner contends the admission of Merillat's testimony was erroneous because it was neither scientific nor sufficiently reliable under Rule 702 of the Texas Rules of Evidence. In other words, Petitioner challenges the trial court's ruling on state law, namely, the rules embodied in the Texas Rules of Evidence.[24] Such claims are not cognizable in a federal habeas corpus proceeding, as this Court must defer to the state-court determination of Texas law. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (stating that the Court has repeatedly held that "federal habeas corpus relief does not lie for errors of state law.") (citations omitted); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (finding it is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

---

[24]      Petitioner's citation to *Daubert v. Merrell Dow Pharm.*, Inc. 509 U.S. 579 (1993), does not alter the fact that Petitioner is challenging a ruling on state law. *Daubert* does not establish a constitutional standard which is binding on the states, but rather is "an exegesis of Rule 702 of the Federal Rules of Civil Procedure and governs the admission of expert evidence in federal trials only." *Kinder v. Bowersox*, 272 F.3d 532, 545 n. 9 (8th Cir. 2001); *see also Norris v. Schotten*, 146 F.3d 314, 335 (6th Cir. 1998). As such, *Daubert* is inapplicable to these proceedings.

Petitioner also contends Merillat's testimony was inadmissible under the Eighth Amendment's "heightened reliability" requirement for capital murder prosecutions. According to Petitioner, the gist of Merillat's testimony was that TDCJ is a "death trap" and "totally ineffectual" at safeguarding the lives of those who live and work there. Because this has nothing to do with the "individualized sentence" he is entitled to under the Eighth Amendment, Petitioner argues, Merillat's testimony was unconstitutional. However, the Eighth Amendment's heightened reliability requirement does not concern the admissibility or reliability of evidence, but rather whether the sentencing scheme as a whole "guards against arbitrariness by streamlining discretion at the eligibility stage, and then allows for the exercise of wide-ranging discretion at the selection stage." *Coble v. Davis*, 728 F. App'x 297, 301-02 (5th Cir. 2018) (unpublished) (citing *United States v. Fields*, 483 F.3d 313, 336 (5th Cir. 2007)). For this reason, the Supreme Court has held that "it is not the role of the Eighth Amendment to establish a special 'federal code of evidence' governing 'the admissibility of evidence at capital sentencing proceedings.'" *Kansas v. Carr*, 136 S. Ct. 633, 644 (2016) (citation omitted). Instead, "it is the Due Process Clause that wards off the introduction of 'unduly prejudicial' evidence that would 'rende[r] the trial fundamentally unfair.'" *Id*. (citations omitted).

Petitioner does not argue that the admission of Merillat's testimony violated the Due Process Clause.[25] Nor has Petitioner cited to a single case in which a court found the admission of unreliable evidence to violate the Eighth Amendment. Accordingly, Petitioner's Eighth Amendment claim is not cognizable and does not establish a constitutional violation.

---

[25]     Even if he had, such a claim was not raised in the state courts and would therefore be procedurally barred from relief in this Court.

2.    Dr. Richard Coons

Petitioner also challenges the admission of Dr. Richard Coons's testimony at the punishment phase.  Over the objection of defense counsel, Dr. Coons testified that, in his opinion, a hypothetical person with Petitioner's history, conduct, and character would likely pose a danger of violence in the future.  On appeal, the TCCA determined the trial court abused its discretion in admitting Dr. Coons' opinion on future dangerousness, but concluded the error was harmless. Petitioner now contends this determination violated *Daubert* and his Eighth Amendment right to an individualized assessment of future dangerousness.

As stated in the previous section, the Eighth Amendment does not concern the admissibility or reliability of evidence.  *Kansas v. Carr*, 136 S. Ct. at 644; *Coble v. Davis*, 728 F. App'x at 301-02.  Even if it did, the Supreme Court has determined that psychiatric testimony predicting a capital defendant's future dangerousness is not *per se* improper.  *Barefoot v. Estelle*, 463 U.S. 880, 898-99 (1983).  Although Petitioner contends Dr. Coons's testimony failed to meet the *Daubert* reliability standard set forth by the Supreme Court ten years after its *Barefoot* opinion, Petitioner's reliance on *Daubert* is unpersuasive.  The Fifth Circuit has repeatedly held that *Daubert* does not control the admission of expert mental health testimony regarding future dangerousness offered at the punishment phase of a capital murder trial.  *See*, *e.g*., *Williams v. Stephens*, 761 F.3d 561, 571 (5th Cir. 2014) ("*Daubert* does not apply to the standards governing the admissibility of expert evidence at a capital sentencing hearing"); *Roberts v. Thaler*, 681 F.3d 597, 608-09 (5th Cir. 2012) ("*Barefoot* stands for the proposition that expert testimony predicting a defendant's future dangerousness is not *per se* inadmissible."); *Fields*, 483 F.3d at 341-43 (holding *Daubert* inapplicable to the admission of such testimony); *see also Gonzales v. Stephens*, 606 F. App'x 767, 774 (5th Cir. 2015) (unpublished) (stating the Fifth Circuit has "consistently held that *Daubert* did

not overrule *Barefoot* for the proposition that expert testimony regarding future dangerousness is permissible . . ."); *Holiday v. Stephens*, 587 F. App'x 767, 783 (5th Cir. 2014) (unpublished) (same).

Because expert evidence predicting a capital defendant's future dangerousness is permissible under *Barefoot*, Petitioner has not shown constitutional error in the admission of Dr. Coons's testimony.  Thus, Petitioner has not shown that the state court's decision regarding this claim was contrary to, or an unreasonable application of, federal law.

    3.    <u>Harmless Error</u>

Even assuming the trial court erred in admitting the testimonies of Merillat and Dr. Coons, Petitioner would still not be entitled to relief because the error was harmless.  The Supreme Court has held that the test for harmless error on federal habeas review is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *see also Davis v. Ayala*, 135 S. Ct. 2187, 2197–2198 (2015) (outlining distinction between "actual prejudice" under *Brecht* and the requirements of the AEDPA).  To determine whether the state court's admission of the testimony was harmless, the Court will evaluate the following factors:  (1) the importance of the testimony to the State's case; (2) whether the testimony was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the testimony on material points; (4) the extent of cross-examination; and (5) the overall strength of the State's case. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

Petitioner fails to demonstrate that the testimony of either Merillat or Dr. Coons had a "substantial and injurious effect" on the jury's determination of his future dangerousness.  First, these witnesses were only a small part of the State's case and were only briefly mentioned during

counsels' closing arguments.  Further, the effect of their testimony was lessened by vigorous cross-examination by defense counsel.  *See* 34 RR 181-210 (Merillat stating on cross-examination that his generalized knowledge is not subject to peer review or statistical analysis and admitting some inmates do make positive changes in prison); 36 RR 275-86 (Dr. Coons admitting that no research or case studies support the reliability of his methodology and that no professional organization has approved such future-dangerousness predictions).  Merillat's testimony was also effectively rebutted by the contradicting testimony given by the defense's expert, Larry Fitzgerald.  35 RR 147-205.

Thus, the impact of Merillat's and Dr. Coons's testimony was limited and had little likely impact on the State's burden of showing Petitioner was a danger to society.  That burden was instead met by: (1) the abundant evidence presented at the guilt/innocence phase concerning Mel Cotton's brutal murder, including the fact that she was stabbed a staggering 107 times, as well as the fact Petitioner attempted to murder her five-year-old son, Demitrius, (2) the abundant evidence presented at the punishment phase concerning Petitioner's lifelong tendency toward violence, including Petitioner's prior convictions, domestic assaults, violent behavior while incarcerated, and murderous plot to escape from jail during his trial, and (3) Petitioner's own admission to numerous assaults, including Mel Cotton's murder, and to violent behavior toward anyone—including his own mother—who angered him.  *See* Background, Section I(B)(1) and (2), *supra*.

As a result, any error in admitting the testimony of Merillat or Dr. Coons was rendered harmless by the overall strength of the State's case and the overwhelming evidence of Petitioner's potential for future danger.   Because it is clear that the admission of their testimony simply had no prejudicial effect on the jury's ultimate verdict, relief is denied.  *Brecht*, at 637.

**F.**     <u>**Search and Seizure**</u> **(Claim 16)**

In his final claim for relief, Petitioner alleges a violation of his Fourth Amendment rights because the search warrants used to search his home and obtain DNA samples lacked sufficient probable cause.  On direct appeal, Petitioner unsuccessfully challenged the trial court's denial of his motion to suppress evidence taken from his home, car, and person as authorized by four separate search warrants.  He now argues that the state court's decision upholding the searches was an unreasonable.

Relief on Petitioner's Fourth Amendment allegation is barred pursuant to the Supreme Court's decision in *Stone v. Powell*, 428 U.S. 465, 494 (1976).  Under *Stone*, if the State has provided "an opportunity for full and fair litigation of a Fourth Amendment claim," federal habeas corpus relief may not be granted to a state prisoner on that claim.  *Id*.  Indeed, if the State provides the necessary processes to raise a Fourth Amendment claim, *Stone* bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes.  *Register v. Thaler*, 681 F.3d 623, 628 (5th Cir. 2012); *Shislnday v. Quarterman*, 511 F.3d 514, 524 (5th Cir. 2007).  The *Stone* bar "applies to all claims arising under the Fourth Amendment," including challenges to an arrest or the seizure of evidence.  *Hughes v. Dretke*, 412 F.3d 582, 596 (5th Cir. 2005).

The State of Texas does have a process that allows defendants to litigate Fourth Amendment claims at the trial level and on direct appeal.  *Register*, 681 F.3d at 628.  In this case, Petitioner did both, raising his Fourth Amendment claims at the trial level through a motion to suppress and again on direct appeal.  He makes no argument that his opportunity in the state courts to challenge the admissibility of evidence under the Fourth Amendment was circumscribed in any way, nor has he alleged "the processes provided by the state to fully and fairly litigate Fourth

Amendment claims are routinely or systematically applied in such a way as to prevent the actual litigation of Fourth Amendment claims on their merits." *Williams v. Brown*, 609 F.2d 216, 220 (5th Cir. 1980). Consequently, his allegation is barred from federal habeas review.

## V. <u>Certificate of Appealability</u>

The Court must now determine whether to issue a certificate of appealability (COA). *See* Rule 11(a) of the Rules Governing § 2254 Proceedings; *Miller–El v. Cockrell,* 537 U.S. 322, 335-36 (2003) (citing 28 U.S.C. § 2253(c)(1)). A district court may deny a COA *sua sponte* without requiring further briefing or argument. *Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir. 2000). But a COA may issue only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requires Petitioner to show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537 U.S. at 327).

The Supreme Court has explained that the showing required under § 2253(c)(2) is straightforward when a district court has rejected a petitioner's constitutional claims on the merits: The petitioner must demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). The issue becomes somewhat more complicated when the district court denies relief on procedural grounds. *Id*. In that case, the petitioner seeking COA must show both "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Gonzalez v. Thaler*, 565 U.S. 134, 140-41 (2012) (citing *Slack,* 529 U.S. at 484). Whatever the basis for the denial, however, the court must bear in mind that "[w]here the petitioner faces the

death penalty, 'any doubts as to whether a COA should issue must be resolved' in the petitioner's favor.'" *Allen v. Stephens*, 805 F.3d 617, 625 (5th Cir. 2015) (quoting *Medellin v. Dretke*, 371 F.3d 270, 275 (5th Cir. 2004)), *abrogated on other grounds by Ayestas v. Davis*, 138 S. Ct. 1080 (2018).

In this case, Petitioner has not made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor could reasonable jurists debate the denial of federal habeas corpus relief on either substantive or procedural grounds, or find that the issues presented are adequate to deserve encouragement to proceed further. *Miller-El*, 537 U.S. at 327 (citing *Slack*, 529 U.S. at 484). Accordingly, Petitioner is not entitled to a COA.

## VI. Conclusion and Order

The Court has thoroughly reviewed the extensive record and pleadings submitted by both parties in this case. After careful consideration, the Court concludes Petitioner has failed to establish that the state court's rejection of the aforementioned claims on the merits during his direct appeal or state habeas proceedings was either (1) contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) based on an unreasonable determination of the facts in light of the evidence presented during Petitioner's state trial, appellate, and habeas corpus proceedings.

With regard to Petitioner's unexhausted claims, the Court concludes the claims are procedurally barred from federal habeas relief and that Petitioner fails to establish cause to excuse the procedural bar pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). Alternatively, even when evaluated under a *de novo* standard of review, the claims do not warrant federal habeas relief because they lack merit.

Accordingly, based on the foregoing reasons, **IT IS HEREBY ORDERED** that:

1.   Federal habeas corpus relief is **DENIED** and Petitioner Milton Dwayne Gobert's Amended Petition for Writ of Habeas Corpus (ECF No. 22) is **DISMISSED WITH PREJUDICE**;

2.   No Certificate of Appealability shall issue in this case; and

3.   All other remaining motions, if any, are **DENIED**, and this case is now **CLOSED**.

It is so **ORDERED**.

**SIGNED this the 30th day of March, 2022.**

**ROBERT PITMAN**
**UNITED STATES DISTRICT JUDGE**